Page 1

1          UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                    *   *   *

5    MARK PANNEK, et al.,

6          Plaintiffs,

7       vs.                  CASE NO. 1:19-CV-00852

8    U.S. BANK NATIONAL ASSOCIATION,

9          Defendant.

10                    *   *   *

11          Deposition of DAVID LITTLE,

12   Witness herein, called by the Plaintiffs for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me remotely, Stacey M.

15   Mortsolf, RPR, CRR, a Notary Public in and for the

16   State of Ohio, in Irving, Texas, on Thursday,

17   September 16, 2021, at 10:01 a.m.

18                    *   *   *

19

20

21

22

23

24

25

Page 2

1                        I N D E X

2

   WITNESS:  DAVID LITTLE

3  EXAMINATION                                PAGE

      BY MR. SMITH:........................      4

4     BY MS. GOETZ-ANDERSON:...............     83

5                  INDEX OF EXHIBITS

   EXHIBIT     DESCRIPTION                    PAGE

6     Exhibit 1    Policies & Resources,
                  Workplace Respect........     35

7     Exhibit 2    email chain..............     61

      Exhibit 3    An Important Message

8                  from David Little:
                  Organizational Changes...     70

9     Exhibit 4    Talking Points for
                  leader in CBSS

10                 Servicing...............     72

      Exhibit 5    CBSS Servicing

11                 Organization Chart.......     73

      Exhibit 6    email...................     76

12    Exhibit 7    organizational chart.....     79

      Exhibit 8    email chain..............     80

13    Exhibit 9    John Gemrich Follow-Up
                  Discussion...............     81

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   REMOTE APPEARANCES:
 2      On behalf of the Plaintiffs:
 3          Stagnaro, Saba & Patterson Co., L.P.A.
 4      By:  Joshua M. Smith
             Matthew D. Soaper
 5           Attorneys at Law
             2623 Erie Avenue
 6           Cincinnati, Ohio  45208
             Jms@sspfirm.com
 7           mds@sspfirm.com
             (513) 533-2701
 8
        On behalf of the Defendant:
 9
             Jackson Lewis, P.C.
10
        By:  Jamie M. Goetz-Anderson
11           Attorney at Law
             70 Birch Alley
12           201 East Fifth Street
             26th Floor
13           Cincinnati, Ohio  45202
             Jamie.goetz-anderson@jacksonlewis.com
14           (513) 898-0050
15      ALSO PRESENT:
16           Tom Strotman
             Mark Pannek
17
18                    *   *   *
19
20
21
22
23
24
25
```

```
                                         Page 4
 1              MR. SMITH:  Stipulate to doing it
 2    remotely and providing the oath via remote, I'm
 3    fine with that.  No objection to it.
 4              MS. GOETZ-ANDERSON:  No objection
 5    from our end either.
 6                       *  *  *
 7              DAVID LITTLE
 8    of lawful age, Witness herein, having been first
 9    duly cautioned and sworn, as hereinafter
10    certified, was examined and said as follows:
11              CROSS-EXAMINATION
12    BY MR. SMITH:
13         Q.   Mr. Little, my name is Josh Smith.
14    I represent the plaintiffs in this matter, Mark
15    Pannek and Tom Strotman, in the matter of Mark
16    Pannek and Tom Strotman v. U.S. Bank National
17    Association.  Do you understand that you are
18    attending today to provide testimony under oath
19    in this matter?
20         A.   Yes.
21         Q.   Okay.  Have you ever had your
22    deposition taken before?
23         A.   Yes.
24         Q.   When was the last time you had
25    your deposition taken?
```

```
                                              Page 5
 1              A.    In the neighborhood of 15 years
 2      ago.
 3              Q.    Was that in a -- can you tell me
 4      where that was taken?
 5              A.    San Francisco.
 6              Q.    Okay.  And why were you providing
 7      testimony?
 8              A.    It was a shareholder lawsuit.
 9              Q.    Who were the parties in that case?
10              A.    I don't recall.  I was employed by
11      Household International at the time.
12              Q.    What was your position there at
13      that time?
14              A.    I was a senior vice president in
15      operations.
16              Q.    Do you recall what that case was
17      about?
18              A.    It had to do with financial
19      representation in some of the company's default
20      practices.
21              Q.    Were you a party in that case?
22              A.    No, I wasn't.
23              Q.    Other than that occasion 15 years
24      ago, any other occasions where you've had your
25      deposition taken?
```

Page 6

1          A.    No, not that I'm aware of.

2          Q.    I'm just going to go over some

3    ground rules with you regarding today.  The

4    first thing is the court reporter, especially

5    when we're doing this remotely, can only

6    capture one of us speaking at a time.  So if

7    you could just let me, as I ask you questions,

8    if you could just wait until I finish the

9    question before you provide the answer, and

10   I'll give you the same courtesy as far as your

11   answers.  I'll wait until you finish, and I'll

12   ask you the next question.  Does that make

13   sense?

14         A.    Yes.

15         Q.    Okay.  Next, we need to make sure

16   that your answers are verbalized.  So if it

17   calls for a yes or no, it would be a yes or a

18   no rather than a nodding of the head or an

19   huh-uh or uh-huh, does that make sense?

20         A.    Yes.

21         Q.    If you need a break today, just

22   ask for one.  If I've asked you a question, I

23   just need you to answer that, and we can go

24   ahead and take a break.  But if you need a

25   break, just speak up.  Does that make sense?

Page 7

1          A.    Okay.  Yes.

2          Q.    Okay.  First, where are you

3    located today as you're sitting for this

4    deposition?

5          A.    Irving, Texas.

6          Q.    Okay.  It looks like you're in an

7    office.  Are you at work today?

8          A.    Yes.

9          Q.    Okay.  Is anyone else in the room

10   with you?

11         A.    No.

12         Q.    Okay.  What have you done to

13   prepare for your deposition today?

14         A.    I had a conversation with Jamie.

15         Q.    And I'm not interested in what you

16   and Jamie discussed, but when did you have that

17   conversation with Jamie?

18         A.    Sometime last week.

19         Q.    Okay.  Was that over the phone?

20         A.    Yes.

21         Q.    Okay.  And how long was that phone

22   conversation?

23         A.    I don't recall specifically.  It

24   was less than an hour.

25         Q.    Okay.  Other than that phone

Page 8

1  conversation, have you had any other meetings

2  or phone conversations with counsel in

3  preparation for your deposition?

4          A.   No.

5          Q.   Okay.  Other than counsel, is

6  there anyone else you've spoken with regarding

7  your deposition today?

8          A.   No.

9          Q.   What else have you done to prepare

10  for your deposition today besides speaking with

11  anyone?

12          A.   Nothing.

13          Q.   You didn't review any documents?

14          A.   Jamie put forth a couple

15  documents, but that was it.

16          Q.   Okay.  What documents were those

17  that you reviewed?

18          A.   I actually don't recall.

19          Q.   You don't recall anything about

20  them?  Were they emails or --

21          A.   I think one was a -- some type of

22  Skype message.

23          Q.   Do you recall the date on that?

24          A.   I do not.

25          Q.   Besides the Skype message, what

```
                                           Page 9
 1   else did you review?
 2             A.    I don't recall.
 3             Q.    But you do recall there were other
 4   documents you looked at?  You just can't recall
 5   what they were?
 6             A.    In hindsight, I'm sure there was
 7   one.  I'm not sure if there was more than one,
 8   to be honest.
 9             Q.    Anything else you did to prepare
10   for your deposition today?
11             A.    No.
12             Q.    Okay.  You used to work at U.S.
13   Bank?
14             A.    Yes.
15             Q.    What's your current position?
16             A.    Executive vice president, consumer
17   and business banking operations.
18             Q.    Is that typically referred to as
19   CBSS, an acronym?
20             A.    I think at one time we were
21   referenced as that.  It's now referenced as
22   CBBO.
23             Q.    Got it.  And how long have you
24   held that position?
25             A.    I came to the bank, started with
```

Page 10

1    the bank in May of '14.

2          Q.   So have you held this executive

3    vice president position of consumer -- I think

4    it was consumer and business banking

5    operations, is that right?  Have you held it

6    since you started in 2014?

7          A.   My responsibility in 2014

8    encompassed just mortgage servicing.  And over

9    the years, I've added more responsibility;

10   hence, the title change to the unit.

11         Q.   Okay.  And in your current role, I

12   want to get an understanding of how many

13   employees report to you both directly and

14   indirectly.  So let's start with direct.  How

15   many direct reports do you have in your current

16   role?

17         A.   I believe I have nine including my

18   admin.

19         Q.   Okay.  And how about anyone who

20   reports up, how many employees are under you?

21         A.   North of 4,000.

22         Q.   Okay.  In your current role, what

23   divisions of the bank report to you?

24         A.   Well, I'm responsible for mortgage

25   servicing.  I'm responsible for consumer loan

1   servicing.  I'm responsible for a group that is

2   called branch operations that supports our

3   retail branches.  I have responsibility for a

4   business banking credit group that underwrites

5   business banking credit loans.  And I have a

6   wholesale credit underwriting group as well.

7   And I have a piece of business banking

8   servicing.

9           Q.    And then who do you report to?

10          A.    Tim Welsh, who is vice chair --

11  one of the vice chairs of the bank.

12          Q.    Do you have hiring and firing

13  authority in your position?

14          A.    Yes, subject to HR approval.

15          Q.    What do you mean by that?

16          A.    Meaning that all of our offers,

17  all of our terminations, would be reviewed by

18  HR before execution.

19          Q.    You make a recommendation and HR

20  has to approve it?  Is that what I'm hearing?

21                MS. GOETZ-ANDERSON:  I'm sorry,

22  David.  I'm going to object that that

23  mischaracterizes his testimony, but, David, you

24  can answer if you're able to.

25                THE WITNESS:  Okay.  Can you repeat

Page 12

1    the question?

2                MR. SMITH:  Yeah.  Stacey, can you

3    read that back?

4                (Record read.)

5                THE WITNESS:  Yes.  We would want

6    their agreement on whatever action we took, yes.

7    I wouldn't say they approve it, but we would want

8    their agreement.

9    BY MR. SMITH:

10           Q.   Do you have to have their

11   agreement before you can execute a termination?

12           A.   In my mind, yes.

13           Q.   Okay.  HR is typically involved in

14   any termination decision?

15           A.   Yes.

16           Q.   Is that the same with hiring?

17           A.   Yes.

18           Q.   Let's go back to when you first

19   started at the bank in May of 2014.  You were

20   hired on as an executive vice president,

21   correct?

22           A.   Yes.

23           Q.   Okay.  At that time did you also

24   report to Tim Welsh?

25           A.   No.

1          Q.    Who did you report to at that

2     time?

3          A.    Kent Stone.

4          Q.    Who is Kent Stone?

5          A.    Was a vice chair with the bank.

6     Retired.

7          Q.    Okay.  Same reporting structure?

8     It's just that Kent Stone, was he replaced by

9     Tim Welsh?

10          A.    Yes.

11          Q.    And then in 2014 when you started,

12     what divisions of the bank reported to you?

13          A.    Mortgage servicing.

14          Q.    Any others?

15          A.    No.

16          Q.    At what point did you gain the

17     additional divisions of the bank reporting to

18     you, the ones we just discussed?  I think there

19     were six.

20          A.    I think consumer servicing late

21     '17/early '18; branch operations, '18; business

22     banking was in that '17/'18 time frame;

23     wholesale credit was in the October '20 time

24     frame.

25          Q.    Why did these divisions start

Page 14

1    reporting to you in those various time frames?

2            A.    Those were decisions made by Kent

3    and Tim.

4            Q.    Why were those decisions made?

5            MS. GOETZ-ANDERSON:  Objection.

6    Calls for speculation.

7    BY MR. SMITH:

8            Q.    You can answer.

9            THE WITNESS:  Okay.  Do I have to

10   answer that?

11           MS. GOETZ-ANDERSON:  Yes.  If you

12   can, you can answer it.

13           THE WITNESS:  Okay.  Well, you know,

14   based on the performance of our group as well as

15   some changes made within the vice chair structure

16   is why we ended up with that additional

17   responsibility.

18   BY MR. SMITH:

19           Q.    All right.  Let's start with the

20   performance of the group.  What was -- what was

21   the performance of the group?  I mean, explain

22   that to me.  How did that prompt this change?

23           A.    Well, again, I'm speculating.

24   High performing team who successfully exited a

25   difficult consent order as well as exceeded

Page 15

1   investor expectations.

2           Q.   Any other performance-related

3   bases for this change?

4           A.   No.

5           Q.   And, to be clear, the performance

6   items you had mentioned, is that applying to

7   all of these additional divisions that ended up

8   reporting to you?

9           A.   Yes.

10          Q.   Okay.

11          A.   Again, it's speculation, but, you

12  know, my own personal performance as well as

13  the team led to additional responsibility.

14          Q.   Well, where are you getting that

15  speculation from?

16          A.   Getting in the head of my vice

17  chair.

18          Q.   Okay.  Did he tell you anything

19  like that?

20          A.   I don't recall.

21          Q.   Okay.  Did anyone else tell you

22  that it was because of performance of the group

23  and changes within the vice chair?

24          A.   Well, I will say regarding the

25  consumer move, the individual who was reporting

1   to Kent left the company, so Kent took that

2   opportunity to do a restructure.

3           Q.   Kent conveyed that to you, that he

4   was going to do this restructuring?

5           A.   Yes.

6           Q.   What specifically did he convey to

7   you?

8           A.   I don't recall.

9           Q.   Did he give you direction as to

10  how this was going to be done?

11          A.   You know, speculation, again, yes,

12  but I don't recall specifics.

13          Q.   Well, I don't know if it's

14  speculation.  I mean, you're saying he did

15  convey to you that that was how it was going to

16  be done; you just don't recall what he said?

17          A.   Yes.  That's right.

18          Q.   Okay.  When did he convey that to

19  you?

20          A.   Don't know the exact dates.

21  Around that time frame when that happened.

22          Q.   That time frame, that being late

23  2017/early 2018?

24          A.   Yes.

25          Q.   Okay.  Who was in charge of

1  this -- I'm going to call it a reorganization.

2  You might also call it a merger between these

3  divisions.  But who was in charge of it?

4          A.   Well, when the responsibility

5  transferred to my group, ultimately myself.

6          Q.   What about the process where

7  they're being transferred and obviously you

8  have employees from one division merging into

9  another?  Who was in charge of ensuring that

10 goes smoothly and that everything gets

11 completed?

12         A.   Well, ultimate accountability -- I

13 mean, I'm the leader of the group, but there's

14 multiple teams of people involved in any

15 integration.

16         Q.   And all those groups are reporting

17 to you, right?

18         A.   No.  HR would not report to me.

19         Q.   Okay.  Other than HR, anyone else

20 who would not report to you?

21         A.   You know, from a technology -- I

22 mean, we have business partners in technology,

23 compliance, risk.  We have a lot of business

24 partners that we would count on to assist.

25         Q.   Are you saying business partners,

1  tech, compliance, risk, did not report to you

2  under these divisions?

3          A.   No.

4          Q.   No, you're not saying that?

5          A.   No.  I'm saying they did not

6  report to me.

7          Q.   Okay.  Well, then maybe it's

8  easier -- which ones did report to you?

9          A.   The operational groups.

10          Q.   What -- tell me who falls under

11  the operational groups.

12          A.   I don't recall specifically who

13  were the operational groups in 2017.

14          Q.   Okay.  But those all did report to

15  you, and those groups were being merged

16  together, right?

17          A.   Yes.

18          Q.   Between lending services and

19  mortgage?

20          A.   Yes.

21          Q.   And were you ultimately the person

22  in charge of those groups and those being

23  merged together and how that process was going

24  to go?

25          A.   Yes, again, subject to, where

Page 19

1    needed, HR approval.

2         Q.   Are there any other reasons why

3    this merger was occurring in late 2017 or early

4    2018 between mortgage and consumer lending that

5    we haven't discussed?

6         A.   Not that I'm aware of.

7         Q.   Okay.  U.S. Bank wasn't having any

8    financial issues or these divisions weren't

9    aware as to the bases why this was occurring?

10        A.   The bank was not having financial

11   issues, no.

12        Q.   Was it your understanding that

13   employees were going to be terminated as a

14   result of this reorganization?

15        A.   No expectations.

16        Q.   Did employees end up being

17   terminated as a result of this reorganization?

18        A.   I believe there was some employee

19   actions taken, yes.

20        Q.   How many employees were let go?

21        A.   No recollection.

22        Q.   None at all?

23        A.   No.

24        Q.   Okay.  This is your division,

25   right?  I mean, these are employees who report

Page 20

1    up to you eventually, right?

2           A.   Yes.

3           Q.   Okay.  Who made the decision to

4    let these employees go?

5           A.   It would have been my direct

6    reports along with human resources.

7           Q.   Did your direct reports inform you

8    that they were letting employees go?

9           A.   Not to the specific employee

10   level, no.

11          Q.   Okay.  What did they inform you

12   about regarding employee termination?

13          A.   Typically I would be advised of

14   counts, but I wouldn't be advised and get into

15   employee decisions.

16          Q.   What do you mean by count?

17          A.   Whether, you know, there was

18   duplication and, you know, we were letting go X

19   number of people because we had duplication or

20   whatever, but not to the employee level.

21          Q.   Okay.  At some point were you

22   informed how many employees were being let go?

23          A.   Yes.

24          Q.   Did you direct your reports to

25   determine whether certain employees would be

Page 21

1   let go or positions would be eliminated?

2           A.    No.

3           Q.    So they did that on their own

4   without any direction?

5           A.    Yes.

6           Q.    Okay.  How many of your direct

7   reports made that determination that certain

8   employees would be let go?

9           A.    Well, I don't know how many

10  direct -- I'd have to go back and see how many

11  direct reports I had at the time, but anyone

12  running an operational or support group, you

13  know, would have made that determination.

14          Q.    Any of your direct reports

15  indicate that no employees were going to be let

16  go?

17          A.    I don't recall that.

18          Q.    You don't recall one way or the

19  other?

20          A.    No.

21          Q.    We'll come back to the specific

22  merger we're talking about in a bit, but I want

23  to ask you more generally at U.S. Bank is

24  there -- are there processes in place through

25  HR or otherwise when there's a reorganization

                                            Page 22

1    of this type that are to be followed?

2            A.    Yes, sir.

3            Q.    Well, let me ask you this way.

4    With respect to employees being let go, are

5    there certain written policies or procedures

6    that are supposed to be followed?

7            A.    I don't know and I don't have -- I

8    don't have reference to any exact policies or

9    procedures other than HR approval is required.

10           Q.    Okay.  Do you have any awareness

11   as to how HR approves such a decision?

12           A.    Not specifically, no.

13           Q.    Okay.  Are you familiar with the

14   term peer group analysis?

15           A.    Yes.

16           Q.    Okay.  Can you explain to me just

17   briefly what that is?

18           A.    Understanding that would be a

19   review of like-type positions where various

20   factors are used to do an analysis, be it

21   performance, be it experience, being job type,

22   et cetera.

23           Q.    What's the purpose of performing a

24   peer group analysis?

25           A.    I believe it involves the

Page 23

1   appropriateness and, you know, selection of

2   individuals who may be actioned and may not be.

3           Q.   When you say actioned, do you mean

4   terminated?

5           A.   Yes.

6           Q.   Is that process required whenever

7   two or more employees in the same group are

8   being terminated or considered for termination?

9           A.   I don't know if there's a

10  number -- exact number associated with it or

11  not.

12          Q.   Okay.  Who conducts the peer group

13  analysis?

14          A.   I believe our HR group along with

15  the business team.

16          Q.   What business team?  What

17  encompasses the business team?

18          A.   The operations team.

19          Q.   Is there more than -- I'm just

20  kind of trying to understand who does it.  So

21  when you say the operations team, is that more

22  than one person besides HR?

23          A.   I don't know.

24          Q.   Have you ever done a peer group

25  analysis yourself?

1          A.    I have not.

2          Q.    Have you ever been involved in one?

3          A.    No.

4          Q.    Your direct reports have conducted

5   them, is that right?

6          A.    I don't know.

7          Q.    Do you know if peer group analyses

8   have ever been performed at U.S. Bank?

9          A.    Yes.  I've heard them referenced,

10  yes.

11         Q.    Okay.  But you don't know if any

12  of your direct reports have ever done one?

13  You've never done one?  Did you know of any

14  examples where it's been done?

15         A.    Not specifically, no.

16         Q.    Are you trained on peer group

17  analyses at U.S. Bank?

18         A.    Myself personally, I have not been.

19         Q.    Okay.  Are others trained on the

20  peer group analysis?

21         A.    I don't know.

22         Q.    Does a peer group analysis have to

23  be performed whenever an employee is being

24  terminated?

25         A.    For any -- for any reason?

1          Q.    Right.  For any reason.

2          A.    Not that I'm aware of.

3          Q.    Okay.  What are the circumstances

4    where a peer group analysis would not be

5    performed?

6          A.    Employee is terminated for not

7    showing up at work.  That would be an example.

8          Q.    So performance related or

9    misconduct?  Is that what you're saying?

10         A.    Yes.

11         Q.    With a peer group analysis, again,

12   this is looking at two or more employees,

13   right?

14               MS. GOETZ-ANDERSON:  Objection.

15   Asked and answered.

16   BY MR. SMITH:

17         Q.    You're looking at two or more

18   employees in a peer group analysis in

19   determining which one is going to be kept and

20   which one is going to be let go?

21               MS. GOETZ-ANDERSON:  Same objection.

22   David, you can answer if you're able to.

23               THE WITNESS:  All right.  Repeat the

24   question.

25               MR. SMITH:  Can you read that back,

Page 26

1    Stacey?

2              (Record read.)

3              THE WITNESS:  Again, I don't know

4    enough about the process to answer that question.

5    BY MR. SMITH:

6         Q.   Okay.  How did you become aware of

7    the process that you've been describing?

8         A.   I've heard it referenced by our HR

9    leaders.

10        Q.   When?

11        A.   Throughout the course of my time

12   at the bank.

13        Q.   In what context would they

14   reference it?

15        A.   I don't recall specifics.

16        Q.   Did they reference it during these

17   reorganizations that you've been referring to?

18        A.   I don't recall specifically.

19        Q.   Okay.  Going back to the

20   reorganization and merger between mortgage and

21   consumer lending, do you know if peer group

22   analyses were performed in that?

23        A.   I don't know specifically.

24        Q.   Do you know even generally whether

25   they were performed?

Page 27

1          A.    I believe so, but I don't have
2    direct knowledge.
3          Q.    What gives you that belief?
4          A.    Again, general discussion with HR
5    leaders.
6          Q.    What do you mean by that?
7          A.    Again, HR leaders referencing that
8    term in process.
9          Q.    Right.  They're talking about this
10   specific reorganization.  Your belief was based
11   on these general discussions.  I mean, is there
12   a discussion you're referring to or is this
13   just you've had these discussions with the bank
14   throughout your employment so you think it
15   would have occurred here?
16         A.    The latter.
17         Q.    Okay.  No one told you that any
18   sort of peer group analysis was going to be
19   performed?
20         A.    Yeah.  I recall no specifics.
21         Q.    At the time of this reorganization
22   and merger, Bryan Bolton was reporting to you?
23         A.    I believe so.
24         Q.    Okay.  Was he reporting to you
25   prior to this merger?

Page 28

1          A.    I believe so.

2          Q.    Okay.  And what was his role prior

3    to the merger?

4          A.    He ran my internal risk and

5    control area.

6          Q.    You were his direct supervisor at

7    this time and after the merger?

8          A.    Yes.

9          Q.    Okay.  You performed his -- did

10   his performance reviews?

11         A.    Yes.

12         Q.    You had had frequent conversations

13   with him, right?

14         A.    Yes.

15         Q.    Okay.  Mr. Bolton, he was a part

16   of this merger as far as employees that were

17   going to be put from two divisions into one?

18   He was doing that?

19         A.    Yes.

20         Q.    Okay.  He was part of that

21   operational group that you were referring to

22   earlier, right?

23         A.    Yes.

24         Q.    Okay.  Do you recall Mr. Bolton

25   providing you any feedback during this whole

Page 29

1   reorganization process?

2           A.   No, not specifically.

3           Q.   Do you recall him even generally

4   telling you how it was going?

5           A.   Not specifically, no.  I don't

6   recall.

7           Q.   Well, I'm not asking specifically.

8   Did he ever give you any feedback at all, even

9   if you don't recall what it was?

10          A.   I'm sure he did, but I don't recall.

11          Q.   Did he at some point inform you

12  that employees were going to be let go from his

13  team?

14          A.   I'm not sure if Bryan did directly

15  or our HR leader did, but at some point I would

16  have been made aware of the number, yes.

17          Q.   Okay.  You don't recall what the

18  number was, right?

19          A.   No.  No.

20          Q.   So more than a handful?

21          A.   I don't recall.  I believe so, but

22  I don't recall exactly.

23          Q.   Okay.  Did he tell you the

24  reason -- or Tim or HR, did they tell you the

25  reason why these employees, even if you didn't

1  know the names, why these ones were being let

2  go?

3          A.    Typically either duplication of

4  function or ability to outsource the work

5  versus internal.  Two common reasons that crop

6  up in these things.

7          Q.    Okay.  You referenced those as

8  typically what happens.  Is that what he told

9  you?

10         A.    I don't recall in this case.

11         Q.    If employees under your division

12  are going to be let go, do you need to know

13  why?

14         A.    No.

15         Q.    Why not?

16         A.    Because I have direct reports who

17  have -- I have trust in their judgment along

18  with our HR group.

19         Q.    Have you ever had occasion to

20  audit one of these decisions where one of your

21  direct reports or the HR group has made a

22  decision that has been questioned?

23         A.    Not that I'm aware of, no.

24         Q.    Okay.  Changing gears a bit, I

25  want to talk about antidiscrimination and

Page 31

1    harassment policies at U.S. Bank.  I believe

2    U.S. Bank has a policy in place regarding

3    discrimination, is that right?

4           A.    Yes.

5           Q.    Are you familiar with that policy?

6           A.    Not specifically.  I couldn't

7    recite it.

8           Q.    Have you been trained on the

9    policy?

10          A.    Yes.

11          Q.    When did you receive training on

12   the policy?

13          A.    I believe we do an annual -- that

14   might be an annual certification.

15          Q.    Who all has to get that annual

16   certification?

17          A.    I believe anybody in a manager

18   role.

19          Q.    That would include all of your

20   direct reports?

21          A.    Yes.

22          Q.    What topics does that training

23   cover?  I mean, I've referenced discrimination,

24   but did you cover other areas within that such

25   as harassment or retaliation?

Page 32

```
 1            A.    I don't recall specifically.
 2            Q.    Okay.  Do you recall if it covers
 3      complaint procedures?
 4            A.    It's a pretty broad category.  Can
 5      you be more specific?
 6            Q.    Yeah.  Complaints regarding
 7      discrimination, harassment, retaliation?
 8            A.    I believe so.
 9            Q.    Okay.  And how do complaints of
10      that nature work at U.S. Bank?  So if an
11      employee makes a complaint, I'm trying to
12      understand where they make it and then how is
13      it handled.
14            A.    I believe our HR team would get
15      involved, and we have an employee relations
16      team along with HR that would investigate that
17      complaint.
18            Q.    The HR team, is there a specific
19      team assigned to each department?
20            A.    Yeah.  I have a leader who is
21      associated with my team, and they have
22      individuals under them who support my direct
23      reports.
24            Q.    During this merger we were talking
25      about in late 2017/early 2018, who was your
```

Page 33

1    leader for HR?

2          A.    Either would have been Bill Watson

3    or Andrea Bond.  I'm not sure when that

4    transition took place.

5          Q.    With Mr. Bolton as your direct

6    report, do you know who his HR team was?

7          A.    I do not.

8          Q.    Do you have any reason to dispute

9    it might be Diane Watson?

10         A.    No.

11         Q.    Do you know who Diane Watson is?

12         A.    Yes.

13         Q.    And who is she?

14         A.    She would have been an HR lead who

15   would have worked under Bill and/or Andrea.

16         Q.    Was there a point in time where

17   she was your HR business partner?

18         A.    My direct business partner or --

19   not that I recall.

20         Q.    Okay.  Did she work with you in

21   mortgage servicing prior to this merger?

22         A.    I don't recall that either.

23         Q.    Are you familiar with something

24   called a centralized investigation team or CIT

25   at U.S. Bank?

Page 34

1           A.    I think you're referencing what I

2     referenced as a, you know, employee relations

3     team, yes.

4           Q.    Okay.  Explain to me what that is,

5     the CIT team or the employee relations team.  I

6     mean, what do they do?

7           A.    I think they investigate the

8     employee's complaint.

9           Q.    Okay.  So they do that and the HR

10    team does that as well?

11          A.    I think the HR team at some point

12    hands that off to the employer relations team,

13    provides input information, but, you know, the

14    CIT or employee relations team actually

15    completes the investigation or complaint.

16          Q.    Has that been the case throughout

17    your employment at U.S. Bank?

18          A.    Yes.

19          Q.    And CIT or the employee relations

20    team, just to be clear, they handle all of the

21    complaints related to discrimination,

22    harassment, retaliation, anything falling under

23    that antidiscrimination policy?

24          A.    I don't know that specifically.

25          Q.    Okay.  Have you ever been involved

Page 35

1    in investigations of the nature we're talking

2    about since -- throughout the time you've been

3    employed at U.S. Bank?

4            A.   Not that I'm aware of.

5            Q.   All right.  Mr. Little, I'm going

6    to put an exhibit in front of you.  This is

7    being shared through Exhibit Share software.

8    So do you have that software available and are

9    you able to open the exhibit?

10           A.   I'm in the Veritext Exhibit Share

11   area.

12           Q.   It may take a minute to upload, so

13   just --

14           MS. GOETZ-ANDERSON:  David, you might

15   have to -- if you like refresh or double click on

16   the marked exhibits folder, and then it will show

17   up.  It should show up there.

18           (Thereupon, Plaintiffs' Exhibit 1,

19   Policies & Resources, Workplace Respect, was

20   marked for purposes of identification.)

21           THE WITNESS:  So something labeled

22   workplace respect showed up.

23   BY MR. SMITH:

24           Q.   Yes.  Have you ever seen this

25   policy before?

Page 36

1          A.   Let me access it.  I believe I
2    would have seen it, yes.
3          Q.   Okay.  We had discussed some
4    training.  Is this one of the policies that
5    you're trained on?
6          A.   Okay.
7          Q.   There's a section with the heading
8    of we prohibit sexual harassment.  Do you see
9    that?
10         A.   Yes.
11         Q.   Okay.  Going to the very bottom
12   line of that first page, can you go ahead and
13   just read that for me all the way through to
14   the colon at the end?
15         A.   You're referring to the line that
16   begins sexual harassment?
17         Q.   Yeah.  They all do.  Sexual
18   harassment may be verbal or nonverbal.
19         A.   Okay.  Sexual harassment may be
20   verbal or nonverbal.  Remember, it isn't about
21   intent; it's about the effect harassment has on
22   others.  We will not tolerate the following
23   behaviors, which have the potential of being
24   considered sexual harassment.
25         Q.   Okay.  And then if we move to the

Page 37

1   second page, it looks like there's examples of

2   verbal and nonverbal examples of potentially

3   being sexual harassment.  Do you see that?

4           A.   Yes.

5           Q.   Indicated in there is making

6   sexual or derogatory comments, correct?

7           A.   Yes.

8           Q.   Okay.  Also making harassing phone

9   calls, correct?

10          A.   Yes.

11          Q.   Okay.  And in the line below that,

12  if you could read that for me for the record.

13  It starts with further, we won't tolerate.

14          A.   Further, we won't tolerate any

15  other unprofessional or disrespectful behavior.

16  The following examples may or may not

17  constitute sexual harassment, but they're

18  unprofessional and don't belong in the

19  workplace.

20          Q.   Okay.  Go ahead and read those

21  examples for me.

22          A.   Using language that's degrading or

23  abusive.  Telling jokes of a sexual nature or

24  making sexually explicit comments.  Referring

25  to someone as babe, a hunk, honey, or similar

Page 38

1    terms.  Talking about one's sex life or sex

2    life of coworkers, customers, or others.

3    Turning innocuous statements into sexual

4    innuendoes.

5         Q.   Okay.  And you'd agree that all of

6    those examples are examples that could be

7    considered sexual harassment and aren't

8    tolerated at U.S. Bank?

9         A.   Yes.  Could be.  Yes.

10        Q.   And then, finally, directing you

11   to the last page, there's a heading of

12   nonretaliation.  If you could read that policy

13   for me?

14        A.   We do not tolerate retaliation

15   against anyone in connection with a good faith

16   report of harassment or other inappropriately

17   conduct.  Not only is retaliation a violation

18   of this policy and the code of ethics and

19   business conduct, it is also illegal.  We

20   investigate all retaliation allegations.

21   Anyone who engages in retaliatory behavior will

22   face disciplinary action, up to and including

23   termination.  If you believe that you or

24   someone else is experiencing retaliation,

25   report it to the resources below.

Page 39

1          Q.   Okay.  And you'd agree that U.S.
2    Bank prohibits retaliation against employees?
3          A.   Yes.  Yes.
4          Q.   And all allegations of retaliation
5    are supposed to be investigated pursuant to
6    this policy?
7          A.   Yes.
8          Q.   Changing gears a bit again, have
9    you heard of -- are you familiar with the
10   Legends of Possible Award at U.S. Bank?
11         A.   Yes.
12         Q.   And what is that award?  Can you
13   just describe it for me?
14         A.    It is an annual award that came
15   into play a few years ago to recognize people
16   within the bank.  It actually was an award that
17   anyone in the organization could recommend
18   somebody else for.
19         Q.   Okay.  What are the criteria for
20   receiving it?
21         A.   You know, don't have specifics,
22   but high performance or some type of
23   achievement that was, you know, perhaps above
24   and beyond.  Something that resonated with
25   someone enough to nominate someone.

Page 40

1          Q.   You'd agree this would be given to

2    the best -- to some of the best employees at

3    U.S. Bank, right?

4          A.   Typically, yes.

5          Q.   Are there occasions where it

6    wouldn't be given to the best employees of the

7    bank?

8          A.   Assumption on my part, but it is a

9    subjective process.

10          Q.   What do you mean by that?

11          A.   Meaning there aren't specific

12    performance criteria associated with it.

13          Q.   Since there aren't specific

14    criteria associated with it, you might not

15    necessarily get the best person in all

16    occasions?

17          A.   Correct.

18          Q.   Regardless, though, it is

19    typically given to a top performer at the bank

20    or someone who's had an achievement that's gone

21    above and beyond?  I mean, that's -- you're

22    saying that's how it's typically awarded?

23              MS. GOETZ-ANDERSON:  Objection.

24    Asked and answered.  Sorry.  David, you can go

25    ahead.

Page 41

1          THE WITNESS:  That's the intent.

2    Yes.

3    BY MR. SMITH:

4          Q.    Okay.  Is that -- I mean, is that

5    how it's executed in your -- is it your

6    understanding it's executed that way?

7               MS. GOETZ-ANDERSON:  Objection.

8    Asked and answered.  David, again, you can answer

9    if you can.

10              THE WITNESS:  Yes.

11   BY MR. SMITH:

12         Q.    Have you ever received the Legends

13   of Possible Award?

14         A.    No.

15         Q.    Have you ever nominated anyone?

16         A.    I may have, but I don't recall

17   specifically.

18         Q.    Have any of your direct reports

19   ever received the Legend of Possible Award?

20         A.    Not that I'm aware of.  Typically,

21   I'm a host at the event, and typically I might

22   select, you know, one or two of my direct

23   reports to attend as well.  I don't know if

24   they're specifically excluded, but I don't

25   believe anyone has, other than going as a host,

Page 42

1    received the award.

2            Q.    Okay.   What do you do as the host

3    at the event?

4            A.    Meet and greet.   Meet the

5    employees.   Participate in the events.

6            Q.    Okay.   And I don't think we talked

7    about this, but it sounds like you're saying

8    there's an event that takes place.   Is that at

9    a particular location?

10           A.    Yes.   Typically, up until COVID,

11   there would be a location where winners and

12   their guests were sent.

13           Q.    Are their expenses all paid for

14   that?

15           A.    Yes.

16           Q.    Okay.   Do they receive -- what all

17   do the award recipients get as a result?

18           A.    I think they get a memento of some

19   type, and typically there's some gifts

20   associated with that as well.

21           Q.    These occurring before COVID

22   anyway, would these occur over a number of

23   days?

24           A.    Yes.   Three to four days.

25           Q.    How many days?   Three to four

Page 43

1   days?  Okay.  When someone gets nominated for

2   this award, are they always selected or is

3   it -- do they have to be nominated and then

4   someone approves them?

5           A.   The latter.

6           Q.   Okay.  And then if that's the

7   case, who approves the nominations?

8           A.   Typically, it's going to be my

9   direct report for their group.

10          Q.   Okay.  So if it's Bryan Bolton,

11  one of his direct reports, he would approve it?

12  Is that what you're saying?

13          A.   Yes.

14          Q.   Okay.  Do you have involvement in

15  that process at all?

16          A.   No.

17          Q.   Other than hosting the event, what

18  other involvement do you have in the Legends of

19  Possible Award?

20          A.   None outside of, you know, maybe

21  some email communications of congratulatory

22  nature to the group in total.  I may also

23  allocate -- I may also allocate -- we're

24  allocated -- you know, we might get 60 awards

25  that are allocated to my entire group, so I may

Page 44

1    allocate those 60 out to my directs.

2         Q.    So you get a certain number of

3    awards that your team can basically give to

4    employees?

5         A.    Yes.

6         Q.    Is there a percentage associated

7    with that?  So, for instance, if you have 500

8    people under you, is it one percent of that or

9    five percent, ten percent?

10        A.    Yeah, I mean, you can do the math.

11   We typically get around 70 for 4,000 plus.

12        Q.    Okay.  Was that the case in 2017

13   and 2018?  It may have changed a bit with the

14   merger, but was it around that same ratio?

15        A.    I believe so.

16        Q.    How many nominations are there

17   versus those that are actually accepted?

18        A.    I think the high mark was -- you

19   know.  You know, we've had upwards of 500

20   nominations.  I would say the first year we did

21   it, it was far less, maybe less than 200.

22        Q.    And let's start with the 500.

23   That's 500 nominations under your group, and if

24   we're using the same example, that

25   approximately 70 of those nominations would be

Page 45

1    selected?

2            A.    Yes.

3            Q.    Okay.  When was the first year it

4    started?  I apologize if you said it.  I didn't

5    hear it.

6            A.    Yeah, I don't recall if it was '17

7    or '18.  I believe there were two trips pre

8    COVID, so that kind of lines with '17 and '18.

9            Q.    Is the award still being given out

10   today?

11           A.    Yes.  It was maybe about 200 or

12   less in the first year, and then it was about

13   500.

14           Q.    Is the 500, was that in the second

15   year of your example?

16           A.    I don't recall.  I think -- I'm

17   referencing more so in past years, more recent.

18           Q.    Okay.  So it started around 200

19   nominations, eventually went up to around 500

20   now, not sure how many it was between then?

21           A.    Yes.

22           Q.    Okay.  Sounds like a fairly

23   prestigious award, is that fair to say?

24           A.    Yes.  Yes.

25                 MR. SMITH:  All right.  We've been

Page 46

1    going a little over an hour.  I want to take just

2    a ten-minute break if that works.

3                    MS. GOETZ-ANDERSON:  Sure.

4                    THE WITNESS:  Yes.

5                    (Pause in proceedings.)

6    BY MR. SMITH:

7            Q.    Okay.  We're back on.  Mr. Little,

8    you're still under oath.  Going back to the

9    reorganization efforts, and I want to talk

10   about it kind of in general, when employees are

11   displaced as a result of one of these

12   reorganizations or mergers, does U.S. Bank make

13   any efforts to place them in another position?

14           A.    I think they're made aware of

15   other open positions.

16           Q.    How are they made aware of that?

17           A.    I don't know specifically.

18           Q.    Is there someone who would make

19   them aware?

20           A.    I don't know specifically.

21           Q.    Do you know generally?

22           A.    I don't know if HR gives them that

23   direction.  They all have access to open

24   positions throughout the company.

25           Q.    Okay.  Does U.S. Bank have a

Page 47

1   policy of making attempts to place displaced

2   employees in other open positions?

3           A.   I don't know of a specific policy.

4           Q.   Those employees remain eligible

5   for other positions at the bank, right?

6           A.   To my knowledge, yes.

7           Q.   They're eligible for -- even after

8   they're terminated, they would be eligible for

9   rehire?

10          A.   I believe so, yes.

11          Q.   Does U.S. Bank ever place an

12  employee in a lower level position versus

13  terminating them in this circumstance?

14          A.   I don't know specifics, if that's

15  happened or not.

16          Q.   There's nothing that prevents

17  that, right?

18          A.   Not that I'm aware of.

19          Q.   Prior to the mortgage servicing

20  and consumer lending reorganization, was there

21  a merger in the consumer lending division

22  between consumer lending and I believe it was

23  commercial and student loans?  Do you recall

24  anything like that?

25          A.   No.

Page 48

1      Q.   Okay.  If there was something of
2   that nature, you wouldn't have had any
3   involvement in it?
4      A.   No.
5      Q.   Prior to the merger, who was in
6   charge of consumer lending?
7      A.   Consumer lending servicing was run
8   by a person named Sandra Broderick.
9      Q.   What was her position?
10      A.   She was an EVP.
11      Q.   What happened to her after this
12   merger?
13      A.   Which merger are you referring to?
14      Q.   Sorry.  The merger between
15   consumer and mortgage.
16      A.   She voluntarily left the bank
17   beforehand.
18      Q.   So her position was never replaced --
19      A.   Correct.
20      Q.   -- right?
21      A.   Correct.
22      Q.   Did her resignation factor into --
23   do you know if her resignation factored into
24   the decision to merge these two divisions?
25      A.   Yes.

Page 49

1      Q.   Yes, it did?

2      A.   Yes.

3      Q.   Prior to this lawsuit, were you

4   familiar with Mark Pannek and Tom Strotman?

5      A.   Not that I can recall.

6      Q.   Okay.  You had -- you don't recall

7   ever meeting either of them?

8      A.   No.

9      Q.   Were you aware that Tom Strotman

10   received the Legends of Possible Award?

11      A.   No.

12      Q.   Okay.  Do you typically meet all

13   the employees who are receiving the awards on

14   the trips that you go on with them?

15      A.   I've only been able to host one

16   trip.

17      Q.   Okay.  And which one did you host?

18      A.   One that was held in Tucson,

19   Arizona.

20      Q.   What year was that?

21      A.   I want to say '18, but I'm not

22   sure.  It could have been '17.

23      Q.   And back to my question, did you

24   meet all the recipients in 2018?

25      A.   Probably not.

Page 50

1          Q.    How many would you have met?

2          A.    Don't know.  It's a large group

3    attending.

4          Q.    Would you have been made aware of

5    who was receiving the award that was under your

6    division?

7          A.    Yes.

8          Q.    Okay.  In 2018 Tom Strotman was

9    under your division, is that right?

10         A.    I don't recall.

11         Q.    You don't recall whether Mark

12   Pannek was either?

13         A.    No.

14         Q.    Prior to this litigation, have you

15   ever heard Mark Pannek or Tom Strotman's name

16   before?

17         A.    Not that I'm aware of.

18         Q.    Had you ever heard of any

19   complaints that either of them had made during

20   their employment?

21         A.    Not that I recall.

22         Q.    On Bryan Bolton's team, were you

23   ever informed prior to this litigation of a

24   complaint made against John Gemrich?

25         A.    Yes.

```
                                            Page 51
 1            Q.    And what complaint were you made
 2   aware of?
 3            A.    I believe it was a complaint that
 4   involved John making sexual comments.
 5            Q.    What sexual comments?
 6            A.    I don't recall specifics.
 7            Q.    Do you recall generally what they
 8   were?
 9            A.    No.
10            Q.    Who told you -- who -- strike
11   that.  Who informed you of this complaint?
12            A.    I'm not sure if it was Bryan or my
13   HR leader at the time.
14            Q.    And who was your HR leader at the
15   time?
16            A.    I believe Andrea.
17            Q.    And when did either Bryan or
18   Andrea inform you of this complaint?
19            A.    When?
20            Q.    Yeah.
21            A.    Yeah, I don't recall specifically.
22            Q.    Do you recall the month or the
23   year?
24            A.    I don't.
25            Q.    Is John Gemrich still employed at
```

1   the bank?

2           A.   No.

3           Q.   When did his employment end?

4           A.   I don't recall specifically.  It's

5   been a while.

6           Q.   Was it in the last year?

7           A.   I think it was prior.

8           Q.   Prior to 2020?

9           A.   Yeah, it was prior to COVID, so

10  yes.

11          Q.   Okay.  What -- understanding you

12  don't know if it was Bryan or your HR leader,

13  but what did they -- what else did they inform

14  you about the complaint against John Gemrich?

15          A.   Outside of a complaint and of a

16  sexual nature, I don't recall any other

17  specifics.

18          Q.   Okay.  Did you provide any feedback?

19          A.   Not that I'm aware of.

20          Q.   Okay.  Were you concerned about it?

21          A.   Yes.

22          Q.   And why were you concerned about it?

23          A.   I'm concerned about any complaint

24  regarding a leader in my organization.

25          Q.   Were you concerned that the

Page 53

1    complaint was about Mr. Gemrich making

2    complaints of a sexual nature -- I'm sorry --

3    comments of a sexual nature?

4          A.    Just concerned about a complaint

5    in general.

6          Q.    Okay.   That -- does the fact that

7    they were of a sexual nature, that didn't

8    factor into you being concerned at all?

9          A.    No.   As I said, any complaint is

10   concerning.

11         Q.    Okay.   How was that complaint

12   handled?

13         A.    I don't recall specifically.   I

14   think we talked about that process earlier.

15         Q.    Was it handled in that same process?

16         A.    I don't recall.

17         Q.    Okay.   Other than the -- when you

18   were informed of this complaint by either Bryan

19   Bolton or the HR leader, were you informed of

20   anything else regarding the allegations against

21   Mr. Gemrich?

22         A.    Not that I recall.

23         Q.    Were you told they were

24   substantiated?

25         A.    Not that I recall.

Page 54

1          Q.    I understand you don't recall what
2     the specific explicit comments were, but at
3     some point did someone inform you what those
4     comments were?
5          A.    I believe Bryan made reference to
6     them in a conversation, you know, regarding his
7     sexual behavior.  You know, I do recall a
8     conversation -- a general conversation.
9          Q.    And that was Bryan that told you
10    that?
11         A.    Yes.
12         Q.    Okay.  And do you recall when that
13    conversation occurred?
14         A.    I do not.
15         Q.    Do you recall ever being told when
16    the complaint was made?
17         A.    No.
18         Q.    What was your expectation
19    regarding the complaint and how it should be
20    responded to?
21         A.    That our HR and employer relations
22    team would investigate accordingly and react
23    accordingly.
24         Q.    Okay.  Did you expect that if it
25    was substantiated, action should be taken

Page 55

1    against Mr. Gemrich?

2         A.   As I said, I would expect that

3    those two groups would advise of the

4    appropriate action to take.

5         Q.   Which two groups?

6         A.   Our HR team as well as the

7    employee relations team, if it was investigated

8    by them.

9         Q.   I think you had testified earlier

10   generally the employee relations team would

11   investigate these complaints, right?

12        A.   Yes.

13        Q.   You would expect that they would

14   have been investigating this case, right?

15        A.   Yes.

16        Q.   I know you indicated you don't

17   recall who complained or being told who

18   complained, but do you recall if it was one

19   person, two people, three, how many it was?

20        A.   I don't recall.

21        Q.   Okay.  Do you recall whether it

22   was just one or more than one, even if you

23   don't know the specific number?

24             MS. GOETZ-ANDERSON:  Objection.

25             THE WITNESS:  No.

Page 56

1          MS. GOETZ-ANDERSON:  Asked and
2  answered.
3          THE WITNESS:  No.
4  BY MR. SMITH:
5          Q.   Okay.  Was it your expectation
6  that you'd be told what the outcome of the
7  investigation would be?
8          A.   No.  I don't recall that.
9          Q.   Did you care what the outcome
10 would be?
11         A.   Yes.  I cared that the appropriate
12 action and investigation took place.
13         Q.   Okay.  Did you ever verify whether
14 the appropriate action had taken place?
15         A.   Not that I recall.
16         Q.   Prior to this complaint, did you
17 know who John Gemrich was?
18         A.   Yes.
19         Q.   Okay.  And explain to me who John
20 Gemrich is, what his position was at the bank.
21         A.   John had a role in project
22 management, and at some point he -- I don't
23 recall if he was part of the merger or whether
24 he was hired by one of my directs before this
25 integration, but at some point he joined my

Page 57

1   team.
2           Q.   What was his role on your team?
3           A.   I believe he had responsibility
4   for our QC function.
5           Q.   Would you say quality control?
6           A.   Yes.
7           Q.   Do you know if John Gemrich had
8   any experience with quality control prior to
9   taking that role on in your team?
10          A.   I don't recall.
11          Q.   Where did John Gemrich fit in your
12  organization?  Was he a direct report to you or
13  who did he report to?
14          A.   I believe he reported to Bryan --
15          Q.   Okay.
16          A.   -- at some point.
17          Q.   Was it ever reported to you that
18  there was ongoing fear of retaliation by John
19  Gemrich by his subordinates?
20          A.   Not that I recall.
21          Q.   We looked at that workplace
22  respect policy, and assuming there were
23  allegations that Mr. Gemrich was retaliating or
24  there was fear of retaliation, those should be
25  investigated, correct?

Page 58

1          A.   Yes.  If somebody brought those
2     forth, yes.
3          Q.   Okay.  At the time of this
4     complaint against Mr. Gemrich, do you know who
5     Bryan Bolton's human resources business partner
6     was?
7          A.   No.
8          Q.   Other than the complaint we've
9     been discussing, are you aware of any other
10    complaints against Mr. Gemrich?
11         A.   Not specifically, no.
12         Q.   I know you're saying specifically.
13    Is there something you generally recall?
14         A.   Just vaguely that there may have
15    been something else, but I don't recall
16    specifics.
17         Q.   Okay.  What are -- I understand
18    you don't know the specifics, but what are you
19    even generally referring to there, or are you
20    talking about something else?
21         A.   I just vaguely remember there may
22    have been more than one complaint and no
23    recollection of what it might be.
24         Q.   Okay.  How did you become aware
25    that there may have been more than one

Case: 1:19-cv-00852-MWM-KLL Doc #: 48 Filed: 11/03/21 Page: 59 of 108 PAGEID #: 2210

Page 59

1  complaint?

2          A.   Well, again, since I can't recall

3  anything specific, I don't know.

4          Q.   Okay.  But you do recall there may

5  have been more than one complaint; you just

6  don't know anything about who told you that,

7  what it was, when you were told that, anything?

8          A.   Yes.  That's right.

9          Q.   Other than this vague recollection

10 there may have been something else, any other

11 complaints against Mr. Gemrich that you recall?

12         A.   No, not that I recall.

13         Q.   How about investigations?  Do you

14 recall any other investigations into Mr. Gemrich?

15         A.   No.

16         Q.   You do recall Mr. Gemrich was --

17 that he's no longer employed with the bank,

18 right?

19         A.   Yes.

20         Q.   Okay.  Was he -- did he resign

21 from the bank or was he let go?

22         A.   I don't recall.

23         Q.   You were informed of this one

24 complaint that we had discussed where

25 Mr. Gemrich had shared explicit details of his

www.veritext.com                                    888-391-3376

Page 60

1   sex life.  Had there been other complaints, is

2   it your expectation you would have been made

3   aware of those as well?

4           A.   I'm not aware of any others.

5           Q.   I understand you're not aware of

6   any others, but if there were any, is it your

7   expectation that you would be made aware of

8   those?

9           A.   Yes.

10          Q.   Does Bryan Bolton need your

11  approval to make a termination decision?

12          A.   No.

13          Q.   Okay.  He needs HR's approval,

14  though, similar to, I think you testified, you

15  needed HR's approval to make a decision?

16          MS. GOETZ-ANDERSON:  I'm going to

17  object that mischaracterizes his testimony.  I

18  think he said agreement, not approval.

19          MR. SMITH:  Okay.  Agreement is fine.

20  BY MR. SMITH:

21          Q.   He would need HR's agreement in

22  order to execute a termination?

23          A.   Yes.

24          Q.   Other than HR, is there anyone

25  else he needs agreement or approval from to

Page 61

1    execute a termination?

2            A.   No.

3            Q.   I'm going to introduce an exhibit

4    for you, Mr. Little, Exhibit 2.

5                 (Thereupon, Plaintiffs' Exhibit 2,

6    email chain, was marked for purposes of

7    identification.)

8    BY MR. SMITH:

9            Q.   I just uploaded it, so let me know

10   when you have it on your screen.

11           A.   I have it.

12           Q.   Okay.  You had mentioned at the

13   beginning of today that you had gone over -- I

14   think you said it was a Skype conversation.  Is

15   this the conversation that you reviewed?

16           A.   Yes, I believe it is.

17           Q.   Okay.  And this would appear to be

18   a conversation between you and Mr. Bolton, is

19   that right?

20           A.   Yes.

21           Q.   Okay.  First, does this refresh

22   your recollection at all as to whether

23   Mr. Gemrich had resigned or been let go?

24           A.   No.

25           Q.   Okay.  Why don't you just read --

Page 62

1  if you can just read Mr. Bolton's statements

2  from top to bottom here.

3        A.    Mr. Bolton:  Working with HR,

4  Gemrich is pinging people for data for his

5  resume and asked HR for his case file.  They

6  advised no, starting to make noise about legal

7  action.  Mr. Bolton:  Here was my response.

8  Mr. Bolton:  Yep, he can push, he can go to an

9  attorney, but two investigations and one

10 written warning in a year and throw in a

11 unicorn and it's not a good story for him.

12 Mr. Bolton:  Besides OCC, you seemed pleased

13 with Mod recommendation.

14        Q.    I don't see any statements from

15 you in here.  Did you respond to any of these

16 messages?

17        A.    Not to my recollection.

18        Q.    Okay.  Did you see these at some

19 point?

20        A.    Couldn't recall that.

21        Q.    Okay.  So you and Mr. Bolton

22 typically converse via these instant messages?

23        A.    It's typical.

24        Q.    Okay.  It appears he is telling

25 you about -- well, he's referring to two

Page 63

1  investigations here.  Do you have any idea what

2  he's referring to there?

3          A.    I think I answered that.

4          Q.    What's he referring to there?

5          A.    Two investigations, which I

6  referenced one I was aware of and one I had

7  vague recollection of.

8          Q.    Okay.  And then one written

9  warning.  Do you know what he's referring to

10  there?

11          A.    Well, a written warning would be a

12  written documentation of action that

13  Mr. Gemrich needs to -- corrective action

14  Mr. Gemrich needs to take regarding something

15  that warranted a written warning.

16          Q.    Okay.  Do you know what that

17  written warning was about?

18          A.    I do not.

19          Q.    Do you know if you were ever made

20  aware of the written warning prior to this

21  instant message?

22          A.    No recollection.

23          Q.    Okay.  When Mr. Bolton says here

24  was my response, is he referring to the next

25  line, do you know?

Page 64

1              A.   I don't know.

2              Q.   Okay.  And he references throw in

3    a unicorn.  What's he talking about there?

4              A.   My recollection is that term came

5    up in the nature of the sexual complaint.

6              Q.   Okay.  Does that refresh your

7    recollection as to what you were informed of

8    when you were told about that complaint?

9              A.   No.

10             Q.   Okay.  Then how do you know that's

11   what the unicorn statement's referring to?

12             A.   Well, I vaguely remember it

13   referred to.

14             Q.   When?

15             A.   At whatever time I became aware of

16   a complaint.

17             Q.   Okay.  So you did reference that

18   at the time you became aware of the complaint

19   something about a unicorn, and that's a sexual

20   reference?

21             A.   I believe.

22             Q.   Okay.  And what specific

23   reference -- when he's talking about a unicorn,

24   what does he mean?

25             A.   I don't know.

Page 65

1              Q.   Okay.  Did you know at some point
2      and you just can't recall right now?
3              A.   I don't recall that.
4              Q.   Did you ever ask anyone what he --
5      what Mr. Bolton meant by that?
6              A.   I don't recall that.
7              Q.   What's Mr. Bolton referring to
8      when he says you seemed pleased with the Mod
9      recommendation?
10             A.   I don't -- I don't know.
11     Something to do with a loan modification
12     recommendation of some type.
13             Q.   Okay.  Did this conversation
14     continue from here or is this all of it?
15             A.   No idea.
16             Q.   Okay.  Other than this
17     conversation and when you were informed of the
18     one complaint, did you have any other
19     conversations with Mr. Bolton about
20     Mr. Gemrich's conduct or any complaints against
21     him?
22             A.   Not that I can recall specifically.
23             Q.   How about generally?
24             A.   I don't recall.
25             Q.   Do you recall in late 2018/early

Page 66

1    2019 that a peer group analysis was being

2    performed under Mr. Gemrich's team?

3            A.    I don't recall that.

4            Q.    Do you recall a reduction in force

5    occurring in late 2018/early 2019 within one or

6    more of the divisions under your team?

7            A.    Yes.

8            Q.    Okay.  What do you recall about

9    that?

10           A.    We've had multiple reductions in

11   force, as mentioned previously, either through

12   duplication of function, through outsourcing of

13   work, and improvements in efficiency.

14           Q.    Okay.  And I'm asking about this

15   late 2018/early 2019 period.  What do you

16   recall about the reduction in force?

17           A.    Nothing specifically other than,

18   you know, over a period of two, three years, we

19   had a substantial reduction in workforce.

20           Q.    Two to three years.  What years

21   are you referring to?

22           A.    Primarily '17, '18, '19.

23           Q.    Okay.  So this is all just -- I

24   mean, was it a continuation of the same

25   reducing head count throughout that period?

Page 67

1          A.   Yes, for those three reasons I

2     just stated.

3          Q.   Okay.  Do you recall a reduction

4     in force occurring on the quality control side?

5          A.   Not specifically.

6          Q.   Okay.  And when you refer to a

7     reduction in force, that includes that same

8     peer group analysis that we've been talking

9     about?

10         A.   Not necessarily.  If the job was

11    being eliminated altogether, I don't believe

12    we'd get to a peer group analysis.

13         Q.   Why not?

14         A.   We could be outsourcing the work,

15    and there is no reason to do a peer group

16    analysis.

17         Q.   Okay.  Well, let's talk back to

18    the merger, the merger between consumer lending

19    and mortgage.  You have two employees

20    performing the same job.  Would you perform a

21    peer group analysis in that circumstance?

22              MS. GOETZ-ANDERSON:  Objection.

23    Asked and answered several times now.

24              MR. SMITH:  No, it hasn't been.

25              MS. GOETZ-ANDERSON:  Objection.

Page 68

1    David, you can answer if you're able to.

2              THE WITNESS:  Yes, again, is my

3    understanding.

4    BY MR. SMITH:

5         Q.   Okay.  So in the circumstance

6    where a position is eliminated -- strike that.

7    I missed this at the beginning.  Prior to U.S.

8    Bank, where did you work?

9         A.   I was employed at Household

10   International for 24 years.  I was employed at

11   Bear Stearns and Chase for four years and

12   Nationstar Mortgage for three and a half years.

13        Q.   What was your position at

14   Nationstar?

15        A.   Executive vice president.

16        Q.   Alyson Roberts, are you familiar

17   with her?

18        A.   Yes.

19        Q.   Who's she?

20        A.   A direct report of Bryan Bolton.

21        Q.   Okay.  What's her -- okay.  What's

22   her position?

23        A.   Today Alyson has responsibility

24   for QC and vendor management.

25        Q.   QC is what John Gemrich previously

Page 69

1    had, right?

2           A.    Yes.

3           Q.    Alyson worked at Nationstar with

4    you, right?

5           A.    She was employed there at the same

6    time I was there, yes.

7           Q.    Okay.  Did you know each other at

8    that time?

9           A.    No.

10          Q.    Okay.  When did she start at U.S.

11   Bank?

12          A.    I don't recall.

13          Q.    Okay.  Were you involved in her

14   hiring decision?

15          A.    I don't recall that.

16          Q.    Did she use you as a referral?

17          A.    No recollection of that.

18          Q.    Were you ever made aware she has a

19   criminal record?

20          A.    Yes, recently.

21          Q.    How were you made aware?

22          A.    Through my short call with Jamie.

23          Q.    Okay.  I don't want to know

24   anything you guys discussed, but outside of --

25   you weren't made aware other than that?

Page 70

1          A.    No.

2          Q.    I'm not going to going to

3   introduce Exhibit 3.

4              (Thereupon, Plaintiffs' Exhibit 3, An

5   Important Message from David Little:

6   Organizational Changes, was marked for purposes of

7   identification.)

8   BY MR. SMITH:

9          Q.    If you could let me know when

10  that's up.

11         A.    Okay.

12         Q.    Okay.  This is a document produced

13  by your counsel.  It's undated, but it appears

14  to be a message from you regarding

15  organizational changes.  Do you recall seeing

16  this document before?

17         A.    Only reviewed it last week, but yes.

18         Q.    Had you seen it prior to last week?

19         A.    Yeah, I would have seen it.  It

20  went out under my name.

21         Q.    Okay.  Did you draft it?

22         A.    I would not have drafted it.  I

23  would have approved it.

24         Q.    Okay.  Who would have drafted it?

25         A.    More than likely my communications

Page 71

1  team.

2         Q.    Who is your communications team?

3         A.    Works under one of my direct

4  report, John Varol.

5         Q.    John Varol is your communications

6  team or your communication team reports to him?

7         A.    Reports to him.

8         Q.    Okay.  Who on his team that

9  reports to him drafted this, do you know?

10         A.    No idea.  And, again, I don't know

11  specifically whether they did it or somebody

12  else did it.

13         Q.    Okay.  So you approved it and you

14  reviewed it in full?

15         A.    That would be my recollection, yes.

16         Q.    Okay.  Do you know when this went

17  out?

18         A.    Not specifically, no.

19         Q.    Do you know generally?

20         A.    Well, it references the

21  integration of the two areas, so at that time.

22         Q.    And what's that time?

23         A.    Again, I think we're talking about

24  the late '17/'18 period.

25         Q.    Okay.  And who would this have

```
                                    Page 72
 1  been distributed to?
 2          A.   All of the employees within
 3  mortgage servicing as well as lending services.
 4          Q.   Okay.  I'm showing you Exhibit 4
 5  now.
 6               (Thereupon, Plaintiffs' Exhibit 4,
 7  Talking Points for leader in CBSS Servicing, was
 8  marked for purposes of identification.)
 9               THE WITNESS:  Okay.
10  BY MR. SMITH:
11          Q.   Have you seen this document
12  before?
13          A.   Again, only in preparation of this.
14          Q.   You've not seen this prior to
15  preparing for your deposition?
16          A.   Not that I recall, no.
17          Q.   Okay.  Do you have any idea what
18  this is?
19          A.   It looks like a talking points for
20  the leadership group, if -- to discuss with
21  their teams.
22          Q.   Who comprises the leadership
23  group?
24          A.   Typically that would be a manager,
25  you know, a grade 14 and above.
```

Page 73

```
 1          Q.   That includes all of your direct
 2    reports?
 3          A.   Yes.
 4          Q.   Okay.  I'm introducing Exhibit 5.
 5               (Thereupon, Plaintiffs' Exhibit 5,
 6    CBSS Servicing Organization Chart, was marked for
 7    purposes of identification.)
 8    BY MR. SMITH:
 9          Q.   Let me know when that's up.
10          A.   Okay.
11          Q.   Have you seen this document before?
12          A.   Likely I would have seen it, yes.
13          Q.   When would you have seen it?
14          A.   Typically, I would have reviewed
15    this every month.
16          Q.   Okay.  Did you create this
17    document?
18          A.   No.
19          Q.   Who created it?
20          A.   No idea.
21          Q.   How do you come to see it every
22    month?
23          A.   We do a monthly leadership call
24    that this is part of that material.
25          Q.   And this is titled CBSS Servicing
```

Page 74

1    Organization Chart, and it's got you basically
2    at the top.  Do you know what time period this
3    particular organizational chart applied?
4            A.    Not specifically, no.
5            Q.    How about generally?
6            A.    You know, generally, I would
7    assume around the time of the integration.
8            Q.    Okay.  Under Mr. Bolton's team,
9    there's two open positions.  Do you see that?
10           A.    Yes.
11           Q.    Okay.  That's under risk and
12   controls and risk strategy.  Do you know when
13   those positions were filled?
14           A.    I do not.
15           Q.    Were they eventually filled?
16           A.    I do not know.
17           Q.    Do they still exist?
18           A.    Not that I'm aware of.
19           Q.    When were they eliminated?
20           A.    I don't recall.
21           Q.    Do you know if efforts were made
22   to fill those positions?
23           A.    I don't.
24           Q.    Who was involved in those monthly
25   leadership meetings?

Page 75

1          A.    Everyone grade 14 and above.  And

2    I don't recall -- and I don't recall if those

3    actually took place in the '17/'18 time period.

4          Q.    Okay.  Would you have seen this

5    outside the context of a monthly leadership

6    meeting, this particular document?

7          A.    Don't recall.

8          Q.    Okay.  I understand you don't

9    recall the specific time period when this

10   applied, but does this appear to be an accurate

11   representation at some point of what your

12   organization looked like?

13         A.    I have no reason to believe it

14   isn't.

15         Q.    Okay.  On the monthly leadership

16   meetings, you said everyone grade 14 and above.

17   Looking at this, is there anyone on this chart

18   that would not be a grade 14 or above?

19         A.    Could be.  I don't think so.

20         Q.    Okay.

21              THE WITNESS:  Can we take a short

22   break?

23              MR. SMITH:  Yeah.  Sure.

24              (Pause in proceedings.)

25   BY MR. SMITH:

Page 76

1          Q.   All right.  I have uploaded

2     Exhibit 6.

3               (Thereupon, Plaintiffs' Exhibit 6,

4     email, was marked for purposes of identification.)

5     BY MR. SMITH:

6          Q.   Mr. Little, if you can let me know

7     when you have that in front of you.

8          A.   Okay.

9          Q.   All right.  Have you seen this

10    email before?

11         A.   Not that I recall.

12         Q.   Okay.  I'm going to refer you to

13    the organizational announcement for servicing

14    control and everything below that.  I know you

15    haven't seen this email, but have you seen the

16    message in this before as it went out?

17         A.   I'm sorry.  What was the question?

18         Q.   Yeah.  Where it states

19    organizational announcement, servicing control,

20    had you ever seen that message before, even in

21    another email?

22         A.   I don't recall.

23         Q.   Okay.  Would you typically be

24    copied on any kind of announcement like this?

25         A.   Yes.

Page 77

1          Q.   Okay.  It indicates at the bottom,
2     as part of these changes, I'd like to
3     acknowledge five leaders will leave U.S. Bank,
4     and it references Rhonda Gombold, Matt Kobin,
5     Renea Paulick, Tom Strotman, and Mark Pannek.
6     Those are all employees.  Do you know if those
7     are employees that were let go from the bank?
8          A.   It infers that, yes.
9          Q.   Who is Renea Paulick?
10         A.   No idea.
11         Q.   Who is Matt Kobin?
12         A.   Matt I actually do know.  Matt
13    worked for me at Bear Stearns and Chase.
14         Q.   Were you aware he was being let go
15    from U.S. Bank?
16         A.   Yeah.  Yes.
17         Q.   Okay.  And why was he being let go?
18         A.   I'm assuming, again, in the
19    reorganization his job was either eliminated or
20    we had duplication.
21         Q.   What was his job at U.S. Bank?
22         A.   I don't recall.
23         Q.   How about Rhonda Gombold?
24         A.   I don't know.
25         Q.   You already said, I think, you

1    didn't know Tom Strotman and Mark Pannek at

2    that time, right?

3           A.    Correct.

4           Q.    Looking at those five employees,

5    does that refresh your recollection as to how

6    many employees Mr. Bolton informed you were

7    going to be let go?

8           A.    No.

9           Q.    Okay.  Do you think it would have

10   been -- do you think it was more than five?  Do

11   you have any reason to dispute that was more

12   than -- that it was five?

13          A.    No.  I mean, he's referencing five

14   leaders.  He's not referencing any potential

15   line employees that might have been actioned as

16   well.

17          Q.    Were line employees actioned as

18   well at this time in May of 2018?

19          A.    I don't recall specifically, nor

20   do I recall if it was involving Bryan's group,

21   but, again, over that three-year period I

22   referenced, there were line employees.

23          Q.    Okay.  Do you know who Greg Hovis is?

24          A.    I know of Greg, yes.

25          Q.    What's his position at U.S. Bank?

Page 79

1          A.   I'm not sure what his title is.  I

2   know he works under Bryan.

3          Q.   Do you know when he started?

4          A.   No.

5          Q.   I just introduced Exhibit 7.

6              (Thereupon, Plaintiffs' Exhibit 7,

7   organizational chart, was marked for purposes of

8   identification.)

9   BY MR. SMITH:

10         Q.   Let me know when it's up.

11         A.   Okay.

12         Q.   Have you ever seen this document

13   before?

14         A.   Not that I recall.

15         Q.   Okay.  It indicates here Hovis,

16   change management, interim.  Does that refresh

17   you at all as far as the position that Hovis --

18   Greg Hovis held?

19         A.   No.

20         Q.   Okay.  And then it has risk

21   strategy as a new role.  Is that one of the

22   same roles that we looked at as far as an open

23   position?

24         A.   I believe it was, yes.

25         Q.   Okay.  What is that role?  What do

Page 80

1    they do?

2           A.   I do not know.  I don't know.

3           Q.   Okay.  All right.  I'm introducing

4    Exhibit 8 now.

5                (Thereupon, Plaintiffs' Exhibit 8,

6    email chain, was marked for purposes of

7    identification.)

8                THE WITNESS:  Okay.

9    BY MR. SMITH:

10          Q.   Have you ever seen this document

11   before?

12          A.   No, not that I recall.

13          Q.   What about the spreadsheet that

14   starts towards the bottom of the first page,

15   ends on the second page?  Is that something

16   that was ever shared with you?

17          A.   Not that I recall, no.

18          Q.   Do you know what the term synergy

19   means?

20          A.   Not exactly in this context.  I

21   can make an assumption, but no.

22          Q.   All right.  Well, what's your

23   understanding of it in this context?

24          A.   Well, I would think it's either

25   duplication of a role or, you know, not needed.

1        Q.   Okay.  So when -- yeah, okay.

2   When we look at that spreadsheet, when it says

3   synergy, I mean, do you have any idea as far as

4   these individuals, is it referring to

5   duplication or they're not needed anymore?

6        A.   Well, I can look at some of these

7   and, you know, Matt Kobin, for example,

8   function moving to risk, his level not needed.

9   So that's the -- whatever we were doing moved

10  to a different area outside our organization.

11       Q.   Is synergy a term typically used

12  at U.S. Bank?

13       A.   No recollection if this is, you

14  know, used, how often it's used.

15            MR. SMITH:  All right.  If you just

16  give me five minutes, I think we can hopefully

17  wrap up after that.  So we'll be back at 12:45,

18  and I may have a couple more for you but we should

19  be close to be done.

20            (Pause in proceedings.)

21            (Thereupon, Defendant's Exhibit 9,

22  John Gemrich Follow-Up Discussion, was marked for

23  purposes of identification.)

24  BY MR. SMITH:

25       Q.   All right.  Mr. Bolton (sic), I

Page 82

```
 1   just have a couple questions.  I introduced
 2   Exhibit 9, if you could pull that up.
 3   Mr. Little.  I'm sorry.
 4           A.   Okay.
 5           Q.   Have you ever seen this document
 6   before?
 7           A.   I don't recall this, no.
 8           Q.   Okay.  There's an indication here,
 9   if you see it, that it states John shares
10   personal information about dating and sexual
11   encounters.  Picked up a deaf girl and slept
12   with multiple employees on a trip.  Do you
13   recall those allegations coming up at some
14   point prior to today?
15           A.   I do not.
16           Q.   Okay.  Do you recall any
17   complaint -- I mean, looking at this, do you
18   recall any complaints about Mr. Gemrich
19   sleeping with employees?
20           A.   I do not.
21           Q.   Is that concerning to you?
22           A.   Yes.
23           MR. SMITH:  Okay.  I have nothing
24   further for you.
25           MS. GOETZ-ANDERSON:  Before we -- I
```

```
 1    just have one or two questions for you, David,
 2    before we're done here.  I'll make it brief.
 3                        *   *   *
 4                   DIRECT EXAMINATION
 5    BY MS. GOETZ-ANDERSON:
 6         Q.   All right.  Earlier today, Josh
 7    asked you some questions about your
 8    understanding of the procedures of how an
 9    investigation is done when an employee makes a
10    complaint.  Do you recall those questions?
11         A.   Yes.
12         Q.   And I'm just sort of paraphrasing
13    here, but my understanding is that your
14    understanding is that HR and ER or the CIC
15    team, as it's sometimes called, are both
16    involved or may be involved in investigating a
17    complaint by an employee.  Is that a fair
18    summary of your testimony?
19              MR. SMITH:  Objection to form.
20              THE WITNESS:  Yes.  That's my
21    understanding, yes.
22    BY MS. GOETZ-ANDERSON:
23         Q.   Okay.  David, do you have an
24    understanding of how exactly the HR and ER
25    teams decide who in any particular case who's
```

```
                                        Page 84
 1    going to do the investigation?
 2             A.   No.
 3                  MR. SMITH:  Objection.
 4                  MS. GOETZ-ANDERSON:  Okay.  That's
 5    all I have for you.
 6                  MR. SMITH:  Stacey, we'd like to
 7    order.
 8                  MS. GOETZ-ANDERSON:  We'll take a
 9    copy, e-tran, please.
10                  (Thereupon, signature was not
11    waived.)
12                  (Thereupon, the deposition was
13    concluded at 12:47 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 85

1 STATE OF OHIO          )

2 COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3            I, Stacey M. Mortsolf, a Notary Public

4 within and for the State of Ohio, duly

5 commissioned and qualified,

6            DO HEREBY CERTIFY that the

7 above-named DAVID LITTLE, was by me first duly

8 sworn to testify the truth, the whole truth and

9 nothing but the truth.

10            Said testimony was reduced to writing

11 by me stenographically in the presence of the

12 witness and thereafter reduced to typewriting.

13            I FURTHER CERTIFY that I am not a

14 relative or Attorney of either party, in any

15 manner interested in the event of this action, nor

16 am I, or the court reporting firm with which I am

17 affiliated, under a contract as defined in Civil

18 Rule 28(D).

19

20

21

22

23

24

25

Page 86

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and seal of office at Dayton, Ohio, on this

3     28th day of September, 2021.

4

5

6

7
                    _____

              STACEY M. MORTSOLF, RPR, CRR

8             NOTARY PUBLIC, STATE OF OHIO

              My commission expires 5-31-2025

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 87

1                        Veritext Legal Solutions
                              1100 Superior Ave
2                                Suite 1820
                           Cleveland, Ohio 44114
3                          Phone: 216-523-1313
4

   September 30, 2021
5

   To: Ms. Goetz-Anderson
6

   Case Name: Pannek, Mark Et Al v. US Bank National Association
7

   Veritext Reference Number: 4802985
8

   Witness:  David Little        Deposition Date:  9/16/2021
9

10  Dear Sir/Madam:

11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 88

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS

2
         ASSIGNMENT REFERENCE NO: 4802985
3        CASE NAME: Pannek, Mark Et Al v. US Bank National Association
         DATE OF DEPOSITION: 9/16/2021
4        WITNESS' NAME: David Little
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.

8
    _____        _____
9   Date                   David Little
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:

12
         They have read the transcript;
13       They signed the foregoing Sworn
              Statement; and
14       Their execution of this Statement is of
              their free act and deed.

15
         I have affixed my name and official seal

16
    this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

```
1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS

2

        ASSIGNMENT REFERENCE NO: 4802985
3       CASE NAME: Pannek, Mark Et Al v. US Bank National Association
        DATE OF DEPOSITION: 9/16/2021
4       WITNESS' NAME: David Little
5           In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6       my testimony or it has been read to me.
7           I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
8       well as the reason(s) for the change(s).
9           I request that these changes be entered
        as part of the record of my testimony.
10

            I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____        _____

        Date                    David Little
14

            Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22      this _____ day of_____, 20_____.
23              _____

                Notary Public
24

                _____
25              Commission Expiration Date
```

Page 90

1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2                ASSIGNMENT NO: 4802985
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____      _____
20    Date                    David Little
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                  _____
              Notary Public
24

25                  _____
              Commission Expiration Date

Case: 1:19-cv-00852-MWM-KLL Doc #: 48 Filed: 11/03/21 Page: 91 of 108 PAGEID #: 2242

**&**

**&** 2:6 3:3 35:19

**0**

**00852** 1:7

**1**

**1** 2:6 35:18
**10:01** 1:17
**1100** 87:1
**12:45** 81:17
**12:47** 84:13
**14** 10:1 72:25 75:1
  75:16,18
**15** 5:1,23
**16** 1:17
**17** 13:21,22 45:6,8
  49:22 66:22 71:24
  75:3
**18** 13:21,21,22
  45:7,8 49:21
  66:22 71:24 75:3
**1820** 87:2
**19** 66:22
**1:19** 1:7

**2**

**2** 2:7 61:4,5
**20** 13:23 88:16
  89:22 90:22
**200** 44:21 45:11,18
**201** 3:12
**2014** 10:6,7 12:19
  13:11
**2017** 16:23 18:13
  19:3 32:25 44:12
**2018** 16:23 19:4
  32:25 44:13 49:24
  50:8 65:25 66:5
  66:15 78:18
**2019** 66:1,5,15
**2020** 52:8

**2021** 1:17 86:3
  87:4
**216-523-1313** 87:3
**22265** 86:7
**24** 68:10
**2623** 3:5
**26th** 3:12
**28** 85:18
**28th** 86:3

**3**

**3** 2:7 70:3,4
**30** 87:4
**35** 2:6

**4**

**4** 2:3,9 72:4,6
**4,000** 10:21 44:11
**44114** 87:2
**45202** 3:13
**45208** 3:6
**4802985** 87:7 88:2
  89:2 90:2

**5**

**5** 2:10 73:4,5
**5-31-2025** 86:8
**500** 44:7,19,22,23
  45:13,14,19
**513** 3:7,14
**533-2701** 3:7

**6**

**6** 2:11 76:2,3
**60** 43:24 44:1
**61** 2:7

**7**

**7** 2:12 79:5,6
**70** 2:8 3:11 44:11
  44:25
**72** 2:10
**73** 2:11

**76** 2:11
**79** 2:12

**8**

**8** 2:12 80:4,5
**80** 2:12
**81** 2:13
**83** 2:4
**898-0050** 3:14

**9**

**9** 2:13 81:21 82:2
**9/16/2021** 87:8
  88:3 89:3

**a**

**a.m.** 1:17
**ability** 30:4
**able** 11:24 25:22
  35:9 49:15 68:1
**abusive** 37:23
**accepted** 44:17
**access** 36:1 46:23
**accountability**
  17:12
**accurate** 75:10
**achievement**
  39:23 40:20
**acknowledge** 77:3
  88:11 89:16
**acronym** 9:19
**act** 88:14 89:20
**action** 12:6 38:22
  54:25 55:4 56:12
  56:14 62:7 63:12
  63:13 85:15
**actioned** 23:2,3
  78:15,17
**actions** 19:19
**added** 10:9
**additional** 13:17
  14:16 15:7,13

**address** 87:15
**admin** 10:18
**advise** 55:3
**advised** 20:13,14
  62:6
**affiliated** 85:17
**affixed** 88:15
  89:21
**age** 4:8
**ago** 5:2,24 39:15
**agree** 38:5 39:1
  40:1
**agreement** 12:6,8
  12:11 60:18,19,21
  60:25
**ahead** 6:24 36:12
  37:20 40:25
**al** 1:5 87:6 88:3
  89:3
**allegations** 38:20
  39:4 53:20 57:23
  82:13
**alley** 3:11
**allocate** 43:23,23
  44:1
**allocated** 43:24,25
**altogether** 67:11
**alyson** 68:16,23
  69:3
**analyses** 24:7,17
  26:22
**analysis** 22:14,20
  22:24 23:13,25
  24:20,22 25:4,11
  25:18 27:18 66:1
  67:8,12,16,21
**anderson** 2:4 3:10
  3:13 4:4 11:21
  14:5,11 25:14,21
  35:14 40:23 41:7
  46:3 55:24 56:1

60:16 67:22,25
82:25 83:5,22
84:4,8 87:5
**andrea** 33:3,15
51:16,18
**announcement**
76:13,19,24
**annual** 31:13,14
31:15 39:14
**answer** 6:9,23
11:24 14:8,10,12
25:22 26:4 41:8
68:1
**answered** 25:15
40:24 41:8 56:2
63:3 67:23
**answers** 6:11,16
**antidiscrimination**
30:25 34:23
**anybody** 31:17
**anymore** 81:5
**anyway** 42:22
**apologize** 45:4
**appear** 61:17
75:10 88:11 89:15
**appearances** 3:1
**appears** 62:24
70:13
**appended** 89:11
89:18
**applied** 74:3 75:10
**applying** 15:6
**appropriate** 55:4
56:11,14
**appropriateness**
23:1
**approval** 11:14
19:1 22:9 60:11
60:13,15,18,25
**approve** 11:20
12:7 43:11

**approved** 70:23
71:13
**approves** 22:11
43:4,7
**approximately**
44:25
**area** 28:5 35:11
81:10
**areas** 31:24 71:21
**arizona** 49:19
**asked** 6:22 25:15
40:24 41:8 56:1
62:5 67:23 83:7
**asking** 29:7 66:14
**assigned** 32:19
**assignment** 88:2
89:2 90:2
**assist** 17:24
**associated** 23:10
32:21 40:12,14
42:20 44:6
**association** 1:8
4:17 87:6 88:3
89:3
**assume** 74:7
**assuming** 57:22
77:18
**assumption** 40:8
80:21
**attached** 89:7
**attempts** 47:1
**attend** 41:23
**attending** 4:18
50:3
**attorney** 3:11 62:9
85:14
**attorneys** 3:5
**audit** 30:20
**authority** 11:13
**authorize** 89:11

**available** 35:8
**ave** 87:1
**avenue** 3:5
**award** 39:10,12,14
39:16 41:13,19
42:1,17 43:2,19
45:9,23 49:10
50:5
**awarded** 40:22
**awards** 43:24 44:3
49:13
**aware** 6:1 19:6,9
25:2 26:6 29:16
30:23 35:4 41:20
46:14,16,19 47:18
49:9 50:4,17 51:2
52:19 58:9,24
60:3,4,5,7 63:6,20
64:15,18 69:18,21
69:25 74:18 77:14
**awareness** 22:10

**b**

**babe** 37:25
**back** 12:3,18
21:10,21 25:25
26:19 46:7,8
49:23 67:17 81:17
87:15
**bank** 1:8 4:16 9:13
9:25 10:1,23
11:11 12:19 13:5
13:12,17 19:7,10
21:23 24:8,17
26:12 27:13 31:1
31:2 32:10 33:25
34:17 35:3 38:8
39:2,10,16 40:3,7
40:19 46:12,25
47:5,11 48:16
52:1 56:20 59:17
59:21 68:8 69:11

77:3,7,15,21 78:25
81:12 87:6 88:3
89:3
**banking** 9:17 10:4
11:4,5,7 13:22
**based** 14:14 27:10
**bases** 15:3 19:9
**basically** 44:3 74:1
**bear** 68:11 77:13
**beginning** 61:13
68:7
**begins** 36:16
**behalf** 3:2,8
**behavior** 37:15
38:21 54:7
**behaviors** 36:23
**belief** 27:3,10
**believe** 10:17
19:18 22:25 23:14
27:1,23 28:1
29:21 31:1,13,17
32:8,14 36:1
38:23 41:25 44:15
45:7 47:10,22
51:3,16 54:5 57:3
57:14 61:16 64:21
67:11 75:13 79:24
**belong** 37:18
**best** 40:2,2,6,15
**beyond** 39:24
40:21
**bill** 33:2,15
**birch** 3:11
**bit** 21:22 30:24
39:8 44:13
**bolton** 27:22 28:15
28:24 33:5 43:10
53:19 60:10 61:18
62:3,7,8,12,21
63:23 65:5,7,19
68:20 78:6 81:25

**bolton's** 50:22
58:5 62:1 74:8
**bond** 33:3
**bottom** 36:11 62:2
77:1 80:14
**branch** 11:2 13:21
**branches** 11:3
**break** 6:21,24,25
46:2 75:22
**brief** 83:2
**briefly** 22:17
**broad** 32:4
**broderick** 48:8
**brought** 58:1
**bryan** 27:22 29:14
43:10 50:22 51:12
51:17 52:12 53:18
54:5,9 57:14 58:5
60:10 68:20 79:2
**bryan's** 78:20
**business** 9:17 10:4
11:4,5,7 13:21
17:22,23,25 23:15
23:16,17 33:17,18
38:19 58:5

**c**

**ca** 87:25
**call** 17:1,2 69:22
73:23
**called** 1:12 11:2
33:24 83:15
**calls** 6:17 14:6
37:9
**capture** 6:6
**care** 56:9
**cared** 56:11
**case** 1:7 5:9,16,21
30:10 34:16 43:7
44:12 55:14 62:5
83:25 87:6 88:3
89:3

**category** 32:4
**cautioned** 4:9
**cbbo** 9:22
**cbss** 2:9,10 9:19
72:7 73:6,25
**centralized** 33:24
**certain** 20:25 21:7
22:5 44:2
**certificate** 85:2
89:11
**certification** 31:14
31:16 88:1 89:1
**certified** 4:10
**certify** 85:6,13
**cetera** 22:22
**chain** 2:7,12 61:6
80:6
**chair** 11:10 13:5
14:15 15:17,23
**chairs** 11:11
**change** 10:10
14:22 15:3 79:16
87:13,14 89:8
90:3
**changed** 44:13
**changes** 2:8 14:15
15:23 70:6,15
77:2 87:12 88:7
89:7,9
**changing** 30:24
39:8
**charge** 16:25 17:3
17:9 18:22 48:6
**chart** 2:11,12 73:6
74:1,3 75:17 79:7
**chase** 68:11 77:13
**cic** 83:14
**cincinnati** 3:6,13
**circumstance**
47:13 67:21 68:5

**circumstances**
25:3
**cit** 33:24 34:5,14
34:19
**civil** 1:13 85:17
88:5 89:5
**clear** 15:5 34:20
**cleveland** 87:2
**click** 35:15
**close** 81:19
**code** 38:18
**colon** 36:14
**come** 21:21 73:21
**coming** 82:13
**comments** 37:6,24
51:4,5 53:3 54:2,4
**commercial** 47:23
**commission** 86:8
88:19 89:25 90:25
**commissioned**
85:5
**common** 30:5
**communication**
71:6
**communications**
43:21 70:25 71:2
71:5
**company** 16:1
46:24
**company's** 5:19
**complained** 55:17
55:18
**complaint** 32:3,11
32:17 34:8,15
50:24 51:1,3,11,18
52:14,15,23 53:1,4
53:9,11,18 54:16
54:19 56:16 58:4
58:8,22 59:1,5,24
64:5,8,16,18 65:18
82:17 83:10,17

**complaints** 32:6,9
34:21 50:19 53:2
55:11 58:10 59:11
60:1 65:20 82:18
**completed** 17:11
87:15
**completes** 34:15
**compliance** 17:23
18:1
**comprises** 72:22
**concerned** 52:20
52:22,23,25 53:4,8
**concerning** 53:10
82:21
**concluded** 84:13
**conduct** 38:17,19
65:20
**conducted** 24:4
**conducts** 23:12
**congratulatory**
43:21
**connection** 38:15
**consent** 14:25
**considered** 23:8
36:24 38:7
**constitute** 37:17
**consumer** 9:16
10:3,4,25 13:20
15:25 19:4 26:21
47:20,21,22 48:6,7
48:15 67:18
**context** 26:13 75:5
80:20,23
**continuation**
66:24
**continue** 65:14
**contract** 85:17
**control** 28:5 57:5
57:8 67:4 76:14
76:19

controls 74:12
conversation 7:14
  7:17,22 8:1 54:6,8
  54:8,13 61:14,15
  61:18 65:13,17
conversations 8:2
  28:12 65:19
converse 62:22
convey 16:6,15,18
conveyed 16:3
copied 76:24
copy 84:9
correct 12:21 37:6
  37:9 40:17 48:19
  48:21 57:25 78:3
corrections 87:12
  89:17
corrective 63:13
counsel 8:2,5
  70:13
count 17:24 20:16
  66:25
counts 20:14
county 85:2 88:10
  89:15
couple 8:14 81:18
  82:1
course 26:11
court 1:1 6:4
  85:16 88:7
courtesy 6:10
cover 31:23,24
covers 32:2
covid 42:10,21
  45:8 52:9
coworkers 38:2
create 73:16
created 73:19
credit 11:4,5,6
  13:23

criminal 69:19
criteria 39:19
  40:12,14
crop 30:5
cross 1:13 4:11
crr 1:15 86:7
current 9:15 10:11
  10:15,22
customers 38:2
cv 1:7

d

d 2:1 3:4 85:18
data 62:4
date 8:23 87:8
  88:3,9,19 89:3,13
  89:25 90:20,25
dates 16:20
dating 82:10
david 1:11 2:2,8
  4:7 11:22,23
  25:22 35:14 40:24
  41:8 68:1 70:5
  83:1,23 85:7 87:8
  88:4,9 89:4,13
  90:20
day 86:3 88:16
  89:22 90:22
days 42:23,24,25
  43:1 87:18
dayton 86:2
deaf 82:11
dear 87:10
decide 83:25
decision 12:14
  20:3 22:11 30:22
  48:24 60:11,15
  69:14
decisions 14:2,4
  20:15 30:20
deed 88:14 89:20

deemed 87:19
default 5:19
defendant 1:9 3:8
defendant's 81:21
defined 85:17
degrading 37:22
department 32:19
  87:22
deposition 1:11
  4:22,25 5:25 7:4
  7:13 8:3,7,10 9:10
  72:15 84:12 87:8
  87:11 88:1,3 89:1
  89:3
derogatory 37:6
describe 39:13
describing 26:7
description 2:5
details 59:25
determination
  21:7,13
determine 20:25
determining 25:19
diane 33:9,11
different 81:10
difficult 14:25
direct 10:14,15
  20:5,7,24 21:6,10
  21:11,14 24:4,12
  27:2 28:6 30:16
  30:21 31:20 32:22
  33:5,18 41:18,22
  43:9,11 57:12
  68:20 71:3 73:1
  83:4
directing 38:10
direction 16:9
  21:4 46:23
directly 10:13
  29:14

directs 44:1 56:24
disciplinary 38:22
discrimination
  31:3,23 32:7
  34:21
discuss 72:20
discussed 7:16
  13:18 19:5 36:3
  59:24 69:24
discussing 58:9
discussion 2:13
  27:4,12 81:22
discussions 27:11
  27:13
displaced 46:11
  47:1
dispute 33:8 78:11
disrespectful
  37:15
distributed 72:1
district 1:1,2
division 1:3 17:8
  19:24 30:11 47:21
  50:6,9
divisions 10:23
  13:12,17,25 15:7
  17:3 18:2 19:8
  28:17 48:24 66:6
document 70:12
  70:16 72:11 73:11
  73:17 75:6 79:12
  80:10 82:5
documentation
  63:12
documents 8:13
  8:15,16 9:4
doing 4:1 6:5
  28:18 81:9
double 35:15
draft 70:21

[drafted - financial]                                                                 Page 5

**drafted** 70:22,24
71:9
**duly** 4:9 85:4,7
**duplication** 20:18
20:19 30:3 66:12
77:20 80:25 81:5

**e**

**e** 2:1 84:9
**earlier** 28:22
53:14 55:9 83:6
**early** 13:21 16:23
19:3 32:25 65:25
66:5,15
**easier** 18:8
**east** 3:12
**effect** 36:21
**efficiency** 66:13
**efforts** 46:9,13
74:21
**either** 4:5 30:3
33:2,22 49:7
50:12,19 51:17
53:18 66:11 77:19
80:24 85:14
**eligible** 47:4,7,8
**eliminated** 21:1
67:11 68:6 74:19
77:19
**email** 2:7,11,12
43:21 61:6 76:4
76:10,15,21 80:6
87:17
**emails** 8:20
**employed** 5:10
35:3 51:25 59:17
68:9,10 69:5
**employee** 19:18
20:9,12,15,20
24:23 25:6 32:11
32:15 34:2,5,14,19
47:12 55:7,10

**employee's** 34:8
**employees** 10:13
10:20 17:8 19:13
19:16,20,25 20:4,8
20:22,25 21:8,15
22:4 23:7 25:12
25:18 28:16 29:12
29:25 30:11 39:2
40:2,6 42:5 44:4
46:10 47:2,4
49:13 67:19 72:2
77:6,7 78:4,6,15
78:17,22 82:12,19
**employer** 34:12
54:21
**employment** 27:14
34:17 50:20 52:3
**enclosed** 87:11
**encompassed** 10:8
**encompasses**
23:17
**encounters** 82:11
**ended** 14:16 15:7
**ends** 80:15
**engages** 38:21
**ensuring** 17:9
**entered** 89:9
**entire** 43:25 88:5
89:5
**er** 83:14,24
**erie** 3:5
**errata** 87:13,18
89:7,10,18 90:1
**especially** 6:4
**et** 1:5 22:22 87:6
88:3 89:3
**ethics** 38:18
**event** 41:21 42:3,8
43:17 85:15

**events** 42:5
**eventually** 20:1
45:19 74:15
**evp** 48:10
**exact** 16:20 22:8
23:10
**exactly** 29:22
80:20 83:24
**examination** 1:13
2:3 4:11 83:4
**examined** 4:10
**example** 25:7
44:24 45:15 81:7
**examples** 24:14
37:1,2,16,21 38:6
38:6
**exceeded** 14:25
**excluded** 41:24
**execute** 12:11
60:22 61:1
**executed** 41:5,6
89:10
**execution** 11:18
88:14 89:19
**executive** 9:16
10:2 12:20 68:15
**exhibit** 2:5,6,7,7,9
2:10,11,12,12,13
35:6,7,9,10,18
61:3,4,5 70:3,4
72:4,6 73:4,5 76:2
76:3 79:5,6 80:4,5
81:21 82:2
**exhibits** 2:5 35:16
**exist** 74:17
**exited** 14:24
**expect** 54:24 55:2
55:13
**expectation** 54:18
56:5 60:2,7

**expectations** 15:1
19:15
**expenses** 42:13
**experience** 22:21
57:8
**experiencing**
38:24
**expiration** 88:19
89:25 90:25
**expires** 86:8
**explain** 14:21
22:16 34:4 56:19
**explicit** 37:24 54:2
59:25

**f**

**face** 38:22
**fact** 53:6
**factor** 48:22 53:8
**factored** 48:23
**factors** 22:20
**fair** 45:23 83:17
**fairly** 45:22
**faith** 38:15
**falling** 34:22
**falls** 18:10
**familiar** 22:13
31:5 33:23 39:9
49:4 68:16
**far** 6:10 28:16
44:21 79:17,22
81:3
**fear** 57:18,24
**feedback** 28:25
29:8 52:18
**fifth** 3:12
**file** 62:5
**fill** 74:22
**filled** 74:13,15
**finally** 38:10
**financial** 5:18 19:8
19:10

**find** 87:11
**fine** 4:3 60:19
**finish** 6:8,11
**firing** 11:12
**firm** 85:16
**first** 4:8 6:4 7:2
12:18 36:12 44:20
45:3,12 61:21
80:14 85:7
**fit** 57:11
**five** 44:9 77:3 78:4
78:10,12,13 81:16
**floor** 3:12
**folder** 35:16
**follow** 2:13 81:22
**followed** 22:1,6
**following** 36:22
37:16
**follows** 4:10
**force** 66:4,11,16
67:4,7
**foregoing** 88:13
89:18
**form** 83:19
**forth** 8:14 58:2
**forward** 87:15
**four** 42:24,25
68:11
**frame** 13:22,24
16:21,22
**frames** 14:1
**francisco** 5:5
**free** 88:14 89:20
**frequent** 28:12
**front** 35:6 76:7
**full** 71:14
**function** 30:4 57:4
66:12 81:8
**further** 37:13,14
82:24 85:13

**g**

**gain** 13:16
**gears** 30:24 39:8
**gemrich** 2:13
50:24 51:25 52:14
53:1,21 55:1
56:17,20 57:7,11
57:19,23 58:4,10
59:11,14,16,25
61:23 62:4 63:13
63:14 68:25 81:22
82:18
**gemrich's** 65:20
66:2
**general** 27:4,11
46:10 53:5 54:8
**generally** 21:23
26:24 29:3 46:21
51:7 55:10 58:13
58:19 65:23 71:19
74:5,6
**getting** 15:14,16
**gifts** 42:19
**girl** 82:11
**give** 6:10 16:9 29:8
44:3 81:16
**given** 40:1,6,19
45:9
**gives** 27:3 46:22
**go** 6:2,23 12:18
18:24 19:20 20:4
20:8,18,22 21:1,8
21:10,16 22:4
25:20 29:12 30:2
30:12 36:12 37:20
40:24 49:14 59:21
61:23 62:8 77:7
77:14,17 78:7
**goes** 17:10
**goetz** 2:4 3:10 4:4
11:21 14:5,11

25:14,21 35:14
40:23 41:7 46:3
55:24 56:1 60:16
67:22,25 82:25
83:5,22 84:4,8
87:5
**going** 6:2 11:22
16:4,10,15 17:1
18:23 19:13 21:15
25:19,20 26:19
27:18 28:17 29:4
29:12 30:12 35:5
36:11 41:25 43:8
46:1,8 60:16 61:3
70:2,7 76:12 78:7
84:1
**gombold** 77:4,23
**good** 38:15 62:11
**grade** 72:25 75:1
75:16,18
**greet** 42:4
**greg** 78:23,24
79:18
**ground** 6:3
**group** 11:1,4,6
14:14,20,21 15:22
17:5,13 21:12
22:14,24 23:7,12
23:14,24 24:7,16
24:20,22 25:4,11
25:18 26:21 27:18
28:21 30:18,21
43:9,22,25 44:23
50:2 66:1 67:8,12
67:15,21 72:20,23
78:20
**groups** 17:16 18:9
18:11,13,15,22
55:3,5
**guests** 42:12

**guys** 69:24

**h**

**half** 68:12
**hand** 86:2
**handful** 29:20
**handle** 34:20
**handled** 32:13
53:12,15
**hands** 34:12
**happened** 16:21
47:15 48:11
**happens** 30:8
**harassing** 37:8
**harassment** 31:1
31:25 32:7 34:22
36:8,16,18,19,21
36:24 37:3,17
38:7,16
**head** 6:18 15:16
66:25
**heading** 36:7
38:11
**hear** 45:5
**heard** 24:9 26:8
39:9 50:15,18
**hearing** 11:20
**held** 9:24 10:2,5
49:18 79:18
**hereinafter** 4:9
**hereunto** 86:1
**high** 14:24 39:22
44:18
**hindsight** 9:6
**hired** 12:20 56:24
**hiring** 11:12 12:16
69:14
**honest** 9:8
**honey** 37:25
**hopefully** 81:16
**host** 41:21,25 42:2
49:15,17

**hosting** 43:17
**hour** 7:24 46:1
**household** 5:11
  68:9
**hovis** 78:23 79:15
  79:17,18
**hr** 11:14,18,19
  12:13 17:18,19
  19:1 21:25 22:9
  22:11 23:14,22
  26:8 27:4,7 29:15
  29:24 30:18,21
  32:14,16,18 33:1,6
  33:14,17 34:9,11
  46:22 51:13,14
  52:12 53:19 54:21
  55:6 60:24 62:3,5
  83:14,24
**hr's** 60:13,15,21
**huh** 6:19,19
**human** 20:6 58:5
**hunk** 37:25

**i**

**idea** 63:1 65:15
  71:10 72:17 73:20
  77:10 81:3
**identification**
  35:20 61:7 70:7
  72:8 73:7 76:4
  79:8 80:7 81:23
**illegal** 38:19
**important** 2:7
  70:5
**improvements**
  66:13
**inappropriately**
  38:16
**include** 31:19
**included** 87:13
**includes** 67:7 73:1

**including** 10:17
  38:22
**incorporated**
  89:12
**index** 2:5
**indicate** 21:15
**indicated** 37:5
  55:16
**indicates** 77:1
  79:15
**indicating** 87:13
**indication** 82:8
**indirectly** 10:14
**individual** 15:25
**individuals** 23:2
  32:22 81:4
**infers** 77:8
**inform** 20:7,11
  29:11 51:18 52:13
  54:3
**information** 34:13
  82:10
**informed** 20:22
  50:23 51:11 53:18
  53:19 59:23 64:7
  65:17 78:6
**innocuous** 38:3
**innuendoes** 38:4
**input** 34:13
**instance** 44:7
**instant** 62:22
  63:21
**integration** 17:15
  56:25 71:21 74:7
**intent** 36:21 41:1
**interested** 7:15
  85:15
**interim** 79:16
**internal** 28:4 30:5
**international** 5:11
  68:10

**introduce** 61:3
  70:3
**introduced** 79:5
  82:1
**introducing** 73:4
  80:3
**investigate** 32:16
  34:7 38:20 54:22
  55:11
**investigated** 39:5
  55:7 57:25
**investigating**
  55:14 83:16
**investigation**
  33:24 34:15 56:7
  56:12 83:9 84:1
**investigations**
  35:1 59:13,14
  62:9 63:1,5
**investor** 15:1
**involved** 12:13
  17:14 24:2 32:15
  34:25 51:4 69:13
  74:24 83:16,16
**involvement** 43:14
  43:18 48:3
**involves** 22:25
**involving** 78:20
**irving** 1:16 7:5
**issues** 19:8,11
**items** 15:6

**j**

**jackson** 3:9
**jacksonlewis.com**
  3:13
**jamie** 3:10 7:14,16
  7:17 8:14 69:22
**jamie.goetz** 3:13
**jms** 3:6
**job** 22:21 67:10,20
  77:19,21

**john** 2:13 50:24
  51:4,25 52:14
  56:17,19,21 57:7
  57:11,18 68:25
  71:4,5 81:22 82:9
**joined** 56:25
**jokes** 37:23
**josh** 4:13 83:6
**joshua** 3:4
**judgment** 30:17

**k**

**kent** 13:3,4,8 14:2
  16:1,1,3
**kept** 25:19
**kind** 23:20 45:8
  46:10 76:24
**know** 14:13 15:12
  16:11,13,20 17:21
  20:17,18 21:9,13
  22:7 23:1,9,23
  24:6,7,11,13,21
  26:3,21,23,24 30:1
  30:12 33:6,11
  34:2,13,24 39:21
  39:23 41:22,23
  43:20,24 44:19,19
  46:17,20,21,22
  47:3,14 48:23
  50:2 52:12 54:6,7
  55:16,23 56:17
  57:7 58:4,12,18
  59:3,6 61:9 63:9
  63:16,19,25 64:1
  64:10,25 65:1,10
  66:18 69:7,23
  70:9 71:9,10,16,19
  72:25 73:9 74:2,6
  74:12,16,21 76:6
  76:14 77:6,12,24
  78:1,23,24 79:2,3
  79:10 80:2,2,18,25

[know - multiple]

81:7,14
**knowledge** 27:2
47:6
**kobin** 77:4,11 81:7

**l**

**l.p.a.** 3:3
**labeled** 35:21
**language** 37:22
**large** 50:2
**late** 13:20 16:22
19:3 32:25 65:25
66:5,15 71:24
**law** 3:5,11
**lawful** 4:8
**lawsuit** 5:8 49:3
**lead** 33:14
**leader** 2:9 17:13
29:15 32:20 33:1
51:13,14 52:12,24
53:19 72:7
**leaders** 26:9 27:5
27:7 77:3 78:14
**leadership** 72:20
72:22 73:23 74:25
75:5,15
**leave** 77:3
**led** 15:13
**left** 16:1 48:16
**legal** 62:6 87:1
90:1
**legend** 41:19
**legends** 39:10
41:12 43:18 49:10
**lending** 18:18 19:4
26:21 47:20,21,22
48:6,7 67:18 72:3
**letter** 87:19
**letting** 20:8,18
**level** 20:10,20
47:12 81:8

**lewis** 3:9
**life** 38:1,2 60:1
**line** 36:12,15
37:11 63:25 78:15
78:17,22 87:13
89:7 90:3
**lines** 45:8
**listed** 89:7,17
**listing** 89:7
**litigation** 50:14,23
**little** 1:11 2:2,8 4:7
4:13 35:5 46:1,7
61:4 70:5 76:6
82:3 85:7 87:8
88:4,9 89:4,13
90:20
**loan** 10:25 65:11
**loans** 11:5 47:23
**located** 7:3
**location** 42:9,11
**long** 7:21 9:23
**longer** 59:17
**look** 81:2,6
**looked** 9:4 57:21
75:12 79:22
**looking** 25:12,17
75:17 78:4 82:17
**looks** 7:6 37:1
72:19
**lot** 17:23
**lower** 47:12

**m**

**m** 1:14 3:4,10 85:3
86:7
**madam** 87:10
**making** 37:5,8,24
47:1 51:4 53:1
**management**
56:22 68:24 79:16
**manager** 31:17
72:24

**manner** 85:15
**mark** 1:5 3:16
4:14,15 44:18
49:4 50:11,15
77:5 78:1 87:6
88:3 89:3
**marked** 35:16,20
61:6 70:6 72:8
73:6 76:4 79:7
80:6 81:22
**material** 73:24
**math** 44:10
**matt** 77:4,11,12,12
81:7
**matter** 4:14,15,19
**matthew** 3:4
**mds** 3:7
**mean** 11:15 14:21
16:14 17:13,22
19:25 20:16 23:3
27:6,11 31:23
34:6 40:10,21
41:4 44:10 64:24
66:24 78:13 81:3
82:17
**meaning** 11:16
40:11
**means** 80:19
**meant** 65:5
**meet** 42:4,4 49:12
49:24
**meeting** 49:7 75:6
**meetings** 8:1
74:25 75:16
**memento** 42:18
**mentioned** 15:6
61:12 66:11
**merge** 48:24
**merged** 18:15,23
**merger** 17:2 19:3
21:22 26:20 27:22

27:25 28:3,7,16
32:24 33:21 44:14
47:21 48:5,12,13
48:14 56:23 67:18
67:18
**mergers** 46:12
**merging** 17:8
**message** 2:7 8:22
8:25 63:21 70:5
70:14 76:16,20
**messages** 62:16,22
**met** 50:1
**midwest** 87:17
90:1
**mind** 12:12
**minute** 35:12 46:2
**minutes** 81:16
**mischaracterizes**
11:23 60:17
**misconduct** 25:9
**missed** 68:7
**mod** 62:13 65:8
**modification**
65:11
**montgomery** 85:2
**month** 51:22
73:15,22
**monthly** 73:23
74:24 75:5,15
**mortgage** 10:8,24
13:13 18:19 19:4
26:20 33:21 47:19
48:15 67:19 68:12
72:3
**mortsolf** 1:15 85:3
86:7
**move** 15:25 36:25
**moved** 81:9
**moving** 81:8
**multiple** 17:14
66:10 82:12

**n**

**n** 2:1
**name** 4:13 50:15
70:20 87:6 88:3,4
88:15 89:3,4,21
**named** 48:8 85:7
**names** 30:1
**national** 1:8 4:16
87:6 88:3 89:3
**nationstar** 68:12
68:14 69:3
**nature** 32:10 35:1
37:23 43:22 48:2
52:16 53:2,3,7
64:5
**necessarily** 40:15
67:10
**need** 6:15,21,23,24
30:12 60:10,21
**needed** 19:1 60:15
80:25 81:5,8
**needs** 60:13,25
63:13,14
**neighborhood** 5:1
**never** 24:13 48:18
**new** 79:21
**nine** 10:17
**nodding** 6:18
**noise** 62:6
**nominate** 39:25
**nominated** 41:15
43:1,3
**nominations** 43:7
44:16,20,23,25
45:19
**nonretaliation**
38:12
**nonverbal** 36:18
36:20 37:2
**north** 10:21

**notarized** 87:14
**notary** 1:15 85:3
86:8 87:25 88:10
88:18 89:15,23
90:23
**note** 87:12
**number** 20:19
23:10,10 29:16,18
42:22 44:2 55:23
87:7,13
**numbers** 89:7

**o**

**oath** 4:2,18 46:8
**object** 11:22 60:17
**objection** 4:3,4
14:5 25:14,21
40:23 41:7 55:24
67:22,25 83:19
84:3
**obviously** 17:7
**occ** 62:12
**occasion** 5:23
30:19
**occasions** 5:24
40:5,16
**occur** 42:22
**occurred** 27:15
54:13
**occurring** 19:3,9
42:21 66:5 67:4
**october** 13:23
**offers** 11:16
**office** 7:7 86:2
**official** 88:15
89:21
**ohio** 1:2,16 3:6,13
85:1,4 86:2,8 87:2
**okay** 4:21 5:6 6:15
7:1,2,6,9,12,19,21
7:25 8:5,16 9:12
10:11,19,22 11:25

12:13,23 13:7
14:9,13 15:10,18
15:21 16:18,25
17:19 18:7,14
19:7,24 20:3,11,21
21:6 22:10,13,16
23:12 24:11,19
25:3 26:6,19
27:17,24 28:2,9,15
28:20,24 29:17,23
30:7,24 32:2,9
33:20 34:4,9,25
36:3,6,11,19,25
37:8,11,20 38:5
39:1,19 41:4 42:2
42:6,16 43:1,6,10
43:14 44:12 45:3
45:18,22 46:7,25
48:1 49:6,12,17
50:8 52:11,18,20
53:6,11,17 54:12
54:24 55:21 56:5
56:13,19 57:15
58:3,17,24 59:4,20
60:13,19 61:12,17
61:21,25 62:18,21
62:24 63:8,16,23
64:2,6,10,17,22
65:1,13,16 66:8,14
66:23 67:3,6,17
68:5,21,21 69:7,10
69:13,23 70:11,12
70:21,24 71:8,13
71:16,25 72:4,9,17
73:4,10,16 74:8,11
75:4,8,15,20 76:8
76:12,23 77:1,17
78:9,23 79:11,15
79:20,25 80:3,8
81:1,1 82:4,8,16
82:23 83:23 84:4

**one's** 38:1
**ones** 13:18 18:8
30:1
**ongoing** 57:18
**open** 35:9 46:15
46:23 47:2 74:9
79:22
**operational** 18:9
18:11,13 21:12
28:21
**operations** 5:15
9:17 10:5 11:2
13:21 23:18,21
**opportunity** 16:2
**order** 14:25 60:22
84:7
**organization** 2:11
39:17 52:24 57:12
73:6 74:1 75:12
81:10
**organizational** 2:8
2:12 70:6,15 74:3
76:13,19 79:7
**outcome** 56:6,9
**outside** 43:20
52:15 69:24 75:5
81:10
**outsource** 30:4
**outsourcing** 66:12
67:14

**p**

**p.c.** 3:9
**p.m.** 84:13
**page** 2:3,5 36:12
37:1 38:11 80:14
80:15 87:13,15
89:7 90:3
**paid** 42:13
**pannek** 1:5 3:16
4:15,16 49:4
50:12,15 77:5

78:1 87:6 88:3 89:3

**paraphrasing** 83:12

**part** 28:15,20 40:8 56:23 73:24 77:2 89:9

**participate** 42:5

**particular** 42:9 74:3 75:6 83:25

**parties** 5:9

**partner** 33:17,18 58:5

**partners** 17:22,24 17:25

**party** 5:21 85:14

**patterson** 3:3

**paulick** 77:5,9

**pause** 46:5 75:24 81:20

**peer** 22:14,24 23:12,24 24:7,16 24:20,22 25:4,11 25:18 26:21 27:18 66:1 67:8,12,15,21

**people** 17:14 20:19 39:15 44:8 55:19 62:4

**percent** 44:8,9,9

**percentage** 44:6

**perform** 67:20

**performance** 14:14,20,21 15:2,5 15:12,22 22:21 25:8 28:10 39:22 40:12

**performed** 24:8 24:23 25:5 26:22 26:25 27:19 28:9 66:2

**performer** 40:19

**performing** 14:24 22:23 67:20

**period** 66:15,18,25 71:24 74:2 75:3,9 78:21

**person** 18:21 23:22 40:15 48:8 55:19

**personal** 15:12 82:10

**personally** 24:18 88:11 89:15

**phone** 7:19,21,25 8:2 37:8 87:3

**picked** 82:11

**piece** 11:7

**pinging** 62:4

**place** 21:24 31:2 33:4 42:8 46:13 47:1,11 56:12,14 75:3

**plaintiffs** 1:6,12 3:2 4:14 35:18 61:5 70:4 72:6 73:5 76:3 79:6 80:5

**play** 39:15

**please** 84:9 87:11 87:11

**pleased** 62:12 65:8

**plus** 44:11

**point** 13:16 20:21 29:11,15 33:16 34:11 54:3 56:22 56:25 57:16 62:19 65:1 75:11 82:14

**points** 2:9 72:7,19

**policies** 2:6 22:5,8 31:1 35:19 36:4

**policy** 31:2,5,9,12 34:23 35:25 38:12 38:18 39:6 47:1,3 57:22

**position** 5:12 9:15 9:24 10:3 11:13 46:13 47:12 48:9 48:18 56:20 68:6 68:13,22 78:25 79:17,23

**positions** 21:1 22:19 46:15,24 47:2,5 74:9,13,22

**possible** 39:10 41:13,19 43:19 49:10

**potential** 36:23 78:14

**potentially** 37:2

**practices** 5:20

**pre** 45:7

**preparation** 8:3 72:13

**prepare** 7:13 8:9 9:9

**preparing** 72:15

**presence** 85:11

**present** 3:15

**president** 5:14 9:16 10:3 12:20 68:15

**prestigious** 45:23

**pretty** 32:4

**prevents** 47:16

**previously** 66:11 68:25

**primarily** 66:22

**prior** 27:25 28:2 33:21 47:19 48:5 49:3 50:14,23 52:7,8,9 56:16

57:8 63:20 68:7 70:18 72:14 82:14

**probably** 49:25

**procedure** 1:14 88:5 89:5

**procedures** 22:5,9 32:3 83:8

**proceedings** 46:5 75:24 81:20

**process** 17:6 18:23 23:6 26:4,7 27:8 29:1 40:9 43:15 53:14,15

**processes** 21:24

**produced** 70:12

**production** 87:15 87:17,22

**prohibit** 36:8

**prohibits** 39:2

**project** 56:21

**prompt** 14:22

**provide** 4:18 6:9 52:18

**provides** 34:13

**providing** 4:2 5:6 28:25

**public** 1:15 85:3 86:8 88:10,18 89:15,23 90:23

**pull** 82:2

**purpose** 22:23

**purposes** 35:20 61:6 70:6 72:8 73:7 76:4 79:7 80:6 81:23

**pursuant** 1:13 39:5

**push** 62:8

**put** 8:14 28:17 35:6

**q**

**qc** 57:4 68:24,25
**qualified** 85:5
**quality** 57:5,8
　67:4
**question** 6:9,12,22
　12:1 25:24 26:4
　49:23 76:17
**questioned** 30:22
**questions** 6:7 82:1
　83:1,7,10

**r**

**ran** 28:4
**ratio** 44:14
**react** 54:22
**read** 12:3,4 25:25
　26:2 36:13 37:12
　37:20 38:12 61:25
　62:1 88:5,6,12
　89:5,6,17
**reading** 87:19
**reason** 24:25 25:1
　29:24,25 33:8
　67:15 75:13 78:11
　87:14 89:8 90:3
**reasons** 19:2 30:5
　67:1
**recall** 5:10,16 7:23
　8:18,19,23 9:2,3,4
　15:20 16:8,12,16
　18:12 21:17,18
　26:15,18 27:20
　28:24 29:3,6,9,10
　29:17,21,22 30:10
　32:1,2 33:19,22
　41:16 45:6,16
　47:23 49:5,6
　50:10,11,21 51:6,7
　51:21,22 52:4,16
　53:13,16,22,25

54:1,7,12,15 55:17
55:18,20,21 56:8
56:15,23 57:10,20
58:13,15 59:2,4,11
59:12,14,16,22
62:20 65:2,3,6,22
65:24,25 66:3,4,8
66:16 67:3 69:12
69:15 70:15 72:16
74:20 75:2,2,7,9
76:11,22 77:22
78:19,20 79:14
80:12,17 82:7,13
82:16,18 83:10
**receipt** 87:18
**receive** 31:11
　42:16
**received** 41:12,19
　42:1 49:10
**receiving** 39:20
　49:13 50:5
**recipients** 42:17
　49:24
**recite** 31:7
**recognize** 39:15
**recollection** 19:21
　58:23 59:9 61:22
　62:17 63:7,22
　64:4,7 69:17
　71:15 78:5 81:13
**recommend** 39:17
**recommendation**
　11:19 62:13 65:9
　65:12
**record** 12:4 26:2
　37:12 69:19 89:9
**reduced** 85:10,12
**reducing** 66:25
**reduction** 66:4,16
　66:19 67:3,7

**reductions** 66:10
**refer** 67:6 76:12
**reference** 22:8
　26:14,16 54:5
　64:17,20,23 87:7
　88:2 89:2
**referenced** 9:21
　9:21 24:9 26:8
　30:7 31:23 34:2
　63:6 78:22 88:11
　89:15
**references** 64:2
　71:20 77:4
**referencing** 27:7
　34:1 45:17 78:13
　78:14
**referral** 69:16
**referred** 9:18
　64:13
**referring** 26:17
　27:12 28:21 36:15
　37:24 48:13 58:19
　62:25 63:2,4,9,24
　64:11 65:7 66:21
　81:4
**refresh** 35:15
　61:21 64:6 78:5
　79:16
**regarding** 6:3 8:6
　15:24 20:12 31:2
　32:6 52:24 53:20
　54:6,19 63:14
　70:14
**regardless** 40:18
**rehire** 47:9
**related** 15:2 25:8
　34:21
**relations** 32:15
　34:2,5,12,14,19
　54:21 55:7,10

**relative** 85:14
**remain** 47:4
**remember** 36:20
　58:21 64:12
**remote** 3:1 4:2
**remotely** 1:14 4:2
　6:5
**renea** 77:5,9
**reorganization**
　17:1 19:14,17
　21:25 26:20 27:10
　27:21 29:1 46:9
　47:20 77:19
**reorganizations**
　26:17 46:12
**repeat** 11:25 25:23
**replaced** 13:8
　48:18
**report** 10:13,23
　11:9 12:24 13:1
　17:18,20 18:1,6,8
　18:14 19:25 33:6
　38:16,25 43:9
　57:12,13 68:20
　71:4
**reported** 13:12
　57:14,17
**reporter** 6:4 88:7
**reporting** 13:7,17
　14:1 15:8,25
　17:16 27:22,24
　85:16
**reports** 10:15,20
　20:6,7,24 21:7,11
　21:14 24:4,12
　30:16,21 31:20
　32:23 41:18,23
　43:11 71:6,7,9
　73:2
**represent** 4:14

**representation**
5:19 75:11
**request** 89:9,11
**required** 22:9 23:6
87:25
**resign** 59:20
**resignation** 48:22
48:23
**resigned** 61:23
**resonated** 39:24
**resources** 2:6 20:6
35:19 38:25 58:5
**respect** 2:6 22:4
35:19,22 57:22
**respond** 62:15
**responded** 54:20
**response** 62:7
63:24
**responsibility**
10:7,9 11:3 14:17
15:13 17:4 57:3
68:23
**responsible** 10:24
10:25 11:1
**restructure** 16:2
**restructuring** 16:4
**result** 19:14,17
42:17 46:11
**resume** 62:5
**retail** 11:3
**retaliating** 57:23
**retaliation** 31:25
32:7 34:22 38:14
38:17,20,24 39:2,4
57:18,24
**retaliatory** 38:21
**retired** 13:6
**returned** 87:18
**review** 8:13 9:1
22:19 87:12 88:1
89:1

**reviewed** 8:17
11:17 61:15 70:17
71:14 73:14
**reviews** 28:10
**rhonda** 77:4,23
**right** 10:5 14:19
16:17 17:17 18:16
19:25 20:1 24:5
25:1,13,23 27:9
28:13,22 29:18
31:3 35:5 40:3
45:25 47:5,17
48:20 50:9 55:11
55:14 59:8,18
61:19 65:2 69:1,4
76:1,9 78:2 80:3
80:22 81:15,25
83:6
**risk** 17:23 18:1
28:4 74:11,12
79:20 81:8
**roberts** 68:16
**role** 10:11,16,22
28:2 31:18 56:21
57:2,9 79:21,25
80:25
**roles** 79:22
**room** 7:9
**rpr** 1:15 86:7
**rule** 85:18
**rules** 1:13 6:3 88:5
89:5
**run** 48:7
**running** 21:12

**s**

**s** 87:15 89:8,8 90:3
**saba** 3:3
**san** 5:5
**sandra** 48:8
**saying** 16:14 17:25
18:4,5 25:9 40:22

42:7 43:12 58:12
**says** 63:23 65:8
81:2
**screen** 61:10
**seal** 86:2 88:15
89:21
**second** 37:1 45:14
80:15
**section** 36:7
**see** 21:10 36:8
37:3 62:14,18
73:21 74:9 82:9
**seeing** 70:15
**seen** 35:24 36:2
70:18,19 72:11,14
73:11,12,13 75:4
76:9,15,15,20
79:12 80:10 82:5
**select** 41:22
**selected** 43:2 45:1
**selection** 23:1
**senior** 5:14
**sense** 6:13,19,25
**sent** 42:12
**september** 1:17
86:3 87:4
**services** 18:18
72:3
**servicing** 2:10,10
10:8,25 11:1,8
13:13,20 33:21
47:19 48:7 72:3,7
73:6,25 76:13,19
**set** 86:1
**sex** 38:1,1 60:1
**sexual** 36:8,16,17
36:19,24 37:3,6,17
37:23 38:3,7 51:4
51:5 52:16 53:2,3
53:7 54:7 64:5,19
82:10

**sexually** 37:24
**share** 35:7,10
**shared** 35:7 59:25
80:16
**shareholder** 5:8
**shares** 82:9
**sheet** 87:13 89:7
89:10,18 90:1
**short** 69:22 75:21
**show** 35:16,17
**showed** 35:22
**showing** 25:7 72:4
**shown** 87:16
**sic** 81:25
**side** 67:4
**signature** 84:10
86:7 87:14
**signed** 88:13 89:18
**signing** 87:19
**similar** 37:25
60:14
**sincerely** 87:21
**sir** 22:2 87:10
**sitting** 7:3
**six** 13:19
**skype** 8:22,25
61:14
**sleeping** 82:19
**slept** 82:11
**smith** 2:3 3:4 4:1
4:12,13 12:2,9
14:7,18 25:16,25
26:5 35:23 41:3
41:11 45:25 46:6
56:4 60:19,20
61:8 67:24 68:4
70:8 72:10 73:8
75:23,25 76:5
79:9 80:9 81:15
81:24 82:23 83:19
84:3,6

smoothly 17:10
soaper 3:4
software 35:7,8
solutions 87:1
  90:1
somebody 39:18
  58:1 71:11
sorry 11:21 40:24
  48:14 53:2 76:17
  82:3
sort 27:18 83:12
sounds 42:7 45:22
southern 1:2
speak 6:25
speaking 6:6 8:10
specific 20:9 21:21
  27:10 32:5,18
  40:11,13 47:3
  54:2 55:23 59:3
  64:22 75:9
specifically 7:23
  16:6 18:12 22:12
  24:15 26:18,23
  29:2,5,7 31:6 32:1
  34:24 41:17,24
  46:17,20 51:21
  52:4 53:13 58:11
  58:12 65:22 66:17
  67:5 71:11,18
  74:4 78:19
specifics 16:12
  26:15 27:20 39:21
  47:14 51:6 52:17
  58:16,18
speculating 14:23
speculation 14:6
  15:11,15 16:11,14
spoken 8:6
spreadsheet 80:13
  81:2

ss 85:2
sspfirm.com 3:6,7
stacey 1:14 12:2
  26:1 84:6 85:3
  86:7
stagnaro 3:3
start 10:14 13:25
  14:19 44:22 69:10
started 9:25 10:6
  12:19 13:11 45:4
  45:18 79:3
starting 62:6
starts 37:13 80:14
state 1:16 85:1,4
  86:8 88:10 89:15
stated 67:2
statement 88:13
  88:14 89:19,19
statement's 64:11
statements 38:3
  62:1,14
states 1:1 76:16
  82:9
stearns 68:11
  77:13
stenographically
  85:11
stipulate 4:1
stone 13:3,4,8
story 62:11
strategy 74:12
  79:21
street 3:12
strike 51:10 68:6
strotman 3:16
  4:15,16 49:4,9
  50:8 77:5 78:1
strotman's 50:15
structure 13:7
  14:15

student 47:23
subject 11:14
  18:25
subjective 40:9
subordinates
  57:19
subscribed 88:10
  89:14 90:21
substantial 66:19
substantiated
  53:24 54:25
successfully 14:24
suite 87:2
summary 83:18
superior 87:1
supervisor 28:6
support 21:12
  32:22
supports 11:2
supposed 22:6
  39:5
sure 6:15 9:6,7
  29:10,14 33:3
  45:20 46:3 49:22
  51:12 75:23 79:1
sworn 4:9 85:8
  88:10,13 89:14,18
  90:21
synergy 80:18
  81:3,11

**t**

take 6:24 35:12
  46:1 55:4 63:14
  75:21 84:8
taken 1:14 4:22,25
  5:4,25 19:19
  54:25 56:14
takes 42:8
talk 30:25 46:9
  67:17

talked 42:6 53:14
talking 2:9 21:22
  27:9 32:24 35:1
  38:1 58:20 64:3
  64:23 67:8 71:23
  72:7,19
team 14:24 15:13
  23:15,16,17,18,21
  29:13 32:14,16,18
  32:19,21 33:6,24
  34:3,5,5,10,11,12
  34:14,20 44:3
  50:22 54:22 55:6
  55:7,10 57:1,2,9
  66:2,6 71:1,2,6,6,8
  74:8 83:15
teams 17:14 72:21
  83:25
tech 18:1
technology 17:21
  17:22
tell 5:3 15:18,21
  18:10 29:23,24
telling 29:4 37:23
  62:24
ten 44:9 46:2
term 22:14 27:8
  64:4 80:18 81:11
terminated 19:13
  19:17 23:4,8
  24:24 25:6 47:8
terminating 47:13
termination 12:11
  12:14 20:12 23:8
  38:23 60:11,22
  61:1
terminations
  11:17
terms 38:1
testified 55:9
  60:14

testify  85:8
testimony  4:18 5:7
11:23 60:17 83:18
85:10 88:6,7 89:6
89:9,12
texas  1:16 7:5
thing  6:4
things  30:6
think  8:21 9:20
10:3 13:18,20
27:14 34:1,7,11
42:6,18 44:18
45:16 46:14 52:7
53:14 55:9 60:14
60:18 61:14 63:3
71:23 75:19 77:25
78:9,10 80:24
81:16
thirty  87:18
three  42:24,25
55:19 66:18,20
67:1 68:12 78:21
throw  62:10 64:2
thursday  1:16
tim  11:10 12:24
13:9 14:3 29:24
time  4:24 5:11,13
6:6 9:20 12:23
13:2,22,23 14:1
16:21,22 21:11
26:11 27:21 28:7
33:16 35:2 51:13
51:15 58:3 64:15
64:18 69:6,8
71:21,22 74:2,7
75:3,9 78:2,18
times  67:23
title  10:10 79:1
titled  73:25
today  4:18 6:3,21
7:3,7,13 8:7,10

9:10 45:10 61:13
68:23 82:14 83:6
told  27:17 30:8
51:10 53:23 54:9
54:15 55:17 56:6
59:6,7 64:8
tolerate  36:22
37:13,14 38:14
tolerated  38:8
tom  3:16 4:15,16
49:4,9 50:8,15
77:5 78:1
top  40:19 62:2
74:2
topics  31:22
total  43:22
trained  24:16,19
31:8 36:5
training  31:11,22
36:4
tran  84:9
transcribed  88:7
transcript  87:11
87:12 88:5,12
89:5,11,17
transferred  17:5,7
transition  33:4
trip  49:16 82:12
trips  45:7 49:14
trust  30:17
truth  85:8,8,9
trying  23:20 32:11
tucson  49:18
turning  38:3
two  23:7 25:12,17
28:17 30:5 41:22
45:7 48:24 55:3,5
55:19 62:9,25
63:5 66:18,20
67:19 71:21 74:9
83:1

type  8:21 22:1,19
22:21 39:22 42:19
65:12
typewriting  85:12
typical  62:23
typically  9:18
12:13 20:13 30:3
30:8 40:4,19,22
41:20,21 42:10,19
43:8 44:11 49:12
62:22 72:24 73:14
76:23 81:11

**u**

u.s.  1:8 4:16 9:12
19:7 21:23 24:8
24:17 31:1,2
32:10 33:25 34:17
35:3 38:8 39:1,10
40:3 46:12,25
47:11 68:7 69:10
77:3,15,21 78:25
81:12
uh  6:19,19
ultimate  17:12
ultimately  17:5
18:21
undated  70:13
understand  4:17
23:20 32:12 54:1
58:17 60:5 75:8
understanding
10:12 19:12 22:18
41:6 52:11 68:3
80:23 83:8,13,14
83:21,24
underwrites  11:4
underwriting  11:6
unicorn  62:11
64:3,11,19,23
unit  10:10

united  1:1
unprofessional
37:15,18
upload  35:12
uploaded  61:9
76:1
upwards  44:19
use  69:16

**v**

v  4:16 87:6 88:3
89:3
vague  59:9 63:7
vaguely  58:14,21
64:12
various  14:1 22:19
varol  71:4,5
vendor  68:24
verbal  36:18,20
37:2
verbalized  6:16
verify  56:13
veritext  35:10
87:1,7 90:1
veritext.com.
87:17
versus  30:5 44:17
47:12
vice  5:14 9:16 10:3
11:10,11 12:20
13:5 14:15 15:16
15:23 68:15
violation  38:17
voluntarily  48:16
vs  1:7

**w**

wait  6:8,11
waived  84:11
87:19
want  10:12 12:5,7
21:22 30:25 46:1

**[want - yep]** Page 15

46:9 49:21 69:23
**warning**  62:10
63:9,11,15,17,20
**warranted**  63:15
**watson**  33:2,9,11
**way**  21:18 22:3
36:13 41:6
**we've**  44:19 45:25
58:8 66:10 67:8
**week**  7:18 70:17
70:18
**welsh**  11:10 12:24
13:9
**went**  45:19 70:20
71:16 76:16
**western**  1:3
**whereof**  86:1
**wholesale**  11:6
13:23
**winners**  42:11
**witness**  1:12 2:2
4:8 11:25 12:5
14:9,13 25:23
26:3 35:21 41:1
41:10 46:4 55:25
56:3 68:2 72:9
75:21 80:8 83:20
85:12 86:1 87:8
87:11 88:1,4,11
89:1,4,15
**witness'**  87:14
**work**  7:7 9:12
25:7 30:4 32:10
33:20 66:13 67:14
68:8
**worked**  33:15 69:3
77:13
**workforce**  66:19
**working**  62:3
**workplace**  2:6
35:19,22 37:19

57:21
**works**  46:2 71:3
79:2
**wrap**  81:17
**writing**  85:10
**written**  22:5 62:10
63:8,11,12,15,17
63:20

**x**

**x**  2:1 20:18

**y**

**yeah**  12:2 27:20
32:6,20 36:17
44:10 45:6 51:20
51:21 52:9 70:19
75:23 76:18 77:16
81:1
**year**  44:20 45:3,12
45:15 49:20 51:23
52:6 62:10 78:21
**years**  5:1,23 10:9
39:15 45:17 66:18
66:20,20 68:10,11
68:12
**yep**  62:8

Ohio Rules of Civil Procedure

Title V. Discovery

Rule 30

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless examination and reading are waived by the
witness and by the parties. Any changes in form or
substance that the witness desires to make shall be
entered upon the deposition by the officer with a
statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill, cannot be
found, or refuses to sign. The witness shall have
thirty days from submission of the deposition to
the witness to review and sign the deposition. If
the deposition is taken within thirty days of a
trial or hearing, the witness shall have seven days
from submission of the deposition to the witness to
review and sign the deposition. If the trial or
hearing is scheduled to commence less than seven
days before the deposition is submitted to the
witness, the court may establish a deadline for the

witness to review and sign the deposition. If the deposition is not signed by the witness during the period prescribed in this division, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.