UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **MARK PANNEK, et al.,** | : | Case No. 1:19-cv-00852 |
| | : | |
| Plaintiffs, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | **PLAINTIFF THOMAS STROTMAN'S** |
| | : | **RESPONSE TO DEFENDANT US** |
| **U.S. BANK NATIONAL ASSOCIATION,** | : | **BANK'S PROPOSED UNDISPUTED** |
| | : | **FACTS** |
| Defendant. | : | |

Pursuant to the Court's Standing Order Regarding Procedure in Civil Cases, Plaintiff Thomas Strotman, by and through counsel, hereby submits the following Response to Defendant US Bank's Proposed Undisputed Facts and Disputed Facts:

**Responses to Undisputed Facts**

1. U.S. Bank was formed in accordance with the National Bank Act, 12 U.S.C. § 21. (Declaration of Linda E. Bidon ("Bidon Decl.") ¶3, Doc # 43-1 at PageID 2036.)

   **Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff has no current reason to deny this assertion.**

2. U.S. Bank has operations across the country, including in Cincinnati, Ohio. (Declaration of T. Bryan Bolton ("Bolton Decl.") ¶3, Doc # 43-2 at PageID 2095.)

   **Admit.**

3. U.S. Bank's Workplace Respect Policy prohibits sexual harassment and other inappropriate conduct in the workplace, even if that conduct does not rise to the level of unlawful harassment or discrimination. (Deposition of Laurie Grey ("Grey Dep.") at Exh. 1, Doc # 40-1 at PageID 1919-1921.)

   **Admit that US Bank's Workplace Respect Policy states this.**

4. U.S. Bank's Workplace Respect Policy prohibits unlawful harassment, discrimination, and retaliation. (Grey Dep. at Exh. 1, , Doc # 40-1 at PageID 1919-1921.)

   **Admit that US Bank's Workplace Respect Policy states this.**

5. U.S. Bank's Workplace Respect Policy provides multiple avenues for employees to report any alleged harassment – including to a manager or supervisor, a human resources business partner, or through the U.S. Bank Ethics Line via telephone or

online. (Grey Dep. at Exh. 1, p. 2, Doc # 40-1 at PageID 1920.)

**Admit that US Bank's Workplace Respect Policy states this.**

6. U.S. Bank's Workplace Respect Policy provides that complaints will be investigated, and disciplinary action will taken where appropriate. (Grey Dep. at Exh. 1, p. 3, Doc # 40-1 at PageID 1921.)

**Admit that US Bank's Workplace Respect Policy states this.**

7. U.S. Bank's Workplace Respect Policy provides that retaliation against anyone who makes a good faith complaint of harassment or other inappropriate conduct is not tolerated. (Grey Dep. at Exh. 1, p. 3, Doc # 40-1 at PageID 1921.)

**Admit that US Bank's Workplace Respect Policy states this.**

8. U.S. Bank hired Plaintiff Strotman in January 2017, when he was 48 years old, as the Vice President of Governance Control for the Consumer Banking Default Management group. (Deposition of Thomas Strotman ("Strotman Dep.") at 11, 39, Doc # 36 at PageID 840, 868.)

**Admit.**

9. As a Vice President, Strotman was an officer of the bank. (Strotman Dep. 112, Doc # 36 at PageID 865; Bidon Decl. ¶6, Doc # 43-1 at PageID 2037-38.)

**Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff ha no current reason to deny this assertion.**

10. U.S. Bank's board of directors ratified Strotman's appointment as an officer of the bank on May 10, 2017. (Bidon Decl. ¶6, Doc # 43-1 at PageID 2037-38.)

**Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff ha no current reason to deny this assertion.**

11. In his role as Vice President of Governance Control, Strotman was responsible for executing a number of risk control programs. (Strotman Dep. 39, 45, Doc # 36 at PageID 868, 874.)

**Admit.**

12. In July 2017, Strotman terminated Siobhan Whitlock, an African-American female who led the vendor management/third-party risk function on his team, and subsequently recruited Mark Pannek for that role. (Strotman Dep. 52-54, 56, Doc # 36 at PageID 881-83, 885.)

**Admit that Strotman terminated Siobhan Whitlock, but deny any inference that there was something improper about this termination, or about his selection of Mark Pannek to fill the role.**

13. Pannek was hired in August 2017. (Strotman Dep. 52, 58, Doc # 36 at PageID 881, 887.)

    **Admit.**

14. In late October or early November 2017, U.S. Bank underwent a re-organization of the Consumer Lending division in which Strotman and Pannek worked. (Strotman Dep. 58-59, Doc # 36 at PageID 887-88; Deposition of Mark Pannek ("Pannek Dep."), 75-76, Doc # 35 at PageID 515-16.)

    **Admits that positions in the Consumer Lending Division were reshuffled in late October, early November, 2017.**

15. The Consumer Lending, Commercial Lending, and Student Loan departments merged to form the Lending Services department. (Pannek Dep. 77, Doc # 35 at PageID 517; Strotman Dep. 58-59, Doc # 36 at PageID 887-88.)

    **Admits that in the reshuffling of positions that occurred in late October, early November, the consumer lending, commercial lending and student loan departments merged.**

16. As a result of the reorganization, Strotman and Pannek both began reporting to John Gemrich. (Strotman Dep. 59, Doc # 36 at PageID 887; Pannek Dep. 82, Doc # 35 at PageID 522.)

    **Admit.**

17. Prior to the reorganization, neither Strotman nor Pannek had ever worked with Gemrich nor had any impression of him. (Strotman Dep. 60-61, Doc # 36 at PageID 889-90; Pannek 84-85, 88, Doc # 35 at PageID 524-25, 528.

    **Admit.**

18. In approximately January 2018, the Lending Services division merged with the Mortgage Servicing division to form the CBSS Servicing Group. (Strotman Dep. 79, Doc # 36 at PageID 908; Exh. 2, Doc # 36-1 at PageID 1009-12; Pannek Dep. 156-158, Doc # 35 at PageID 596-97; Exh. 4, Doc # 35-1 at PageID 758-59.)

    **Denied as written. However, admit that it was announced that the newly formed "Lending Services Division" would be merged with Mortgage Services to form the CBSS Servicing Group in approximately January 2018 or February 2018.** *See* **Strotman Dep. 77-79, Doc # 36 at PAGEID 906-908; Pannek Dep. 157-158, Doc # 35 at PAGEID 596-597; Watson Dep. 113-114, Doc # 49 at PAGEID 2388-2389.**

19. Strotman and Pannek ceased reporting to Gemrich and began reporting to Bryan Bolton, Senior Vice President and Chief Administrative Officer of the Consumer Business Banking Operations area. (Strotman Dep. 80-81, Doc # 36 at PageID 910; Exh. 2, Doc # 36-1 at PageID 1009-12; Pannek Dep. 159, Doc # 35 at PageID 599; Deposition of Bryan Bolton ("Bolton Dep.") at 13, 16, Doc # 39 at PageID 1463, 1466.)

   **Admit that with the formation of the CBSS Servicing Group, Pannek and Strotman began reporting to Bryan Bolton.**

20. Gemrich also began reporting to Bolton. (Strotman Dep. Exh. 2; Pannek Dep. 160, Doc # 35 at PageID 600.)

   **Admit that with the formation of the CBSS Servicing Group, Gemrich also began reporting to Bolton.**

21. Prior to the merger, Bolton did not know Pannek or Strotman, and had had only limited interactions with Gemrich. (Bolton Dep. 19, 21-22, Doc # 39 at PageID 1469, 1471-72; see also Strotman Dep. 82-83, Doc # 36 at PageID 911-12; Pannek Dep. 159-160, Doc # 35 at PageID 599-600.

   **Admit that Pannek and Strotman did not know Bolton prior to the merger. Deny Bolton and Gemrich had limited interaction. Gemrich Dep. 71:7-24, Doc #37, PAGEID 1186. Bolton Dep. 21-22, Doc # 39, PAGEID 1471-72. Deny for lack of understanding the criteria for determining "limited."**

22. Prior to the merger, Strotman had led the regulatory change management function for Lending Services, while Rhonda Gombold led a similar function for Mortgage Servicing. (Bolton Dep. 73, Doc # 39 at PageID 1523.)

   **Admit.**

23. Prior to the merger, Strotman led a procedures team that was similar to a function that Amanda Spurrier performed on the Mortgage Servicing side. (Bolton Dep. 73, Doc # 39 at PageID 1523.)

   **Admit.**

24. Almost immediately upon the merger of the Lending Services and Mortgage Serving divisions in early 2018, Bolton began to evaluate his organization for potential synergies or duplication of functions in order to determine if any of those

functions could be consolidated so that the group could operate more efficiently. (Bolton Dep. 24-25, Doc # 39 at PageID 1474-75.)

> **Denied.** *See* **Bolton Dep. 25-26, 28-30, 34, 51, 74-76; Watson Dep. 66-67; Roberts Dep. 114; Grey Dep. 100.**

25. Bolton's evaluation process included gathering feedback from others, observing how well his direct reports were able to work together collaboratively, and having discussions with the direct reports who were new to his team. (Bolton Dep. 27-28, 34-38, 60, Doc # 39 at PageID 1477-78, 1484-88, 1510.)

> **Admit the Bolton claims to have been evaluating his team, and that he testified on the pages cited to the claimed activities, but deny any inference as to the truth or efficacy of his activities. Plaintiff's position with respect to Bolton's evaluation process cannot be neatly admitted or denied in one sentence. See Generally Plaintiff's Memorandum in Opposition.**

26. While he used the feedback that he got from others to help get a full picture, Bolton's own observations were the "overriding factor" on which he relied when making decisions. (Bolton Dep. 66-67, Doc # 39 at PageID 1516-17.)

> **Denied.** *See* **Watson Dep. Exhibit 4, Doc # 48-1, PAGEID 2438-2440 as compared with Bolton Dep. Exhibit 16, 19, Doc # 39-1 at PAGEID 1751 and 1765; Bolton Dep. 60-61, Doc # 39, PAGEID 1510-1511; Watson Dep. 55-58, Doc # 49, PAGEID 2330-2333.**

27. Bolton sought feedback from Gemrich about Strotman, who was Strotman's most recent supervisor, and other individuals within the risk department with whom Strotman worked. On March 1, 2018, Gemrich provided Bolton with his feedback. (See Bolton Dep. 36-37, Doc # 39 at PageID 1487; Exh. 19, Doc # 39-1 at PageID 1765.)

> **Admit that Bolton sought Feedback from Gemrich; Deny that Bolton sought information from other individuals within the risk management department with whom Strotman worked for failure of Bolton to identify any of them. Bolton Dep. 61:10-15; 62:3-20; 63:16-25; 64:13-20, Doc # 39, PAGEID 1511-1514. Plaintiff further notes that Gemrich supervised Strotman for only two months. Gemrich Dep. 20:17-20, Doc # 37, PAGEID 1135; Bolton Dep. 18:21-23, Doc # 39, PAGEID 1468. Further, Bolton failed to credit/seek information**

> provided by Mike Ryan who supervised Strotman prior to Gemrich and for a longer period of time. Bolton Dep. 225-227, Ex. 14, Doc # 39, PAGEID 1675-1677; Bolton Dep. Ex. 14, Doc # 39-1, PAGEID 1742-1743.

28. On March 1, 2018, Gemrich offered several positive comments, as well as some critical comments, including that Strotman could be "[r]esistant to ideas other than his own" and "[m]ay work against direction he does not agree with." (See Bolton Dep. Ex. 19, Doc # 39-1 at PageID 1765.)

> **Denied as written. Gemrich Dep. Exhibits 1-2, 5-7, Doc # 37, PAGEID 1152, 1155, 1165, 1166, 1170; Bolton Dep. Exhibit 16, 18, Doc #39-1, PAGEID 1751 and 1754.**

29. Bolton received similar feedback from the risk partners with whom Strotman worked. (Bolton Dep. 60-62, Doc # 39 at PageID 1510-11 (recalling that the risk partners told him that Strotman "kind of had . . . his own way of doing things, and if the group decided to do it a certain way or the bank's way of doing things didn't align with what Tom thought was the right or the best way to do it, he would just do down the path of doing it his way, over than the bank's way.").)

> **Deny for failure of Bolton to identify the risk partners with whom he spoke. Bolton Dep. 61:10-15; 62:3-20; 63:16-25; 64:13-20, Doc # 39, PAGEID 1511-1514.**

30. Bolton had asked all of his direct reports (including Strotman) to work collaboratively with one another to talk about their respective functions and teams and develop the best model going forward. (Bolton Dep. 27-28, 63, Doc # 39 at PageID 1477-78, 1513)

> **Admit that Bolton made this statement at his deposition.**

31. Rachel Votel, who Bolton asked to coordinate the project, reported to Bolton that Strotman was not participating in the calls. (Bolton Dep. 63, Doc # 39 at PageID 1513.)

> **Denied. See Strotman Declaration ¶ 16.**

32. Bolton had discussions with Strotman about his organization. (Bolton Dep. 34-35, Doc # 39 at PageID 1484-85; Strotman Dep. 109-110, Doc # 36 at PageID 938-39.)

> **Plaintiff admits that he did have some discussion with Bolton, but the discussion was minimal. See Strotman Declaration ¶ 14.**

33. Bolton found these discussions to be frustrating because he felt he had to follow up with Strotman several times in order to get answers to his questions, and felt that a leader at Strotman's level should have a greater knowledge of his or her team than

Strotman seemed to have. (Bolton Dep. 65-68, Doc # 39 at PageID 1515-18.)

> **Plaintiff admits that Bolton testified as indicated on the cited pages, but denies the undisputed nature of the testimony. *See* Strotman Declaration ¶ 14; *See* Bolton Dep. Exhibit 14, Doc # 39-1, PAGEID 1742-1743 (Mike Ryan Performance Summary).**

34. By late February or March, Bolton had formed his opinion that Strotman was not the right leader for his organization. (Bolton Dep. 58, 80, Doc # 39 at PageID 1508, 1530.)

> **Denied.  *See* Bolton Dep. 25-26, 51, 75, 232-234, Doc # 39, PAGEID 1745-1746, 1501, 1525, 1682-1684; Watson Dep. 66-67, Doc # 49, PAGEID 2341-2342 and Exhibit 4, Doc # 49-1, PAGEID 2438-2440; Roberts Dep. 114, Doc # 38 PAGEID 1385; Grey Dep. 100, Doc # 40, PAGEID 1875; Gemrich Dep. Exhibit 4, Doc # 37, 1161; Bolton Dep. 232-234:4-20 Doc # 39-1, PAGEID 1682-1684.**

35. Bolton also decided that Gombold was also not right to lead the change management function because she had been struggling prior to the merger. (Bolton Dep. 79, Doc # 39 at PageID 1529.)

> **Admit that Gombold was not retained. Deny any inference that this occurred in late February or March (see response to Proposed Undisputed Fact 34).**

36. Bolton decided to eliminate both Strotman and Gombold's positions. (Bolton Dep. 79-80, 232-233, 249, Doc # 39 at PageID 1529-30, 1682-83, 1699.)

> **Admit, but deny any interference that he was justified in either decision. *See* Memorandum in Opposition, supra.**

37. Bolton created a position that was a lower-level than Strotman's had been to lead the change management function, and moved Greg Hovis – who had previously reported to Strotman and was 55 years old at the time – into the role. (Bolton Dep. 232-233, Doc # 39 at PageID 1682-83; Strotman Dep. 114-119, Doc # 36 at PageID 943-948; Exh. 4, Doc # 36-1 at PageID 1017; Bolton Dec. ¶8.)

> **Admit that Hovis was temporarily placed in what was left of Strotman's role at a lower-level, but was thereafter moved to the level held by Strotman. Bolton Dep. 233:21-234:6, Doc #39 at PageID 1683. Deny any inference that the move was appropriate or non-retaliatory.**

38. Bolton moved Strotman's procedures responsibilities to Amanda Spurrier. (Bolton Decl. ¶9, Doc # 43-2 at PageID 2097; Strotman Dep. 114-119, Doc # 36 at PageID 943-48; Exh. 4, Doc # 36-1 at PageID 1017.)

       **Admit.**

39. Some of Strotman's other duties moved to another department outside of Bolton's organization. (Bolton Decl. ¶9, Doc # 43-2 at PageID 2097)

       **Admit.**

40. Over the next several weeks, Bolton reviewed and finalized the termination decisions with Human Resources Business Partner Diane Watson. (See Bolton Dep. 53-54, Doc # 39 at PageID 1503-04.)

       **Denied. *See* Bolton Dep. 210-213 Doc # 39, PAGEID 1660-1663 and Exhibits 11-12, Doc # 39-1, PAGEID 1739-1740.**

41. Bolton and Watson informed Strotman that his position had been eliminated on May 15, 2018. (Strotman Dep. 15, Doc # 36 at PageID 844.)

       **Admit.**

42. Strotman was 49 years old at the time of his termination. (Strotman Dep. 11, Doc # 36 at PageID 840.)

       **Admit.**

43. The board ratified the termination of Strotman's officer appointment on July 25, 2018, effective as of May 15, 2018. (Bidon Decl., ¶8, Doc # 43-1 at PageID 2039.)

       **Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff has no current reason to deny this assertion.**

44. After his termination, Strotman applied for several positions with U.S. Bank, including a risk strategy position that reported to Bolton. (Bolton Dep. 228, Doc # 39 at PageID 1678; Strotman Dep. 160-173, Doc # 36 at PageID 989-1002.)

       **Admit.**

45. Bolton did not interview Strotman for the position because he was looking for someone with credit risk and collections strategy experience, which he did not believe that Strotman had. (Bolton Dep. 228, Doc # 39 at PageID 1678; Bolton Decl. ¶14, Doc # 43-2 at PageID 2097.)

       **Admit that Bolton said this, deny the truth of the assertion. See Strotman Declaration ¶ 18-19.**

46. The individual that Bolton hired for the position, Ellie Liu, an Asian-American female, had significant experience in credit risk and collections strategy. (Bolton Decl. ¶14, Doc # 43-2 at PageID 2097.)

       **Deny for lack of knowledge or evidence beyond Bolton's self-serving declaration.**

47. With respect to the other positions for which he applied that did not report to Bolton, Strotman does not know who was hired for any of those positions. (See Strotman Dep. 160-173, Doc # 36 at PageID 989-1002.)

    **Admit.**

48. Pannek filed an ethics hotline complaint on March 27, 2018. (Pannek Dep. 194-197, Doc # 35 at PageID 634-37; Exh. 7, Doc # 35-1 at PageID 766-68.)

    **Admit.**

49. Lydia Buster testified that Pannek referred to the complaint as his "insurance policy" against possible termination. (Deposition of Lydia Buster ("Buster Dep.") 31, Doc # 42 at PageID 1998.) ("Mark said that they had, you know, filed a complaint with the ethics line as kind of an insurance policy to protect themselves against the consolidation that was happening.").)

    **Denied as to the truth of Ms. Buster's testimony. *See* Pannek Dec. ¶ 9.**

50. U.S. Bank assigned Human Resources Business Partner Laurie Grey to investigate Pannek's complaint. (Grey Dep. 53, 61-63, Doc # 40 at PageID 1828, 1836-1838.)

    **Admit.**

51. During the course of her investigation, Grey interviewed, Pannek, Gemrich, and several other employees, including Strotman. (Grey Dep. 64, Exh. 4, Doc # 40-1 at PageID 1930-37.)

    **Admit.**

52. Grey interviewed Strotman, who corroborated Pannek's allegations about a bet and allegations about Gemrich discussing his sex life, though he declined to provide any details about verbiage that Gemrich allegedly used. (Grey Dep. 73-75, Doc # 40 at PageID 1848-50; Exh. 4 p. 5-6, Doc # 40-1 at PageID 1934-35; Strotman Dep. 94-99, Doc # 36 at PageID 923-28.)

    **Deny with respect to Strotman not providing "any details about verbiage" as Strotman did make reference to the verbiage including Gemrich referring to himself as a "f***ing unicorn," that he could "hit an p***y he wanted," and his frequent use of the "p word." *See* Strotman Dep.  95-96, Doc # 36, PAGEID 924-925. Strotman merely indicated that he was embarrassed to say certain words, so would use a shortened version of those words (i.e., the "P word"). *Id.* at 98, Doc # 36, PAGEID 927.**

53. Gemrich was not aware that Strotman participated in the investigation. (Gemrich Dep. 103-104.)

    **Deny as Plaintiff doubts the veracity of Gemrich's statement and has**

   **no knowledge what Gemrich was or was not told.**

54. Grey also interviewed two other employees, Jeff Sorg and Kevin Turner, whom Pannek had identified as people with knowledge of his allegations. (Grey Dep. 75-78, Doc # 40 at PageID 1850-53; Exh. 4 p. 7-8, Doc # 40-1 at PageID 1936-37.)

   **Admit in part. Deny that Grey interviewed Sorg or Turner regarding the entirety of the allegations including the sex-based comments. Grey Dep. 75-78, Doc # 40, PAGEID 1850-1853.**

55. Strotman admits that Gemrich never made sexual advances towards him, never grabbed or groped him, and never touched him inappropriately. (Strotman Dep. 127, Doc # 36 at PageID 956.)

   **Admit.**

56. Gemrich sent an aggressive email to female employee Annette Tatman and later called her a "bitch." (Pannek Dep. 101-104, 118-119, Doc # 35 at PageID 541-44, 558-59; Strotman Dep. 71, 74-75, Doc # 36 at PageID 900, 903-904.)

   **Admit that Gemrich sent an aggressive email to Annette Tatman and called her a "bitch" for going to HR. Pannek Dep. 89-90, 106, 118-119, Doc # 35, PAGEID 529-530, 546, 558-559; Strotman Dep. 74-75, Doc # 36, PAGEID 903-904; Buster Dep. 26, Doc # 42, PAGEID 1993.**

57. Gemrich belittled male employees, including Dr. Wang and Tom Markesbery. (Pannek Dep. 119-122, Doc # 35 at PageID 559-62; Strotman Dep. 62-63, Doc # 36 at PageID 891-92.)

   **Admit that Gemrich treated Dr. Wang and Tom Markesbery inappropriately.**

58. Gemrich was dismissive of female employee Susan Stevens. (Pannek Dep. 110-112, Doc # 35 at PageID 550-52.)

   **Admit.**

59. Gemrich made disparaging remarks about male employee Mike Ryan, including saying that he was not good at his job. (Strotman Dep. 67-69, Doc # 36 at PageID 896-98.)

   **Admit.**

60. Gemrich made inappropriate comments about his sex life to Pannek and Strotman during their weekly meetings when Pannek and Strotman reported to Gemrich. (See Pannek Dep. 75-76, 87, 126, 155-160, Doc # 35 at PageID 515-16, 527, 566, 595-600.)

   **Admit.**

61. Gemrich made the following comments about Gemrich's sex life: (1) on one occasion referred to himself as a "fucking unicorn," which he explained meant "a handsome single male that had a house and money and a good job: (Pannek Dep. 128-131, Doc # 35 at PageID 568-71); (2) on two or three occasions, said he could "fuck or nail any pussy he wanted" (Pannek Dep. 132-134, Doc # 35 at PageID 572-74): (3) on one occasion, said that he "nailed or fucked a deaf woman" who had large breasts that he "motorboated" (Pannek Dep. 134-136, Doc # 35 at PageID (574-76); and (4) on one occasion, told Pannek that he thought a female co-worker's accent was "hot" (Pannek Dep. 138-139, Doc # 35 at PageID 578-79).

**Admit the Gemrich made inappropriate sexual comments.**

62. In consultation with Diane Watson, Bolton decided to issue Gemrich a Written Warning as a result. (Grey Dep. 85, Doc # 40 at PageID 1860; Bolton Decl. ¶12, , Doc # 43-2 at PageID 2097.)

**Admit that Gemrich was issued a written warning.**

63. Bolton is not aware of Gemrich ever making any sexually explicit comments after receiving the Written Warning. (Bolton Dep. 248-249, Doc # 39 at PageID 1698-99.)

**Admit that Bolton said this.**

64. Prior to Pannek's March 27, 2018 complaint, Strotman never reported Gemrich's alleged inappropriate behavior. (Strotman Dep. 99, Doc # 36 at PageID 928),

**Deny. See Strotman Dep. 71-75, Doc # 36, PAGEID 900-904.**

65. U.S. Bank did not hire anyone to replace Strotman. (Bolton Decl. ¶7, Doc # 43-2 at PageID 2097.)

**Admit that US Bank did not hire anyone to replace Strotman. Deny that Strotman was not replaced.**

66. Strotman admits that no one at U.S. Bank ever made any age-related comments to him. (Strotman Dep. 124-125, Doc # 36 at PageID 953-54.)

**Admit.**

67. Bolton and Hovis are older than Strotman. (Strotman Dep. 11, Doc # 36 at PageID 840; Bolton Decl. ¶¶7, 15, Doc # 43-2 at PageID 2096-97.)

**Admit.**

68. Strotman believes that his age was just one factor in his termination. (Strotman Dep. 140, Doc # 36 at PageID 969.)

**Admit.**

69. Laurie Grey interviewed Strotman on April 19, 2018. Grey Dep. Exh. 4, p. 5, Doc # 40-1 at PageID 1934 (Grey interviewed Strotman on April 19, 2018).)

   **Deny for lack of knowledge regarding the exact date.**

70. Strotman admits that Bolton never made any negative comments to him about his participation in the investigation of Pannek's complaint. (See Strotman Dep. 135, Doc # 36 at PageID 964.)

   **Admit Bolton never made comments directly to Strotman.**

71. Gemrich was not involved in the decision to terminate Strotman. (Gemrich Dep. 23, 45-46; Bolton Dep. 249, Doc # 39 at PageID 1699.)

   **Deny.  Gemrich was directly involved in the decision to terminate Strotman. *See* Bolton Dep. Exhibit 16-19, 22, Doc # 39, PAGEID 1466-1469, 1472; Watson Dep. Exhibit 4, Doc # 49-1, PAGEID 2438-2440.**

72. Lydia Buster and Tom Markesbery complained to HR about Gemrich and were not terminated. (See Pannek Dep. 89, 116-117, 149, Doc # 35 at PageID 529, 556-57, 589 and Buster Dep. 21, Doc # 42 at PageID 1988.)

   **Admit that Lydia Buster complained to HR, deny Gemrich was aware that she was the one who made the complaint. *See* Pannek Dep. 89, 106, 118-119, Doc # 35, PAGEID 529, 546, 558-559; Strotman Dep. 74-75, Doc # 36, PAGEID 903-905. Deny that Tom Markesbery "complained" to HR. Plaintiffs also deny any inference that can be made from Defendant's statement that Buster's and Markesbery's complaints negate the retaliation claims of Pannek and Strotman.  Neither Buster nor Markesbery were direct reports of Bolton who were evaluated by him in connection with the alleged RIF.**

73. Jeff Sorg and Kevin Turner participated in Laurie Grey's investigation of Pannek's complaint and were not terminated. (Grey Dep. 75-78, Doc # 40 at PageID 1850-53; Exh. 4 p. 7-8, Doc # 40-1 at PageID 1936-37.)

   **Admit that Sorg and Turner participated in Laurie Grey's investigation. Plaintiffs, however deny any inference that can be made from Defendant's statement that Sorg's and Turner's participation negate the retaliation claims of Pannek and Strotman.  Neither Sorg nor Turner were direct reports of Bolton who were evaluated by him in connection with the alleged RIF, nor did either report any sex-based comments (because they were not asked).  Further, they may have given truthful responses to HR's inquiries, but they did not bring the Complaints.**

## Disputed Facts to be Tried

1. Gemrich created a hostile work environment. (*See* Memorandum in Opposition Pages35-38; Bolton Dep. Exhibits, Doc #39-1 at PageID 1709-1710,1712-1717; Pannek Dep., Doc #35 at PageID 528-539, 542-544, 546, 558-559, 567, 569, 609-611; Gemrich Dep., Doc #37 at PageID 1145; Gemrich Dep. Exhibits, Doc #39-1 at PageID 1262-1270; Strotman Dep.. Doc #36 at PageID 899-904, 924-925; Buster Dep., Doc #42 at PageID 1987-1991, 1993-1994; and Grey Dep., Doc #40 at PageID 1869-1870.)

2. Strotman/Pannek reasonably opposed the hostile work environment Gemrich created. (*See* Memorandum in Opposition Pages 36-37; Pannek Dep., Doc #35 at PageID 531, 609, 645; Strotman Dep., Doc#36, PageID 899-902)

3. Gemrich provided negative information to Bolton to persuade him to disfavor Strotman/Pannek. (*See* Memorandum in Opposition Page 30;  Gemrich Dep. Exhibits 1-2, 5-7, Doc # 37, PAGEID 1152, 1155, 1165, 1166, 1170; Bolton Dep. Exhibit 16, 18, Doc #39-1, PAGEID 1751 and 1754.)

4. Prior to the filing of Pannek's Ethics Complaint regarding the hostile work environment Gemrich created, Bolton had not made any decision to terminate/sever Pannek or Strotman. (See Memorandum in Opposition Page 32; Pannek Dep., Doc #35 at PageID  634-639, 645-646; Strotman Dep., Doc # 36 at Page ID 922-923; Watson Dep., Doc #49 at PageID 2311-2312; Watson Dep. Exhibits, Doc #49-1 at Page ID 2434, 2438-2440; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

5. Bolton, influenced by Gemrich, retaliated against Strotman/Pannek for Pannek's Ethics Complaint. (*See* Memorandum in Opposition Pages 26-35; Gemrich Dep. Exhibits 1-2, 5-7, Doc # 37, PAGEID 1152, 1155, 1165, 1166, 1170; Bolton Dep. Exhibit 16, 18, Doc #39-1, PAGEID 1751 and 1754.)

6. Bolton attempted to justify his retaliation by creating a skewed Peer Group Analysis to justify severing Strotman/Pannek during an alleged RIF. (*See* Memorandum in Oppsition Pages 32-33; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

7. Bolton attempted to justify his retaliation by creating a skewed performance analysis for Pannek/Strotman (based on Gemrich's representations) to justify the terminations of Pannek/Strotman during a US Bank reorganization that affected Bolton and his direct reports. (*See* Memorandum in Opposition Pages 32-33; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

8. US Bank's Human Resources Department conducted a less than satisfactory investigation of both Pannek's Ethics Complaint and Bolton's rationale for terminating employees who had filed/participated in an Ethics Complaint. (*See* Memorandum in Opposition Page 34; Pannek Dep., Doc #35 at PageID 634-640, 645-646, 658-661, 665-670; Pannek Dep. Exhibits, Doc #35-1 at PageID 766-768, 776-781; Strotman Dep., Doc # 36 at Page ID 922-927; Grey Dep., Doc #40 at PageID 1799-1800, 1833-1834, 1850-1856, 1862-1864; Grey Dep. Exhibits, Doc 40-1 at PageID 1919-1921, 1926-1937; Watson Dep., Doc #49 at PageID 2311-2312, 2357-2360, 2363-2365, 2370-2371; and Watson Dep. Exhibits, Doc #49-1 at Page ID 2434, 2449-2454.)

9. Bolton's skewed PGA analysis and performance analysis for Pannek resulted from favoritism for a younger female employee. (*See* Memorandum in Opposition Pages 38-40; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

10. At the time of the Strotman/Pannek terminations, there were positions open at US Bank that Strotman/Pannek could reasonably have filled. (See Memorandum in Opposition Pages 34-35; *See* Bolton Dep., Doc #39 at PageID 1672-1674; Bolton Dep. Exhibits, Doc #39-1 at PageID 1741; *See also* Strotman Dec. ¶ 19; Pannek Dec. ¶ 10.)

Respectfully submitted,

/s/ *Joshua M. Smith*
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com
**Attorneys for Plaintiff Mark Pannek and Thomas Strotman**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served on all counsel of record via CM/ECF this 3rd day of November 2021.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)