# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **MARK PANNEK, et al.,** | : | Case No. 1:19-cv-00852 |
| | : | |
| Plaintiffs, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | **PLAINTIFF MARK PANNEK'S** |
| | : | **RESPONSE TO DEFENDANT US** |
| **U.S. BANK NATIONAL ASSOCIATION,** | : | **BANK'S PROPOSED UNDISPUTED** |
| | : | **FACTS** |
| Defendant. | : | |

Pursuant to the Court's Standing Order Regarding Procedure in Civil Cases, Plaintiff Mark Pannek, by and through counsel, hereby submits the following Response to Defendant US Bank's Proposed Undisputed Facts:

## Responses to Undisputed Facts

1. U.S. Bank was formed in accordance with the National Bank Act, 12 U.S.C. § 21. (Declaration of Linda E. Bidon ("Bidon Decl.") ¶3.)1

   **Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff has no current reason to deny this assertion.**

2. U.S. Bank has operations across the country, including in Cincinnati, Ohio. (Declaration of T. Bryan Bolton ("Bolton Decl.") ¶3.)

   **Admit.**

3. U.S. Bank's Workplace Respect Policy prohibits sexual harassment and other inappropriate conduct in the workplace, even if that conduct does not rise to the level of unlawful harassment or discrimination. (Deposition of Laurie Grey ("Grey Dep.") at Exh. 1, Doc # 40-1 at PageID 1919-1921.)

   **Admit that US Bank's Workplace Respect Policy states this.**

4. U.S. Bank's Workplace Respect Policy prohibits unlawful harassment, discrimination, and retaliation. (Grey Dep. at Exh. 1, , Doc # 40-1 at PageID 1919-1921.)

   **Admit that US Bank's Workplace Respect Policy states this.**

5. U.S. Bank's Workplace Respect Policy provides multiple avenues for employees to report any alleged harassment – including to a manager or supervisor, a human resources business partner, or through the U.S. Bank Ethics Line via telephone or online. (Grey Dep. at Exh. 1, p. 2, Doc # 40-1 at PageID 1920.)

**Admit that US Bank's Workplace Respect Policy states this.**

6. U.S. Bank's Workplace Respect Policy provides that complaints will be investigated, and disciplinary action will taken where appropriate. (Grey Dep. at Exh. 1, p. 3, Doc # 40-1 at PageID 1921.)

**Admit that US Bank's Workplace Respect Policy states this.**

7. U.S. Bank's Workplace Respect Policy provides that retaliation against anyone who makes a good faith complaint of harassment or other inappropriate conduct is not tolerated. (Grey Dep. at Exh. 1, p. 3, Doc # 40-1 at PageID 1921.)

**Admit that US Bank's Workplace Respect Policy states this.**

8. Pannek was recruited to U.S. Bank by Tom Strotman. (Deposition of Thomas Strotman ("Strotman Dep.") 52-54, 56, Doc # 36 at PageID 881-83, 85.)

**Admit.**

9. U.S Bank hired Pannek in August 2017, when he was 53 years old, as the Vice President Third-Party Risk for Consumer Lending Services, and Pannek began reporting to Strotman. (Deposition of Mark Pannek ("Pannek Dep.") at 18, 28, 47, Doc # 36 at PageID 458, 468, 487; Strotman Dep. 52, 58, Doc # 36 at PageID 881, 887.)

**Admit.**

10. In his role as Vice President Third-Party Risk for Consumer Lending Services, Pannek was responsible for making sure that the third-parties or vendors with whom the bank worked had appropriate controls in place for the bank's protection. (Pannek Dep. 49-51, Doc # 36 at PageID 489-91.

**Admit.**

11. As a Vice President, Pannek was an officer of the bank. (Pannek Dep. 71-73, Doc # 36 at PageID 511-13, Bidon Decl. ¶7.)

**Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff has no current reason to deny this assertion.**

12. U.S. Bank's board of directors ratified Pannek's appointment as an officer of the bank on January 24, 2018. (Bidon Decl. ¶7.)

**Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff has no current reason to deny this assertion.**

13. In late October or early November 2017, U.S. Bank underwent a reorganization of the Consumer Lending division in which Strotman and Pannek worked. (Strotman Dep. 58-59, Doc # 36 at PageID 887-89; Pannek Dep. 75-76, Doc # 36 at PageID 515-16.)

**Admits that positions in the Consumer Lending Division were reshuffled in late October, early November, 2017.**

14. The Consumer Lending, Commercial Lending, and Student Loan departments merged to form the Lending Services department. (Pannek Dep. 77, Doc # 36 at

PageID 517; Strotman Dep. 58-59, Doc # 36 at PageID 887-89.)

> **Admits that in the reshuffling of positions that occurred in late October, early November, the consumer lending, commercial lending and student loan departments merged.**

15. As a result of the reorganization, Strotman and Pannek both began reporting to John Gemrich. (Strotman Dep. 59, Doc # 36 at PageID 889; Pannek Dep. 82, Doc # 36 at PageID 522.)

    > **Admit.**

16. Prior to the reorganization, neither Pannek nor Strotman had ever worked with Gemrich nor had any impression of him. (Strotman Dep. 60-61, Doc # 36 at PageID 889-90; Pannek 84-85, 88, Doc # 36 at PageID 524-25, 528.)

    > **Admit**

17. In approximately January 2018, the Lending Services division merged with the Mortgage Servicing division to form the CBSS Servicing Group. (Strotman Dep. 79, Doc # 36 at PageID 908; Exh. 2, Doc # 36-1 at PageID 1009-12; Pannek Dep. 156-158, Doc # 35 at PageID 596-97; Exh. 4, Doc # 35-1 at PageID 758-59.)

    > **Denied as written. However, admit that it was announced that the newly formed "Lending Services Division" would be merged with Mortgage Services to form the CBSS Servicing Group in approximately January 2018 or February 2018.** *See* **Strotman Dep. 77-79, Doc # 36 at PAGEID 906-908; Pannek Dep. 157-158, Doc # 35 at PAGEID 596-597; Watson Dep. 113-114, Doc # 49 at PAGEID 2388.**

18. Strotman and Pannek ceased reporting to Gemrich and began reporting to Bryan Bolton, Senior Vice President and Chief Administrative Officer of the Consumer Business Banking Operations area. (Strotman Dep. 80-81, Doc # 36 at PageID 910; Exh. 2, Doc # 36-1 at PageID 1009-12; Pannek Dep. 159, Doc # 35 at PageID 599; Deposition of Bryan Bolton ("Bolton Dep.") at 13, 16, Doc # 39 at PageID 1463, 1466.)

    > **Admit that with the formation of the CBSS Servicing Group, Pannek and Strotman began reporting to Bryan Bolton.**

19. Gemrich also began reporting to Bolton. (Strotman Dep. Exh. 2; Pannek Dep. 160, Doc # 35 at PageID 600.)

    > **Admit that with the formation of the CBSS Servicing Group, Gemrich also began reporting to Bolton.**

20. Prior to the merger, Bolton did not know Pannek or Strotman, and had had only limited interactions with Gemrich. (Bolton Dep. 19, 21-22, Doc # 39 at PageID

1469, 1471-72; see also Strotman Dep. 82-83, Doc # 36 at PageID 911-12; Pannek Dep. 159-160, Doc # 35 at PageID 599-600.)

> **Admit that Pannek and Strotman did not know Bolton prior to the merger. Deny Bolton and Gemrich had limited interaction. Gemrich Dep. 71:7-24, Doc # 37, PAGEID 1186. Bolton Dep. 21-22, Doc # 39, PAGEID 1471-72. Deny for lack of understanding the criteria for determining "limited."**

21. Prior to the merger, Alyson Roberts, an African American female, led the third-party risk/vendor management function on the Mortgage Servicing side, similar to the third-party risk/vendor management function that Pannek led on the Lending Services side. (Bolton Dep. 72-73, Doc # 39 at PageID 1522-23; Pannek Dep. 165, Doc # 36 at PageID 605.)

> **Admit that prior to the merger that created CBSS, Alyson Roberts led the third- party risk/vendor management function on the Mortgage Servicing side, similar to the third-party risk/vendor management function that Pannek led on the Lending Services side.**

22. Almost immediately upon the merger of the Lending Services and Mortgage Serving divisions in early 2018, Bolton began to evaluate his organization for potential synergies or duplication of functions in order to determine if any of those functions could be consolidated so that the group could operate more efficiently. (Bolton Dep. 24-25, Doc # 39 at PageID 1474-75.)

> **Denied. *See* Bolton Dep. 25-26, 28-30, 34, 51, 74-76, Doc #39 at PAGEID 1475-1476, 1478-1480, 1484, 1501, 1524-1526; Watson Dep. 66-67, Doc #49 at PAGEID 2341-2342; Roberts Dep. 114, Doc #38 at PAGEID 1385; Grey Dep. 100, Doc #40 at PAGEID 1875.**

23. Bolton's evaluation process included gathering feedback from others, observing how well his direct reports were able to work together collaboratively, and having discussions with the direct reports who were new to his team. (Bolton Dep. 27-28, 34-38, 60, Doc # 39 at PageID 1477-78, 1484-88, 1510.)

> **Admit that Bolton claims to have been evaluating his team, and that he testified on the pages cited to the claimed activities but deny any inference as to the truth or efficacy of his activities. Plaintiff's position with respect to Bolton's evaluation process cannot be neatly admitted or denied in one sentence. *See* Memorandum in Opposition, supra.**

24. While he used the feedback that he got from others to help get a full picture, Bolton's own observations were the "overriding factor" on which he relied when making decisions. (Bolton Dep. 66-67, Doc # 39 at PageID 1516-17.)

> **Denied. *See* Watson Dep. Exhibit 4, Doc # 49-1, PAGEID 2438-2440 as compared with Bolton Dep. Exhibit 16, 19, Doc # 39-1 at PAGEID**

> **1751, 1765; Bolton Dep. 60-61, Doc #39 at PAGEID 1510-1511; Watson Dep. 55-58, Doc # 49, PAGEID 2330-2333.**

25. When considering who would lead the third-party risk/vendor management function for the new team, Roberts was immediately the "front runner" in Bolton's mind. (Bolton Dep. 76-78, Doc # 39 at PageID 1526-28.)

> **Admit that Bolton testified as indicated on the cited page.**

26. At the time of the merger, Bolton had supervised Roberts for approximately a year and a half and had a very high opinion of her job performance. (Bolton Dep. 250, Doc # 39 at PageID 1700 (describing Roberts as "extraordinary" and a "superstar.").)

> **Deny. See Bolton's evaluation of Roberts, on the PGA which he prepared for her, where based on her past performance appraisal he did not give her the highest performance rating during the year he worked with her prior to the merger. Bolton Dep. 215:1-219:20, Doc #39 at PAGEID 1665-1669; Bolton Dep. Ex. 12, Doc # 39-1, PAGEID 1741.**

27. Bolton believed that Roberts had a lot of experience with vendor management, and a track record of success, at the bank. (Bolton Dep. 76-77, Doc # 39 at PageID 1526-27.)

> **Admit that Bolton testified to this on the page cited; however, he was unable to provide any specifics to support this assertion. Bolton Dep., 216-221, Doc #39 at PAGEID 1666-1671.**

28. Prior to the merger, the vendor management function was larger on the Mortgage Servicing side than it was on the Lending Services side. (Bolton Dep. 76-77, Doc # 39 at PageID 1526-27.)

> **Deny for lack of understanding the criteria for determining "larger."**

29. Bolton wanted to learn about Pannek and how he ran his organization. (Bolton Dep. 77, Doc # 39 at PageID 1527.)

> **Admit that Bolton made this statement but deny the truth of it.**

30. Bolton sought feedback about Pannek from Gemrich, who was Pannek's most recent supervisor, and other individuals within the risk department with whom Pannek worked. On March 1, 2018, Gemrich provided Bolton with his feedback. (See Bolton Dep. 36-37, Doc # 39 at PageID 1487; Exh. 19, Doc # 39-1 at PageID 1765.)

> **Admit that Bolton sought Feedback from Gemrich; Deny that Bolton sought information from other individuals within the risk management department with whom Pannek worked for failure of Bolton to identify any of them. Bolton Dep. 61:10-15; 62:3-20; 63:16-25; 64:13-20, Doc # 39, PAGEID 1511-1514. Plaintiff further notes that Gemrich supervised Pannek for only two months. Gemrich Dep. 20:17-20; Bolton Dep. 18:21-23, Doc # 39, PAGEID 1468.**

31. On March 1, 2018 Gemrich offered several positive comments about Pannek, as well as some critical comments, including that Pannek "[d]oes not collaborate well," and had "[p]oor conflict resolution skills." (See Bolton Dep. Ex. 19, Doc # 39-1 at PageID 1765.)

   **Denied as written. Gemrich Dep. Exhibits 1-2, 5-7, Doc # 37, PAGEID 1152, 1155, 1165-1166, 1170; Bolton Dep. Exhibit 16, 18, Doc #39-1, PAGEID 1751, 1754-1764.**

32. Bolton received similar feedback about Pannek from the risk partners with whom Pannek worked. (See Bolton Dep. 60, Doc # 39 at PageID 1510.)

   **Deny for failure of Bolton to identify the risk partners with whom he spoke. Bolton Dep. 61:10-15; 62:3-20; 63:16-25; 64:13-20, Doc # 39, PAGEID 1511-1514.**

33. Bolton had asked all of his direct reports (including Pannek) to work collaboratively with one another to talk about their respective functions and teams and develop the best model going forward. (Bolton Dep. 27-28, 63, Doc # 39 at PageID 1477-78, 1513.)

   **Admit that Bolton made this statement at his deposition.**

34. Rachel Votel, who Bolton asked to coordinate the project, reported to Bolton that Pannek was not participating in the calls and was causing conflict. (Bolton Dep. 63-64, Doc # 39 at PageID 1513-14.)

   **Denied. See Pannek Declaration ¶ 8.**

35. Bolton had discussions with Pannek about his organization. (Bolton Dep. 34-35, Doc # 39 at PageID 1484-85; Pannek Dep. 175-176, Doc # 36 at PageID 615-16.)

   **Admit.**

36. Bolton found these discussions with Pannek to be frustrating because he felt he had to follow up with Pannek several times to get answers to his questions, and felt that a leader at Pannek's level should have a greater knowledge of his team than Pannek seemed to have. (Bolton Dep. 65-68, Doc # 39 at PageID 1515-18.)

   **Plaintiff admits that Bolton testified as indicated on the cited pages, but denies the undisputed nature of the testimony.** *See* **Pannek Dep. 176, Doc # 35, PAGEID 616.**

37. Bolton believed that Pannek was more passionate about his process improvement duties because Pannek told him that that he spent just 20% of his time on his vendor management responsibilities and 80% of his time on his process improvement responsibilities. (Bolton Dep. 77, Doc # 39 at PageID 1527.)

   **Admit that Bolton said this, but dispute any inference that it is true or the fact that spending 20% of employee's time on one task, and 80% on another would necessarily be controlled by passion.**

38. Bolton determined that it would be Roberts who would lead the third-party

risk/vendor management function for the new organization. (Bolton Decl. ¶10; Bolton Dep. 80; see also id. at 77, Doc # 39 at PageID 1530; 1527 (over the course of February and into March, Bolton had formed the opinion that Pannek's leadership skills were not as strong as Roberts').)

> **Admit that Bolton was the ultimate decision maker. Deny that Robert's leadership skills were stronger than Pannek's. (See discussion in Plaintiffs' Memorandum in Opposition as Plaintiffs' position cannot be supported by one quick reference.)**

39. On February 22, 2018, Bolton sent Roberts an email identifying the employees from Pannek's organization who "would come to [her]" and asking her to put together a draft organization chart showing the new group "as a result of combining the groups." (See Bolton Dep. Exh. 10, Doc # 39-1 at PageID 1737-38.)

> **Admit that Bolton sent such an email, but deny any inference that any final decisions with respect to reporting relationships or continued employment were made at that time. Roberts Dep. 114:24-115:12, Doc # 38, PAGEID 1385-1386.**

40. Bolton decided to eliminate Pannek's position. (Bolton Dep. 74, 249, Doc # 39 at PageID 1524, 1699.)

> **Admit, but deny any interference that he was justified in either decision.** *See* **Memorandum in Opposition, supra.**

41. Roberts took over the third-party risk/vendor management function. (Bolton Dep. 74, 84, Doc # 39 at PageID 1524, 1534; Pannek Dep. 185-186, Doc # 36 at PageID 625-26; Roberts Dep. 130, Doc # 38 at PageID 1401.)

> **Admit.**

42. Pannek's process improvement duties were distributed to other employees outside of Bolton's organization. (Bolton Decl. ¶10.)

> **Admit that some of Pannek's duties may have been transferred to employees outside Bolton's organization, i.e. not Roberts, but this does not alter Defendant's representation that Roberts is a comparator of Pannek and replaced him. Defendant's Responses to Plaintiff's Interrogatories, (Copy attached).**

43. Over the next several weeks, Bolton reviewed and finalized the termination decisions with Human Resources Business Partner Diane Watson. (See Bolton Dep. 53-54, Doc # 39 at PageID 1503-04.)

> **Denied.** *See* **Bolton Dep. 210-213, Doc # 39, PAGEID 1660-1663; Bolton Dep. Exhibits 11-12, Doc # 39-1 at PAGEID 1739-1740.**

44. Bolton and Watson informed Pannek that his position had been eliminated on May 15, 2018. (Pannek Dep. 177, Doc # 36 at PageID 617.)

> **Admit.**

45. Pannek was 54 years old at the time of his termination. (Pannek Dep. 18, Doc # 36 at PageID 458.)

   **Admit.**

46. U.S. Bank's board of directors ratified the termination of Pannek's officer appointment on July 25, 2018, effective as of May 15, 2018. (Bidon Decl., ¶8.)A

   **Admit as based upon documents produced in discovery on May 10, 2021, Plaintiff has no current reason to deny this assertion.**

47. Pannek filed an ethics hotline complaint on March 27, 2018. (Pannek Dep. 194-197, Doc # 35 at PageID 634-37; Exh. 7, Doc # 35-1 at PageID 766-68.)

   **Admit.**

48. Lydia Buster, a former colleague, testified that Pannek referred to the complaint as his "insurance policy" against possible termination. (Deposition of Lydia Buster ("Buster Dep.") 31, Doc # 42 at PageID 1998.) ("Mark said that they had, you know, filed a complaint with the ethics line as kind of an insurance policy to protect themselves against the consolidation that was happening.").)

   **Admit that Buster said this at her deposition; Deny that that such a comment was actually made** *See* **Pannek Declaration ¶ 9.**

49. In the complaint, Pannek alleged that nearly two months earlier, on February 1, 2018, Gemrich had pressured him into participating in a bet concerning the cost of a vendor, in violation of U.S. Bank's policy prohibiting gambling. (Pannek Dep. Exh. 7, Doc # 35-1 at PageID 766-68.)

   **Admit.**

50. Pannek alleged in the complaint that Gemrich had mistreated Pannek and other employees who used vacation time around the holidays, as well as employees who worked remotely. (Pannek Dep. Exh. 7, Doc # 35-1 at PageID 766-68.)

   **Admit that Pannek's Ethics Complaint referenced issues regarding vacation time and working remotely but deny that the Complaint alleges that the employees took the disputed vacation time.**

51. Pannek alleged in the complaint that Gemrich created a "hostile work environment." (Pannek Dep. Exh. 7, Doc # 35-1 at PageID 766-68.)

   **Admit.**

52. Bolton was not aware of any of the allegations in Pannek's complaint prior to the March 27, 2018 complaint, nor had he ever personally heard Gemrich make any sexually explicit comments. (Bolton Dep. 103-104, 248, Doc # 39 at PageID 1553-54, 1698.)

   **Admit that Bolton said this.**

53. U.S. Bank assigned Human Resources Business Partner Laurie Grey to investigate Pannek's complaint. (Grey Dep. 53, 61-63, Doc # 40 at PageID 1828, 1836-1838.)

   **Admit.**

54. During the course of her investigation, Grey interviewed, Pannek, Gemrich, and other employees. (Grey Dep. 64, Exh. 4, Doc # 40-1 at PageID 1930-37.)

    **Admit.**

55. Grey also reviewed the documents that Pannek sent her regarding his purchase of the gift card. (Grey Dep. 64-65, Doc # 40 at PageID 1839-40.)

    **Admit.**

56. During Grey's interview with Pannek, he provided more information about the bet and his other allegations. (Grey Dep. 57-61, Doc # 40 at PageID 1832-36.)

    **Admit.**

57. During his interview with Grey, Pannek alleged that Gemrich had made inappropriate comments about Gemrich's sex life. (Grey Dep. 57-61, Doc # 40 at PageID 1832-36.)

    **Admit.**

58. Pannek refused to provide Grey with specific details about the comments allegedly made by Gemrich, except to say that Gemrich used the "p-word" and Pannek referenced the "Access Hollywood tapes." (Grey Dep. 57-61, Doc # 40 at PageID 1832-36; Exh. 4 p.2, Doc # 40-1 at PageID 1931; Pannek Dep. 218-219, Doc # 35 at PageID 658-59.)

    **Denied. (Pannek Dep. 198-200, 218-221, Doc #35 at PAGEID 638-640, 658-661).**

59. Grey interviewed Strotman as part of her investigation, who corroborated Pannek's allegations, including those concerning Gemrich discussion his sex life. Strotman declined to provide any details about verbiage that Gemrich allegedly used. (Grey Dep. 73-75, Doc # 40 at PageID 1848-50; Exh. 4 p. 5-6, Doc # 40-1 at PageID 1934-35; Strotman Dep. 94-99, Doc # 36 at PageID 923-28.)

    **Deny with respect to Strotman not providing "any details about verbiage" as Strotman did make reference to the verbiage including Gemrich referring to himself as a "f***ing unicorn," that he could "hit an p***y he wanted," and his frequent use of the "p word."** *See* **Strotman Dep. 95-96, Doc # 36, PAGEID 924-925. Strotman merely indicated that he was embarrassed to say certain words, so would use a shortened version of those words (i.e., the "P word").** *Id.* **at PAGEID 927.**

60. Grey interviewed two other employees, Jeff Sorg and Kevin Turner, whom Pannek had identified as witnesses. (Grey Dep. 75-78, Doc # 40 at PageID 1850-53; Exh. 4 p. 7-8, Doc # 40-1 at PageID 1936-37.)

    **Admit in part. Deny that Grey interviewed Sorg or Turner regarding**

> the entirety of the allegations including the sex-based comments. Grey Dep. 75-78, Doc # 40, PAGEID 1850-1853.

61. At the conclusion of her investigation, Grey determined that Pannek's allegations were substantiated and that Gemrich's conduct violated U.S. Bank's Workplace Respect Policy. (Grey Dep. 84, Doc # 40 at PageID 1859.)

    **Admit.**

62. In consultation with Diane Watson, Bolton decided to issue Gemrich a Written Warning as a result. (Grey Dep. 85, Doc # 40 at PageID 1860; Bolton Decl. ¶12.)

    **Admit that Gemrich was issued a written warning.**

63. The Written Warning outlined several instances of poor judgment, including participation in the bet with Pannek and discussing details of his personal life at work, in addition to other leadership deficiencies. (See Bolton Dep. Exh. 3, Doc # 39-1 at PageID 1709-10.)

    **Admit that the Warning referenced the bet, Gemrich's sexual comments, and leadership deficiencies.**

64. In the Written Warning, Gemrich was cautioned that "[f]ailure to meet the expectations outlined [in the Written Warning] may result in further disciplinary action, up to and including termination of your employment." (Bolton Dep. Exh. 3, Doc # 39-1 at PageID 1709-10.)

    **Admit.**

65. The Written Warning had a "substantial financial impact" on Gemrich's annual variable compensation. (Bolton Dep. 130-131, Doc # 39 at PageID 1580-81; Exh. 3, Doc # 39-1 at PageID 1709-10.)

    **Admit that Bolton indicated the warning could affect Gemrich's bonus.**

66. Bolton is not aware of Gemrich ever making any sexually explicit comments after receiving the Written Warning. (Bolton Dep. 248-249, Doc # 39 at PageID 1698-99.)

    **Admit that Bolton said this.**

67. Bolton decided to terminate Gemrich's employment approximately one year later, in April 2019, based on other issues of poor judgment and leadership that did not involve any allegations of sexually explicit comments or sexual harassment. (Bolton Dep. 174-178, Doc # 39 at PageID 1624-28.)

    **Deny. The investigation summary clearly references the allegations of sexually explicit comments. Further, Plaintiff was not permitted discovery of the findings of investigations following their termination on the ground that US Bank counsel was involved. See Gemrich Dep. 75: Exhibit 11, Doc # 37, PAGEID 1190.**

68. Pannek admits that Gemrich never made sexual advances towards him, never grabbed or groped him, and never touched him inappropriately. (Pannek Dep. 147,

276, Doc # 35 at PageID 587, 716.)

**Admit.**

69. Gemrich sent an aggressive email to female employee Annette Tatman and later called her a "bitch." (Pannek Dep. 101-104, 118-119, Doc # 35 at PageID 541-44, 558-59; Strotman Dep. 71, 74-75, Doc # 36 at PageID 900, 903-904.)

**Admit that Gemrich sent an aggressive email to Annette Tatman and called her a "bitch" for going to HR. Pannek Dep. 89-90, 106, 118-119, Doc # 35, PAGEID 529-530, 546, 558-559; Strotman Dep. 74-75, Doc # 36, PAGEID 903-904; Buster Dep. 26, Doc # 42, PAGEID 1993.**

70. Gemrich belittled male employees, including Dr. Wang and Tom Markesbery. (Pannek Dep. 119-122, Doc # 35 at PageID 559-62; Strotman Dep. 62-63, Doc # 36 at PageID 891-92.)

**Admit that Gemrich treated Dr. Wang and Tom Markesbery inappropriately.**

71. Gemrich was dismissive of female employee Susan Stevens. (Pannek Dep. 110-112, Doc # 35 at PageID 550-52.)

**Admit.**

72. Gemrich made disparaging remarks about male employee Mike Ryan, including saying that he was not good at his job. (Strotman Dep. 67-69, Doc # 36 at PageID 896-98.)

**Admit.**

73. Pannek alleges that Gemrich made inappropriate comments about his sex life during their weekly meetings when Pannek and Strotman reported to Gemrich. (See Pannek Dep. 75-76, 87, 126, 155-160, Doc # 35 at PageID 515-16, 527, 566, 595-600.)

**Admit.**

74. Pannek alleges that Gemrich made the following comments about Gemrich's sex life: (1) on one occasion referred to himself as a "fucking unicorn," which he explained meant "a handsome single male that had a house and money and a good job: (Pannek Dep. 128-131, Doc # 35 at PageID 568-71); (2) on two or three occasions, said he could "fuck or nail any pussy he wanted" (Pannek Dep. 132-134, Doc # 35 at PageID 572-74): (3) on one occasion, said that he "nailed or fucked a deaf woman" who had large breasts that he "motorboated" (Pannek Dep. 134-136, Doc # 35 at PageID 574-76); and (4) on one occasion, told Pannek that he thought a female co-worker's accent was "hot" (Pannek Dep. 138-139, Doc # 35 at PageID 578-79).

**Admit.**

75. Pannek cannot identify any offensive age-related comments that anyone at U.S. Bank ever made to him. (Pannek Dep. 268, Doc # 35 at PageID 708.)

    **Admit.**

76. Roberts had more experience performing vendor management work for U.S. Bank than Pannek did, and had many years of vendor management experience prior to coming to U.S. Bank. (See Roberts Dep. 14-33, Doc # 38 at PageID 1285-1304 (describing prior employment history); Bolton Dep. 81, Doc # 39 at PageID 1531.)

    **Admit that Roberts was hired by US Bank approximately one year prior to Pannek, that both Roberts and Pannek had vendor management experience prior to their arrival at US Bank, and that Pannek had more years of experience than Roberts See Pannek Declaration ¶ 3; see generally Roberts Dep. 14:19 – 33:10.**

77. Bolton testified that he did not consider either Roberts or Pannek's pre-U.S. Bank experience when deciding which employee to retain. (Bolton Dep. 81, 83, Doc # 39 at PageID 1531, 1533.)

    **Admit that Bolton said this, but deny the truth of the statement. See PGA forms filled out in connection with the selection of Roberts over Pannek. See Bolton Ex. 11 and 12, Doc # 39-1, PAGEID 1739-1740; See Bolton Dep. 83:4-8, Doc # 39, PAGEID 1533.**

78. Bolton formed his opinion that Roberts, not Pannek, would lead the third-party risk/vendor management function before Pannek filed his complaint on March 27. (See Bolton Dep. 77, 80, Doc # 39 at PageID 1527, 1530; Exh. 10, Doc # 39-1 at PageID 1737-38.)

    **Deny. *See* Memorandum in Opposition, supra.**

79. Gemrich was not involved in the decision to terminate Pannek. (Gemrich Dep. 23, 45-46; Bolton Dep. 249, Doc # 39 at PageID 1699.)

    **Deny. Gemrich was directly involved in the decision to terminate Strotman. *See* Bolton Dep. Exhibit 16-19, 22, Doc # 39-1, PAGEID 1751-1765; Watson Dep. Exhibit 4, Doc # 49-1, PAGEID 2438-2440.**

80. Lydia Buster and Tom Markesbery complained to HR about Gemrich and were not terminated. (See Pannek Dep. 89, 116-117, 149, Doc # 35 at PageID 529, 556-57, 589 and Buster Dep. 21, Doc # 42 at PageID 1988.)

    **Admit that Lydia Buster complained to HR, deny Gemrich was aware that she was the one who made the complaint. *See* Pannek Dep. 89, 106, 118-119, Doc # 35, PAGEID 529, 558-559; Strotman Dep. 74-75, Doc # 36, PAGEID 903-904. Deny that Tom Markesberry "complained" to HR. Plaintiffs also deny any inference that can be made from Defendant's statement that Buster's and Markesbery's complaints negate the retaliation claims of Pannek and Strotman. Neither Buster nor Markesbery were direct reports of Bolton who were evaluated by him in connection with the alleged RIF.**

81. Jeff Sorg and Kevin Turner participated in Laurie Grey's investigation of Pannek's complaint and were not terminated. (Grey Dep. 75-78, Doc # 40 at PageID 1850-

53; Exh. 4 p. 7-8, Doc # 40-1 at PageID 1936-37.)

> **Admit that Sorg and Turner participated in Laurie Grey's investigation. Plaintiffs, however, deny any inference that can be made from Defendant's statement that Sorg's and Turner's participation negate the retaliation claims of Pannek and Strotman. Neither Sorg nor Turner were direct reports of Bolton who were evaluated by him in connection with the alleged RIF, nor did either report any sex-based comments (because they were not asked). Further, they may have given truthful responses to HR's inquiries, but they did not bring the Complaints.**

## Disputed Facts to be Tried

1. Gemrich created a hostile work environment. (*See* Memorandum in Opposition Pages35-38; Bolton Dep. Exhibits, Doc #39-1 at PageID 1709-1710,1712-1717; Pannek Dep., Doc #35 at PageID 528-539, 542-544, 546, 558-559, 567, 569, 609-611; Gemrich Dep., Doc #37 at PageID 1145; Gemrich Dep. Exhibits, Doc #39-1 at PageID 1262-1270; Strotman Dep.. Doc #36 at PageID 899-904, 924-925; Buster Dep., Doc #42 at PageID 1987-1991, 1993-1994; and Grey Dep., Doc #40 at PageID 1869-1870.)

2. Strotman/Pannek reasonably opposed the hostile work environment Gemrich created. (*See* Memorandum in Opposition Pages 36-37; Pannek Dep., Doc #35 at PageID 531, 609, 645; Strotman Dep., Doc#36, PageID 899-902)

3. Gemrich provided negative information to Bolton to persuade him to disfavor Strotman/Pannek. (*See* Memorandum in Opposition Page 30; Gemrich Dep. Exhibits 1-2, 5-7, Doc # 37, PAGEID 1152, 1155, 1165, 1166, 1170; Bolton Dep. Exhibit 16, 18, Doc #39-1, PAGEID 1751 and 1754.)

4. Prior to the filing of Pannek's Ethics Complaint regarding the hostile work environment Gemrich created, Bolton had not made any decision to terminate/sever Pannek or Strotman. (See Memorandum in Opposition Page 32; Pannek Dep., Doc #35 at PageID 634-639, 645-646; Strotman Dep., Doc # 36 at Page ID 922-923; Watson Dep., Doc #49 at PageID 2311-2312; Watson Dep. Exhibits, Doc #49-1 at Page ID 2434, 2438-2440; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

5. Bolton, influenced by Gemrich, retaliated against Strotman/Pannek for Pannek's Ethics Complaint. (*See* Memorandum in Opposition Pages 26-35; Gemrich Dep. Exhibits 1-2, 5-7, Doc # 37, PAGEID 1152, 1155, 1165, 1166, 1170; Bolton Dep. Exhibit 16, 18, Doc #39-1, PAGEID 1751 and 1754.)

6. Bolton attempted to justify his retaliation by creating a skewed Peer Group Analysis

to justify severing Strotman/Pannek during an alleged RIF. (*See* Memorandum in Oppsition Pages 32-33; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

7. Bolton attempted to justify his retaliation by creating a skewed performance analysis for Pannek/Strotman (based on Gemrich's representations) to justify the terminations of Pannek/Strotman during a US Bank reorganization that affected Bolton and his direct reports. (*See* Memorandum in Opposition Pages 32-33; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

8. US Bank's Human Resources Department conducted a less than satisfactory investigation of both Pannek's Ethics Complaint and Bolton's rationale for terminating employees who had filed/participated in an Ethics Complaint. (*See* Memorandum in Opposition Page 34; Pannek Dep., Doc #35 at PageID 634-640, 645-646, 658-661, 665-670; Pannek Dep. Exhibits, Doc #35-1 at PageID 766-768, 776-781; Strotman Dep., Doc # 36 at Page ID 922-927; Grey Dep., Doc #40 at PageID 1799-1800, 1833-1834, 1850-1856, 1862-1864; Grey Dep. Exhibits, Doc 40-1 at PageID 1919-1921, 1926-1937; Watson Dep., Doc #49 at PageID 2311-2312, 2357-2360, 2363-2365, 2370-2371; and Watson Dep. Exhibits, Doc #49-1 at Page ID 2434, 2449-2454.)

9. Bolton's skewed PGA analysis and performance analysis for Pannek resulted from favoritism for a younger female employee. (*See* Memorandum in Opposition Pages 38-40; Bolton Dep., Doc #39 at PageID 1538, 1657-1669, 1683, 1686-1688; and Bolton Dep. Exhibits, Doc #39-1 at PageID 1739-1740, 1765, 1772-1773.)

10. At the time of the Strotman/Pannek terminations, there were positions open at US Bank that Strotman/Pannek could reasonably have filled. (See Memorandum in Opposition Pages 34-35; *See* Bolton Dep., Doc #39 at PageID 1672-1674; Bolton Dep. Exhibits, Doc #39-1 at PageID 1741; *See also* Strotman Dec. ¶ 19; Pannek Dec. ¶ 10.)

             Respectfully submitted,

             /s/ *Joshua M. Smith*

Peter A. Saba (0055535)
Joshua M. Smith (0092360)
STAGNARO, SABA
& PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2701
(513) 533-2711 (fax)
pas@sspfirm.com
jms@sspfirm.com
**Attorneys for Plaintiff Mark Pannek and Thomas Strotman**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing was served on all counsel of record via CM/ECF this 3rd day of November 2021.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)