## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|                                        |     |                             |
|----------------------------------------|-----|-----------------------------|
| MARK PANNEK and THOMAS STROTMAN,       | :   |                             |
|                                        | :   | Case No. 1:19-cv-852        |
| *Plaintiffs*,                          | :   |                             |
|                                        | :   | Judge Jeffery P. Hopkins    |
| vs.                                    | :   |                             |
|                                        | :   |                             |
| U.S. BANK NATIONAL ASS'N,              | :   |                             |
|                                        | :   |                             |
| *Defendant*.                           | :   |                             |

## OPINION & ORDER

This employment discrimination case is before the Court on separate motions for summary judgment of U.S. Bank (Docs. 43, 44). U.S. Bank requests summary judgment on all claims brought by Plaintiffs Mark Pannek and Thomas Strotman, on the grounds that both of these former executives with the Bank were terminated as part of a corporate reorganization, and because of their performance, rather than for any statutorily prohibited reason. U.S. Bank further argues that there is no genuine issue of fact as to whether either Mr. Pannek or Mr. Strotman was subjected to a hostile work environment in violation of Title VII.

Mr. Pannek and Mr. Strotman filed a joint Response in Opposition (Doc. 50), to which U.S. Bank filed separate Replies (Docs. 53, 54).

For the reasons explained below, U.S. Bank's Motions (Docs. 43, 44) are **GRANTED**.[1]

---

[1] This case was previously before four other judges in the Southern District before being transferred to the undersigned. *See* Doc. 56. The Court expresses its gratitude for the parties' able briefing and regrets the delay in this matter's resolution.

## I.    BACKGROUND

Plaintiffs Tom Strotman and Mark Pannek were friends before they began working as Vice Presidents for U.S. Bank. Indeed, the two worked together in the same area of the Bank before being terminated. Strotman joined U.S. Bank in January 2017 as Vice President of Governance Control after working at several other banks. Doc. 50, PageID 2494; Doc. 36, PageID 873. In that role, Strotman managed various risk- and compliance-related activities for U.S. Bank, such as monitoring the Bank's collections call center to make sure it was following U.S. Bank policies. Doc. 36, PageID 874–880. He managed between four and five direct reports, and a total team of 50–60 people. *Id.* at PageID 880. Strotman originally reported to Jeff Cowan, who was the head of default management for U.S. Bank. *Id.* at PageID 869.

One of the teams Strotman oversaw managed U.S. Bank's technology vendors. *Id.* at PageID 881. At the time Strotman was hired, Siobhan Whitlock was managing this division, but Strotman terminated her in the summer of 2017, having been advised when he took his role that her performance had been unsatisfactory. *Id.* at PageID 882. After Whitlock was terminated, Strotman recruited his friend Pannek to join U.S. Bank and to take over Whitlock's former role of leading vendor relations. *Id.* at PageID 885. Pannek started in August 2017. *Id.* at PageID 887.

Pannek was experienced in technology and compliance work but had an inconsistent employment record; he had spent a significant portion of his career doing independent consulting rather than working full-time for a bank. For much of the 2000s, Pannek worked as a consultant on governance and compliance issues. Doc. 35, PageID 477. He then worked for Computer Science Corporation but was laid off when the company lost a contract it had

with the military. *Id.* at PageID 476. After that, he spent another stretch of time in compliance consulting, then moved to Synchrony Financial, a credit card company. *Id.* at PageID 469–70. Eventually, Strotman recruited Pannek to U.S. Bank from Synchrony.

In October 2017, Strotman and Pannek's division—the Consumer Lending Services division—was reorganized. Doc. 35, PageID 515. As part of that reorganization, Pannek was promoted and no longer reported to Strotman. The two were now peers and both reported to John Gemrich, U.S. Bank's Senior Vice President of Quality Control. Doc. 50, PageID 2496. Gemrich had been at U.S. Bank for 16 years and the Bank had received numerous complaints in the past about his management style. Doc. 50, PageID 2496–97; Doc. 39-1, PageID 1717.

After beginning work under his new manager, Pannek quickly developed a negative opinion of Gemrich. According to Pannek, Gemrich "quickly demonstrated very aggressive, hostile management styles and . . . was very big on belittling folks." Doc. 35, PageID 528. Among other off-putting traits, Pannek found Gemrich to be sexist. Pannek observed that Gemrich was "very big on speaking down to women," and that he would "[b]rag[] about his sex life" among male co-workers during work hours. *Id.* at PageID 528.

The comments on his sex life were of particular concern. Pannek found Gemrich to have a "weird fixation, almost a sexual deviancy on his sexual conquests [and] sharing that information specifically." *Id.* at PageID 530. Gemrich would regale Pannek and Strotman with stories of his sexual escapades; every time Gemrich met with Pannek, "[Gemrich] felt compelled to tell [Pannek] who he had relations with the previous night." *Id.* at PageID 531. He often told these stories in great detail. *Id.* Gemrich also expressed to Pannek romantic interest in their coworkers. At one point, Gemrich commented on "how hot a lady's accent

was on the phone" and his romantic interest in her; another time, Pannek observed Gemrich "ogle [another employee] like no man's business." *Id.* at PageID 531–32.

Apart from sexual comments, Pannek also felt that Gemrich's aggressive management style sometimes crossed an ethical line. In one incident, Pannek and Gemrich got into an argument regarding the cost of an audit performed by an outside vendor. Gemrich challenged Pannek to "[p]ut your money where your mouth is" and make a bet regarding the cost of the audit. Doc. 35, PageID 537. With Gemrich "calling out [his] manhood," Pannek agreed to bet the price of two steak dinners at fine-dining restaurant Jeff Ruby's that the audit quote would be well under $10,000. *Id.* at PageID 538. A few days later, Pannek received the quote, which was close to $10,000, called Jeff Ruby's to figure out the price of two steak dinners, and mailed Gemrich a gift card in that amount. *Id.* at PageID 539.

Other conduct, while not violative of any particular U.S. Bank policy, struck Pannek as needlessly hostile. In one incident, Gemrich "went ballistic" over employees taking time off around the Christmas holiday and started "screaming about that" to Pannek, Strotman, and another employee, Susan Stevens. *Id.* at PageID 540. To make his point, and in Grinch-y fashion, he scheduled a meeting for December 26th, a day Pannek and others had previously planned to take off—even though there was "nothing that had to happen on that day." *Id.* at PageID 541.

Like his friend and compeer Pannek, Strotman also found Gemrich's leadership style distasteful. In one-on-one meetings, Gemrich regularly belittled other employees, which worked against Strotman's efforts to create a positive work environment for his team members. Doc. 36, PageID 891–99. In one incident, Gemrich sent an email to a large distribution list harshly criticizing one of his employees, Annette Tatman, for her work

performance. *Id.* at PageID 900–01. Strotman was "shocked by the tone that was used, by the language that was used, and the demeaning nature of the e-mail." *Id.* at PageID 901. Notably, however, the email was about Tatman's work performance and neither Pannek nor Strotman found it to be sexually demeaning. *See* Doc. 35, PageID 545–46. Later, in a meeting with Strotman, Pannek, and another U.S. Bank employee, Gemrich—according to Strotman— "blast[ed] Annette Tatman calling her a fucking bitch for reporting him to HR." *Id.* at PageID 903. (As it turns out, Gemrich mistakenly thought Tatman reported him, when it was actually another employee on the email chain, not Tatman, who informed on Gemrich. *See* Doc. 35, PageID 546.). *See also* Doc. 42, PageID 1987–94.

In early 2018, U.S. Bank underwent another reorganization. On this occasion, and significantly different from before, U.S. Bank merged its Lending Services department—the overarching area in which Pannek and Strotman worked—with its Mortgage Servicing Department. Doc. 36, PageID 908. After this reorganization, Strotman and Pannek no longer reported to Gemrich and instead reported to Bryan Bolton. Doc. 50-5, ¶ 18. Gemrich himself also began reporting to Bolton. *Id.* ¶ 19. Shortly after the reorganization, Bolton began to assess whether any functions were duplicated within Lending Services and Mortgage Servicing, such that there were redundancies in the newly merged department and employees could be terminated. Doc. 39, PageID 1474–75. As part of that process, Bolton met with employees to understand their responsibilities, including Pannek and Strotman. Doc. 39, PageID 1484–85. To better understand the duties and responsibilities performed by Pannek and Strotman, Bolton also spoke to Gemrich, their previous supervisor. *Id.* at PageID 1486. Gemrich relayed to Bolton that both individuals were hard-working and intelligent but that they did not always work well with others. *Id.* at PageID 1488–89.

At the end of this process, Bolton decided to terminate Pannek and Strotman. He informed Pannek and Strotman of their terminations on May 15, 2018. Doc. 50-5, ¶ 44; Doc. 50-4, ¶ 41. Other employees were terminated as part of the reorganization as well, including Rhonda Gombold, who held a similar position as Strotman but for U.S. Bank's Mortgage Servicing department. Doc. 50-4, ¶¶ 22, 36. As to the timing of Bolton's decision regarding the terminations, he testified that he came to his decision in the "late February through March time period," which was within the same time frame he was meeting with Pannek, Strotman and other employees to understand their roles. Doc. 39, PageID 1530–31. Asked whether it was possible that his decision-making process regarding Pannek and Strotman could have continued into April, Bolton testified his views were "pretty much nailed down" by the end of March. *Id.* at PageID 1530. An email chain produced by U.S. Bank in discovery also confirmed that in mid-February Bolton was seriously contemplating moving Pannek's duties to another employee. Doc. 39-1, PageID 1737–38.

During his deposition, Bolton explained his reasons for terminating Pannek. According to Bolton, Pannek's focus in his previous role with U.S. Bank—mainly process improvement—was inconsistent with the duties of the new position in the reorganization for which he was eligible. Doc. 39, PageID 1527–28. On the other hand, Bolton testified that he was closer to keeping Strotman in a position under the new management structure. But Strotman was recalcitrant and somewhat unhelpful during Bolton's research of the business operations he managed during the reorganization. This ultimately dissuaded Bolton from retaining Strotman. *Id.* at PageID 1529–30 ("[A]s I got to know him better and we talked about things and my struggles to get the type of information from him that I would expect to get . . . I wasn't convinced that he would be the right leader[.]").

On March 27, 2018, while Bolton's evaluation process was ongoing, Pannek filed an ethics complaint with the Bank concerning Gemrich's unprofessional workplace behavior. *See* Doc. 35-1, PageID 766–68. In the complaint, Pannek criticized Gemrich's bullying of other employees in late 2017, including his email criticizing Tatman and his being "verbally aggressive" over employees taking leave around Christmas. *Id.* at PageID 766. Pannek also mentioned the Jeff Ruby's bet, and noted it was "against company policy to gamble." *Id.* Pannek further complained that Gemrich had "created a hostile work environment" and his behavior was "humiliating to the employees." *Id.* Pannek testified that the written record of his complaint, *id.*, accurately summarized the complaint he made on the phone, except that it left out complaints he made about Gemrich's "guttural language" and sexual comments. Doc. 35, PageID 638–39. As to the delay between the incidents at issue and the complaint, Pannek testified that he "really struggled" with whether to report Gemrich, because Pannek thought he might lose his job in response, but he was motivated to make the report after participating in a company training on hostile work environments. *Id.* at PageID 645. As it turns out, Bolton also became aware of Pannek's complaint about Gemrich. Even so, while still focused on the Bank's reorganization and the elimination of redundancies in the workforce, Bolton sent an email to U.S. Bank human resources personnel shortly afterward stating that he was at that time considering terminating Pannek and Strotman for reasons unrelated to Pannek's complaint. Doc. 49-1, PageID 2438–40.

U.S. Bank human resources official Laurie Grey began investigating Pannek's complaint concerning Gemrich's workplace conduct in mid-April. Doc. 40, PageID 1866. In the course of that investigation, she interviewed Pannek, Strotman, Gemrich, and others. While Gemrich's discussions of his sex life were not a focus of Pannek's recorded complaint,

they were a focus of Grey's discussions with Pannek and Strotman. During the investigation, Pannek and Strotman's complaints about Gemrich's leadership style were corroborated by other employees, but those other employees did not raise significant concerns about Gemrich's conversations regarding his sex life. Doc. 40, PageID 1855–56. As of April 26, Grey had finished her investigation, and she shared the results with Bolton shortly thereafter. *Id.* at PageID 1857; Doc. 39-1, PageID 1711.

On May 7, 2018, Bolton gave Gemrich a written warning identifying several concerns regarding his workplace conduct. Doc. 39-1, PageID 1709–10. The warning noted concerns Pannek had raised and specifically mentioned the bet on the steak house dinner as well as his "[d]iscussing his personal life with staff in a manner that made them uncomfortable." *Id.* at PageID 1709. Bolton's warnings to Gemrich also mentioned his losing his temper, "mak[ing] people feel uncomfortable," and "[m]aking people at least feel they need to work longer hours." *Id.* The notice said that Gemrich's behavior was "creating a hostile work environment." *Id.* One month later, in June of 2018, U.S. Bank conducted another investigation of Gemrich, finding issues like those previously reported by Pannek. *See* Doc. 50, PageID 2512. Then, the following January in 2019, U.S. Bank began yet another investigation of Gemrich, this time focusing on Germich's "practicing favoritism" toward certain employees, retaliating against a manager for not accepting a job offer, and handling a reduction-in-force process improperly. Doc. 39-1, PageID 1723. U.S. Bank's investigation "did not prove retaliation or sexism" but concluded that Gemrich had made "multiple poor leadership decisions" related to terminations and employee evaluations. *Id.* at PageID 1724. Following that investigation, U.S. Bank terminated Gemrich. *Id.* at PageID 1729; Doc. 37, PageID 1192.

On October 7, 2019, Pannek and Strotman sued U.S. Bank under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and related Ohio state laws, alleging they were retaliated against for Title VII-protected activity, subjected to a hostile work environment, and discriminated against because of their age. Compl., ¶¶ 48–81. On October 6, 2021, following the close of discovery, U.S. Bank filed the motions for summary judgment presently under consideration. Docs. 43, 44.

## II.     STANDARD OF REVIEW

As the party seeking summary judgment, U.S. Bank "'bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *8 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Pannek and Strotman cannot defeat summary judgment by pointing to just any factual dispute. Indeed, "the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e., a fact that could matter to the outcome).

After reviewing the evidence before it, the Court must determine whether there is some "sufficient disagreement" about material facts that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*,

477 U.S. at 251–52). In making that determination, the Court must afford all reasonable inferences to the nonmoving parties—here, Pannek and Strotman—and construe the evidence in the light most favorable to them. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### III. LAW & ANALYSIS

#### A. Ohio Law Claims

Pannek and Strotman initially brought claims under Ohio law alongside their federal claims. Compl., ¶¶ 55–57, 66–68, 79–81. U.S. Bank seeks summary judgment on these claims on the grounds that Ohio state employment laws are preempted by the National Bank Act. The Bank argues that because Pannek and Strotman are "officers" under the National Bank Act, Ohio state employment law does not apply to their employment with U.S. Bank. Doc. 43, PageID 2022–23; Doc. 44, PageID 2117–18. Pannek and Strotman do not oppose U.S. Bank's request for summary judgment on their Ohio state law claims. Doc. 50, PageID 2489 n.1. Because Pannek and Strotman concede that the claims asserted in this action under Ohio law are untenable, U.S. Bank's Motion for Summary Judgment is **GRANTED** as to those claims.

#### B. Retaliation

Pannek and Strotman both allege that U.S. Bank retaliated against them for engaging in activity protected by Title VII. Compl., ¶¶ 48–54.[2] Specifically, Pannek asserts that U.S.

---

[2] The Court notes that neither Pannek nor Gemrich represents that he filed a charge of discrimination with the Equal Employment Opportunity Commission. This is contrary to the statutory scheme for Title VII claims; "Before filing a lawsuit in federal court, a Title VII plaintiff must exhaust her administrative remedies by timely filing a charge of discrimination with the EEOC and receiving a right-to-sue letter." *Campbell-Jackson v. State Farm Insurance*, No. 23-1834, 2024 WL 4903807, *4 (6th Cir. 2024). The exhaustion requirement, however, is non-jurisdictional and subject to waiver. *See Becraft v. Garden Manor Extended Care Ctr.*, No. 1:11-cv-566, 2012 WL 12704, *2 (S.D. Ohio Jan. 4, 2012). While U.S. Bank raised the defense of exhaustion in its answer, Doc. 11, PageID 44, it failed to make

Bank terminated him in retaliation for his March 2018 ethics complaint against Gemrich. *Id.* ¶ 49. Strotman, on the other hand, contends that U.S. Bank terminated him in retaliation for Pannek's having complained to HR about Genrich, or in the alternative for his participation in U.S. Bank's investigation of Gemrich in Spring 2018. Doc. 50, PageID 2517–18.[3]

U.S. Bank seeks summary judgment on these claims. Because U.S. Bank filed separate summary judgment motion as to Pannek and Gemrich, the Court will assess each plaintiff's retaliation claims separately.

### i. Pannek

To defeat Pannek's retaliation claim, U.S. Bank presents separate theories in support of its motion for summary judgment. First, U.S. Bank argues that it decided to terminate Pannek well before his complaints to HR about Gemrich's boorish workplace behavior, so he failed to prove any "causal connection between his alleged protected activity – his March 27, 2018 complaint about Gemrich – and his termination." Doc. 43, PageID 2032. Second, U.S. Bank argues that even if Pannek can establish a prima facie case that his complaint was related to his termination, Pannek's retaliation claim fails under the *McDonnell Douglas* burden-shifting framework. According to the Bank, it proffered a lawful reason for Pannek's termination, and Pannek failed to raise a genuine issue of fact as to whether the reason presented was pretextual. *Id.* Pannek responds that he has raised a jury issue as to whether U.S. Bank terminated him in retaliation for his complaints about Gemrich, Doc. 50, PageID

---

the argument in its Motion for Summary Judgment (Doc. 43). Failure to exhaust administrative remedies is an affirmative defense on which U.S. Bank bears the burden of proof; as the Bank has offered no evidence on this point, dismissal of the case on this basis would be inappropriate. "Failure to exhaust administrative remedies . . . is an affirmative defense, and the defendant bears the burden of pleading and proving this failure." *Lockhart v. Holiday Inn Exp. Southwind*, 531 F.App'x 544, 547 (6th Cir. 2013) (citation omitted). *See also Brown v. Marsh*, 777 F.2d 8, 15 (D.C. Cir. 1985) ("The history of this litigation is such that plaintiff would be substantially and unfairly prejudiced if dismissal on exhaustion grounds were permitted at this excessively late date.").

[3] Strotman presented other bases for retaliation in the Complaint, *see* Compl. ¶ 50, but only identified these two theories of retaliation in his Response.

2514–23, even though predicated largely on the proximity in time of when Pannek engaged in protected activity, i.e., his reporting to HR on Gemrich, and when U.S. Bank learned of it and decided to terminate him.

Title VII makes it unlawful for an employer to "discriminate against any . . . employee[] . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). This "opposition clause" of Title VII, as it is commonly referred to, "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Like a Title VII discrimination claim, a claim based on this clause—a retaliation claim—"can be established either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Id.* (citation and internal quotation marks omitted). Where, as here, a plaintiff attempts to prove his retaliation claim using circumstantial evidence, the Court analyzes the claim using the *McDonnell Douglas* burden-shifting framework. *Id.*

In the *McDonnell Douglas* framework, the plaintiff bears the initial burden to establish a *prima facie* case of retaliation. If he succeeds, "the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions." *Id.* (citation omitted). If the employer satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason was pretextual. "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Id.* (citation omitted).

**Prima facie case.** To establish a prima facie case of Title VII retaliation, Pannek must demonstrate: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* (citation and internal quotation marks omitted). "Title VII retaliation claims 'must be proved according to traditional principles of but-for-causation.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

U.S. Bank disputes only the fourth element of Pannek's *prima facie* case. The Bank contends that Pannek failed to meet his burden as to causation because deposition testimony shows Bolton formed his opinion that Pannek would be terminated well before Pannek complained about his supervisor Gemrich on March 27, 2018. Bolton's testimony, however, does not support this assertion, i.e., that he had decided to terminate Pannek prior to March 27, 2018. *See, e.g.*, Bolton Dep., Doc. 39, PageID 1501 ("I think the final determination [regarding who would be terminated] would have been sometime in the April [2018] timeframe. . . . I began forming opinions before that . . . . But going through the process in its entirety and landing on final decisions, that would have been most likely sometime in the April [2018] timeframe."). Nevertheless, Bolton *did* testify that he had formed a negative opinion of Pannek as early as February 2018. *Id.* at PageID 1527 ("[O]ver that course of February and into March, I didn't think . . . Mark's knowledge and leadership skills [in vendor management] were as strong as Alyson [Roberts]'s, if I remember right."). Additionally, an email produced in discovery—an email from Bolton to Roberts saying who from Pannek's team would move to her team—supports U.S. Bank's assertion that Bolton was

contemplating moving the employees reporting to Pannek to the team run by Alyson Roberts. Doc. 39-1, PageID 1738. *However*, this does not change the fact that Bolton did not *finalize* his decision to terminate Pannek until April—well after Pannek filed his complaint on March 27, 2018 (*See* Doc. 35-1, PageID 766–68)—and Pannek was not notified of his termination until May 15, 2019. Doc. 43, PageID 2019.

None of the authority cited by U.S. Bank is directly analogous to this case, where adverse action was *contemplated* before the protected activity—although plaintiff was not informed of that fact—and no decision was *finalized* or action taken until afterward. U.S. Bank points to *Nascimento v. University of Cincinnati*, No. 1:08-cv-326, 2010 WL 3037124 (S.D. Ohio Aug. 2, 2010), but in that case the plaintiff was directed prior to his protected activity to complete a certain task and then failed to do so. The *Nascimento* court found no causation as to one adverse action against plaintiff,[4] because plaintiff would have been subject to adverse action for failing to complete the task regardless of whether he engaged in protected activity or not. Additionally, that same case notes that the "*prima facie* showing is not an onerous burden." *Id.* at *11. In this instance, the Court finds that Pannek has met the "minimal burden of a *prima facie* showing," *id.*, as an inference can be made that his ethics complaint against Gemrich who, at that time, held the position of Senior Vice President at U.S. Bank, was a cause of his termination. The Court's analysis, however, "does not end here." *Id.*

**Legitimate reason and pretext.** The burden now shifts to U.S. Bank to offer a non-discriminatory reason for Pannek's termination. On this score, U.S. Bank contends that Pannek was terminated because his position was eliminated in a corporate reorganization. Specifically, U.S. Bank explains that its Lending Services division merged with its Mortgage

---

[4] Plaintiff met his burden regarding causation as to a separate adverse action. *Nascimento*, 2020 WL 3037124 at *11.

Servicing division to form the CBSS Servicing Group. Doc. 43, PageID 2016. For U.S. Bank this merger created overlaps in responsibilities in the new CBSS Servicing Group, including in Pannek's area of third-party risk/vendor management. Prior to consolidation of the two bank operations, Alyson Roberts led that function for Mortgage Servicing, while Pannek led it for Lending Services. *Id.* Bolton set out to determine who would lead the newly formed third-party risk/vendor management function for CBSS Servicing. According to Bolton, from the start, Roberts was the leading candidate, as Bolton had more experience working with her and her Mortgage Servicing division did more vendor management work than Pannek's Lending Services division. Doc. 43, PageID 2017. Nevertheless, Bolton proceeded to solicit feedback on Pannek and his organization, including from Gemrich, in a process that began in early March 2018 and continued throughout the month. *Id.* at PageID 2017–18. Bolton ultimately determined that Roberts would lead third-party risk/vendor management for CBSS Servicing and that Pannek's position would be eliminated. *Id.* at PageID 2019. In addition to Bolton's receiving some negative feedback about Pannek, Pannek exhibited conduct during the process Bolton found to be very unhelpful. *Id.* at PageID 2018.

U.S. Bank's burden at this stage is "one of production and not persuasion," and it has met that burden. *See Nascimento*, 2010 WL 3037124 at *12 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). *See also Hammond v. Sysco Corp.*, No. 23-5385, 2023 WL 8847365 (6th Cir. 2023) (holding that evidence of corporate reorganization and attendant reduction in force was sufficient to shift burden back to plaintiff).

In order to survive U.S. Bank's motion for summary judgment, then, Pannek must rebut this reason by showing it is a pretext for unlawful retaliation. *Nascimento*, 2010 WL 3037124 at *12. To meet his burden at the pretext stage, Pannek must "produce sufficient

evidence from which a jury could reasonably reject [U.S. Bank's] explanation." *Goodwin v. Newcomb Oil Co., LLC*, No. 23-5594, 2024 WL 1828304, \*6 (6th Cir. 2024) (citation omitted). There are three standard ways to show pretext: "by demonstrating that the proffered reasons (1) had no basis in fact, (2) did not motivate the employer's action, or (3) were insufficient to motivate the employer's action." *Id.* (citation and internal quotation marks omitted).

Pannek presents several theories in an attempt to demonstrate that U.S. Bank's proffered reason for terminating him was pretextual. First, he claims that the timing was suspicious, as Bolton first communicated internally his thoughts about terminating Pannek only four days after he became aware of Pannek's complaint. Doc. 50, PageID 2520. Second, he says that Bolton failed to follow U.S. Bank protocols—specifically, the Peer Group Analysis (PGA) process—in selecting Pannek for termination. *Id.* at PageID 2521. Third, Pannek points to Bolton's questioning of the timing of Pannek's complaint in an email to U.S. Bank's human resources department, thus insinuating Bolton's belief—prior to any investigation—that Pannek's complaint was meritless. *Id.* at PageID 2522. Fourth, and relatedly, he argues that U.S. Bank did not adequately investigate his complaint. *Id.* Finally, Pannek maintains that there were open positions for which he was qualified, evincing the fact that his termination did not result from position elimination. *Id.* at PageID 2522–23.

U.S. Bank responds that "temporal proximity alone is insufficient to establish pretext," Doc. 43, PageID 2032, and other employees engaged in the same protected activity as Pannek and were not terminated, which establishes that "'there is no nexus' between the plaintiff's complaint and subsequent termination." *Id.* at PageID 2033 (quoting *Hawk v. Providence Home Servs.*, 83 F.App'x 191, 192 (9th Cir. 2003)). U.S. Bank also resists Pannek's assertion that Bolton did not follow the PGA process, noting that Bolton filled out the appropriate PGA

forms while evaluating the merger of the two bank departments. Doc. 53, PageID 2660–62. Additionally, the Bank argues that Pannek was not qualified for other open positions, as he did not have the "particular type of experience" U.S. Bank was seeking for those positions. *Id.* at PageID 2662–63.

The Court agrees with U.S. Bank. Pannek has failed in this case to meet his burden to demonstrate pretext. While the three standard methods of proving pretext recited above "are not the only ways to establish pretext . . . they are a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Goodwin*, 2024 WL 1828304 at *6 n.12 (citation and internal quotation marks omitted). Here, that framework is useful for focusing the analysis. None of the evidence that Pannek offers suggests that U.S. Bank's stated reason had no basis in fact, did not motivate U.S. Bank's action, or was insufficient to motivate that action.

As to timing, Pannek acknowledges that suspicious timing "cannot be the sole basis for finding pretext." *Seeger v. Cincinnati Bell Tel. Co. LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (citation omitted). However, proximity or timing can normally support a plaintiff's pretext argument when accompanied by other evidence. *Id.* In the context of all the other evidence presented, the timing of Pannek's termination does not support his argument of pretext. In fact, the timing of Pannek's termination *cuts in U.S. Bank's favor* at the pretext stage. The evidence adduced indicates that Bolton was seriously considering moving Pannek's direct reports over to Alyson Roberts' department *prior* to Pannek's complaint about Gemrich's workplace conduct, as part of a larger corporate reorganization in which several employees were going to be terminated. Nothing about the timing of Pannek's complaint in relation to

his termination indicates that U.S. Bank's stated reasons for that termination—a corporate reorganization and reduction in force—are mere pretext.

Perhaps Pannek's best argument on pretext is his claim that Bolton did not follow the standard PGA process for evaluating employees and deciding whom to terminate. The evidence adduced, however, supports U.S. Bank's contention that Bolton followed the PGA process in broad strokes, even if he did not conduct it as fastidiously as was the norm at U.S. Bank. *See, e.g.,* Watson Dep., Doc. 49, PageID 2332 ("I don't recall if the actual forms were used, but . . . Bryan did an analysis of his management team."). The record evidence demonstrates that Bolton made a substantial effort to evaluate Pannek's responsibilities and job performance, along with the responsibilities and performance of other employees, before coming to the decision to terminate him. *See* Doc. 39, PageID 1478–81. Pannek and Strotman were both high-level officers at the bank, and it makes sense that Bolton's process in evaluating leadership would be somewhat more informal than his process for evaluating lower-level employees, as it involved subjective assessments of leadership ability. Further supporting U.S. Bank's argument on this point is the email that Bolton sent on April 2, 2018, shortly after Pannek complained to HR about Gemrich. Doc. 49-1, PageID 2438–40. In that email, Bolton acknowledges Pannek's complaint against Gemrich and goes on to explain the reasons why Bolton was considering terminating Pannek and Strotman, separately from their complaint against Gemrich. *Id.* Regardless of the other events taking place at U.S. Bank at that time related to Gemrich, Bolton's email demonstrates that by that point—April 2, 2018— he had made a thorough assessment of Pannek's strengths and weaknesses and was leaning towards termination.

Bolton's April 2, 2018 email is also relevant to Pannek's third argument, that Bolton questioned the timing of Pannek's complaint when it was filed, which suggests that Bolton himself made a connection between Pannek's complaint and his termination. In the email, Bolton sets out his reasons for terminating Pannek and Strotman and says expressly that these reasons are unrelated to Pannek's complaint against Gemrich. *Id.* at PageID 2440 ("I prefer to include them in the severance exercise, it's justified with their reduced scope and my performance concerns which gives us a defendable position with supporting documentation that none of this could be construed as retribution , bias etc."). Notably, Bolton did express concern in the email about Gemrich's conduct. *Id.* at PageID 2438 ("I'm very concerned on what is in [the complaint] and would like to understand next steps."). Bolton's email does not support Pannek's argument of pretext, then, because in it Bolton disavows any influence of the complaint on his evaluation of Pannek and Strotman. Pannek, on the other hand, maintains that the email is highly suspicious—why would Bolton mention expressly the need to come up with a "defendable position" as to Pannek's termination?—but in the present environment, where employers are well aware of the commands of the anti-discrimination laws and eager to avoid impropriety that risks litigation, it is unsurprising to see the risk of litigation mentioned in an internal correspondence in the context of a discussion about consolidation of departments and a reduction in force. Nothing in Bolton's email supports a claim of pretext.[5]

Pannek next argues that U.S. Bank "failed to adequately and thoroughly investigate" Pannek's complaint of a hostile work environment. Doc. 50, PageID 2522. He contends that

---

[5] Pannek also calls the email a "clear effort to dissuade the Bank from full investigation, by insinuating that the complaints are not valid." Doc. 50, PageID 2522. This is inconsistent with the email itself, where Bolton says he is "very concerned" about Pannek's complaint and "very glad [Pannek] has raised these issues." Doc. 49-1, PageID 2438.

this means U.S. Bank did not take his complaint seriously. The connection between U.S. Bank not taking the complaint seriously and pretext is unclear—perhaps Pannek's contention is that U.S. Bank's response to the complaint shows it did not give credence to his concern and was more inclined to punish him for making the complaint rather than punish Gemrich, the wrongdoer. The connection is too attenuated, and Pannek points the Court to no authority for the proposition that a less-than-desired response to a complaint supports a plaintiff's argument that he was terminated for making that complaint. Further, the Court notes that U.S. Bank conducted several more investigations of Gemrich following Pannek's initial complaint, resulting eventually in Gemrich's termination.

Fifth, Pannek contends that U.S. Bank skipped over him for open and available positions, "call[ing] into question US Bank's claims that this was a position elimination, and that it had no available positions for [him]." *Id.* at PageID 2523. Pannek offers no evidence, however, to show that he was qualified for any particular new position that became available during this period. More to the point, qualifications Pannek may have possessed to fill other positions at U.S. Bank do not necessarily prove that U.S. Bank's stated reason for his termination was pretextual. *See Johnson v. Lockheed Martin Corp.*, 598 F.App'x 364, 369 (6th Cir. 2015).

Finally, the Court considers an argument not pressed by Pannek but anticipated and responded to by U.S. Bank: was it appropriate for Bolton to consider Gemrich's feedback on Pannek? *See* Doc. 53, PageID 2663–64. Here, the Court agrees with U.S. Bank that considering the feedback of an employee against whom a discrimination complaint has been filed does not render discriminatory an adverse action against the complainant. For one, Pannek's Title VII-protected activity was his March 27, 2018 hotline complaint to HR, and

the record reflects that Gemrich reported to Bolton on Pannek's qualifications and performance *prior* to the hotline complaint. *See* Doc. 39-1, PageID 1765. Accordingly, the negative comments Gemrich made were not influenced by Pannek's hotline complaint, and it would not be a form of indirect retaliation for Bolton to consider those negative comments. More to the point, the fact that Bolton considered Gemrich's feedback in making his decision does not demonstrate that Bolton's stated reason for Pannek's termination was a pretext for unlawful retaliation. Instead, it shows the opposite—Bolton considered Pannek's manager's review of his performance in assessing whether Roberts or Pannek should take over vendor management responsibilities following U.S. Bank's reorganization, as would be expected in a reshuffling of responsibilities following a corporate reorganization. Bolton's justification for choosing Alyson Roberts over Pannek, primarily that he had worked more closely with her in the past several months and that "[o]ver that course of February and into March [of 2018], [he] didn't think . . . Mark [Pannek]'s knowledge and leadership skills [in vendor management] were as strong as Alyson [Roberts]'s" finds ample support in the record and is non-discriminatory. *See* Doc. 39, PageID 1527

Accordingly, Pannek has failed to meet his burden of demonstrating that U.S. Bank's "stated reason behind its decision to terminate [Pannek] was merely a mask for its true motivation, to wit, retaliation . . . ." *Nascimento*, 2010 WL 3037124 at *14. Nothing in the record creates a genuine issue of fact as to whether U.S. Bank's stated reason for terminating Pannek was its true reason.

ii. Strotman

Strotman alleges that U.S. Bank terminated him in retaliation for protected activity related to complaints about Gemrich. He offers two separate theories: first, that U.S. Bank

terminated him as a third-party reprisal for Pannek's complaint against Gemrich, and second, that U.S. Bank terminated him in retaliation for his participation in the investigation of Gemrich. *See* Doc. 50, PageID 2517–18.[6] The Court addresses each in turn.

      a.   Third-party retaliation

U.S. Bank contends that Strotman cannot offer this theory because he "did not plead any type of associational retaliation claim" and he may not "*de facto* amend his Complaint" in response to U.S. Bank's summary judgment motion. Doc. 54, PageID 2678 n.5. The Court is not persuaded that, in this context, Strotman was required to separately plead third-party reprisal in order to advance this theory at summary judgment. In their complaint filed with this Court, Pannek and Strotman aver that: "Strotman also engaged [in] protected activity under Title VII, including expressing his opposition to Gemrich's harassing behavior, in assisting [Lydia] Buster in filing an HR complaint on [Annette] Tatman's behalf, and in participating in US Bank's internal investigation." Compl. ¶ 50. The first part of this claim— that Strotman was retaliated against for expressing opposition to Gemrich's behavior— adequately encompasses Strotman's assertion in his Response that Bolton "lump[ed] . . . Pannek and Strotman together for termination immediately after Pannek's complaint." Doc. 50, PageID 2518. And as to the validity of third-party-reprisal claims in general, Strotman rightly points out that "in the Title VII context, a third-party reprisal can form the basis of a retaliation claim," and further, "the Court has explicitly declined to identify a fixed class of

---

[6] U.S. Bank's Motion (Doc. 44) takes Strotman to be alleging retaliation for: (1) confronting Gemrich about his mistreatment of employee Tom Markesbery, and (2) participating in U.S. Bank's investigation of Pannek's complaint. Doc. 44, PageID 2126. Strotman does not respond to U.S. Bank's argument regarding (1) and instead offers the theories recited here. Doc. 50, PageID 2517–18. Accordingly, Strotman concedes U.S. Bank's argument that his complaints about Gemrich's treatment of Markesbery do not qualify as protected activity under Title VII.

relationships for which third-party reprisals are unlawful." *Nailon v. Univ. of Cincinnati*, 715 F.App'x 509, 516 (6th Cir. 2017) (citation, internal quotation marks and alteration omitted).

**Prima facie case.** Moving to the substance of Strotman's third-party retaliation claim, much of the analysis above regarding Pannek's retaliation claim applies to this claim. As to causation as an element of the *prima facie* case, the Court concludes, largely for the reasons stated above as to Pannek, that Strotman has adequately made out a *prima facie* case that he was retaliated against for Pannek's complaint against Gemrich. While Bolton formed some opinions about Pannek and Strotman over the course of February and March of 2018, the record evidence indicates he did not come to the view that he intended to terminate them until April 2, 2018, at the earliest. *See* Doc. 49-1, PageID 2438–40. That was shortly after Pannek's complaint about Gemrich. Further, in the April 2 email, Bolton expressly linked Strotman to Pannek's complaint, saying that Pannek and Strotman "are very close and have worked together in the past," he "believe[d] the timing of Mark's COE violation complaint is tied to [the reorganization and threat to his job]," and he "wouldn't be surprised to see Tom take a similar tact.*" Id.* at PageID 2438. In sum, Strotman has met his "minimal burden of a *prima facie* showing" that he was retaliated against for Pannek's complaint. *Nascimento*, 2010 WL 3037124 at *11.

**Legitimate reason and pretext.** Moving to the pretext phase, much of the analysis for Pannek applies to Strotman at this stage as well. Pannek and Strotman raise the same arguments as to pretext in their joint brief, and those arguments fail as to Strotman largely for the reasons explained above. Two points, however, merit further analysis.

First, we consider the argument concerning other open and available risk management positions. Strotman applied to several open risk management positions at U.S. Bank following

his termination, including an open position on Bolton's team. Doc. 50, PageID 2511. He was rejected from those positions without an interview. *Id.* Strotman asserts that the availability of these positions again "calls into question US Bank's claims that this was a position elimination." Doc. 50, PageID 2523. Also relevant, shortly before being terminated Strotman received U.S. Bank's Legends of Possible award, a yearly award given to roughly 1% of U.S. Bank's workforce for outstanding performance. *See* Doc. 39, PageID 1674. Strotman's argument as to pretext is strengthened by both these points: that he *applied* to other U.S. Bank jobs and was rejected without consideration, and also that he was a high performer at U.S. Bank immediately prior to his termination.[7] Ultimately, however, these arguments fail to raise a genuine issue of fact as to whether U.S. Bank's stated reason for Strotman's termination was pretext for unlawful retaliation. The record substantiates U.S. Bank's assertion that despite Strotman being a high performer historically, Bolton developed a negative view of Strotman's ability to succeed under the Bank's reorganized corporate structure. *See, e.g.*, Doc. 49-1, PageID 2440 ("My questions [to Strotman] are very basic and quite frankly at his leadership level he should be providing a well thought out response instead of me having to go through . . . repeated asks and meetings. I don't see him as a strong leader for this organization."); Doc. 39, PageID 1678 (Bolton explaining that Strotman did not have experience he was looking for in collections strategy). While Strotman comes closer than Pannek to raising a genuine issue as to whether U.S. Bank's stated reason for his termination was "insufficient to warrant" termination, he too offers only "disagreement with [U.S. Bank's] assessment of [his] performance" and that disagreement "does not render [U.S.

---

[7] Bolton also received a reference letter from one of Strotman's previous managers, Mike Ryan. *See* Doc. 39, PageID 1675–77. Bolton testified that he would have considered the letter in his decision as to whether to retain Strotman but he would not have given it very much weight as he "relied heavily on [his] own experiences" with Strotman to come to his decision on termination. *Id.* at PageID 1677.

Bank's] [termination] decision pretextual." *Johnson v. Lockheed Martin Corp.*, 598 F.App'x 364, 369 (6th Cir. 2015).

Second, we address questions surrounding Gemrich's input in Bolton's hiring decision. Like for Pannek, Bolton solicited feedback from Gemrich, Strotman's previous manager, while coming to his decision on leadership for the new CBSS organization. The record reflects that Gemrich had a more direct influence on Bolton's decision regarding Strotman than for Pannek. For example, Bolton asked Gemrich directly whether Strotman or another employee, Greg Hovis, should lead change management for CBSS Servicing, and Gemrich recommended Hovis. Doc. 39-1, PageID 1751. Bolton also forwarded to Gemrich correspondence with Strotman about Strotman's team and responsibilities and asked Gemrich to comment. *Id.* at PageID 1752–53. Gemrich made the recommendation of Hovis over Strotman on April 20, 2018, shortly after he was contacted by U.S. Bank human resources personnel to discuss Pannek's complaint. *See id.*; Doc. 40-1, PageID 1933 (identifying April 17, 2018 as date of Laurie Grey's interview with Gemrich regarding Pannek's complaint). Given the timing, it is possible that Gemrich's view of Pannek and Strotman was colored by the recent complaint. Under the circumstances, however, the Court concludes that Bolton considering Gemrich's view of Strotman's performance does not create a triable issue as to whether his termination was pretextual. Here, as in the context of Bolton's assessment of Pannek, considering Gemrich's view was consistent with U.S. Bank's stated, legitimate reason for terminating Strotman and Pannek. Gemrich was Strotman's previous supervisor and a senior officer at the bank at the time, so his feedback was relevant to Bolton's decision-making regarding leadership of the CBSS Servicing unit. Strotman has not raised a

genuine issue as to whether Bolton—the decisionmaker—terminated him in retaliation based on Pannek's complaint.

      b.   Retaliation for participation in U.S. Bank's investigation of Gemrich

**Prima facie case.** Strotman next argues that he was terminated in retaliation for participating in U.S. Bank's investigation of Gemrich. Once again, Strotman meets his burden to establish a prima facie case of unlawful retaliation. The record evidence indicates that no decision regarding Strotman's termination was finalized until late April, which was after Strotman's interview with Laurie Grey as part of the investigation of Pannek's complaint. *See* Doc. 40-1, PageID 1934 (identifying April 19, 2018 as date of Grey's interview with Strotman); Doc. 39-1, PageID 1751 (Gemrich April 20, 2018 message to Bolton indicating Bolton's decisionmaking regarding Strotman was ongoing). U.S. Bank's timing-based causation argument fails; Strotman has made out a prima facie case of retaliation for his participation in the investigation of Gemrich.

**Legitimate reason and pretext.** Strotman's claim fails, however, at the third stage of the *McDonnell Douglas* analysis, for many of the reasons set out above—all of which relate to direct retaliation in similar fashion to third-party retaliation. In addition to those reasons, the Court identifies two additional points relevant to the pretext analysis for this retaliation theory. First, as U.S. Bank stresses, several other employees complained about Gemrich but were not terminated. Doc. 44, PageID 2128. *See* Doc. 42, PageID 1987–89 (Lydia Buster recounting email she sent to HR making a complaint about Gemrich). Second, and just as relevant to the pretext analysis, several employes *did not* complain about Gemrich and *were* terminated. In fact, Buster, an employee within Pannek and Strotman's organization, testified that when the reorganization was taking place in 2018 "it was very apparent . . . that a

consolidation was happening and that there would be jobs that would be eliminated from that." Doc. 42, PageID 1985. Several employees, such as Rhonda Gombold and Matt Kobin, were terminated as a result of the reorganization. These employees, like Pannek and Strotman, were direct reports of Bolton but unlike Pannek and Strotman they did not make any notable complaints about Gemrich. *See* Doc. 39, PageID 1478, 1519–20. To summarize, the context of Strotman's termination supports U.S. Bank's proffered reason for their termination and works against Strotman's claim of pretext. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 726 (6th Cir. 2012) (finding plaintiff failed to show pretext where undisputed evidence showed defendant employer eliminated numerous positions as part of a reduction in force).

### C. Title VII Hostile Work Environment

Pannek and Strotman also brought claims alleging that they were subjected to a hostile work environment due to Gemrich's conduct. Compl. ¶¶ 58–65. U.S. Bank seeks summary judgment on these claims on the grounds that any harassment Pannek and Strotman experienced was not based on sex. Doc. 43, PageID 2023–25. The Bank also argues that any harassment they experienced was not "severe and pervasive," *id.* at PageID 2025–27 (quoting *Handshoe v. Mercy Med. Ctr.*, 34 F.App'x 441, 448 (6th Cir. 2002)), and that U.S. Bank is not responsible for the alleged harassment because it took reasonable efforts to prevent and correct sexually harassing behavior. *Id.* at PageID 2027–29. Pannek and Strotman contend that there are questions of fact relevant to each of these arguments, so none is a basis for granting summary judgment. Doc. 50, PageID 2523–26.

Here again the Court agrees with U.S. Bank. There is no genuine issue of material fact as to whether Pannek and Strotman experienced sex-based harassment actionable under Title

VII. Title VII makes unlawful "discriminat[ion] against any [employee] . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2. Where the form of discrimination alleged is harassment creating a hostile work environment, and the harasser is of the same sex as the plaintiff, there are three primary "ways to demonstrate that the harassment was 'based on' sex: (1) where the harasser is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of [one sex] in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Wade v. Automation Personnel Servs., Inc.*, 612 F.App'x 291, 296–97 (6th Cir. 2015) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998)).

Pannek and Strotman use the third approach, presenting what appears to the Court to be a novel, or at least unusual, theory of sexual harassment: their supervisor discussed his sexual exploits with them because they were men whereas he did not discuss those exploits with women working at the Bank. Doc. 50, PageID 2523–24 ("Gemrich regularly subjected both Plaintiffs to harassing comments regarding his sex life . . . . Contrast that with the lack of any record evidence that Gemrich made those types of comments to women. . . . [T]he record shows that he had a fixation on discussing his sex life with Plaintiffs. . . . Gemrich's conduct toward Plaintiffs was specifically geared toward them because they were both men."). To Plaintiffs' credit, the relevant authority on sexual harassment supports the notion that "gender-selective joking" or sex-based comments made only to members of one sex, can be the basis for a hostile work environment claim. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 566 (6th Cir. 2021) (explaining that evidence of "gender-selective joking" could help defeat summary judgment motion). However, it is also well-established that objectionable

conduct is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The Court concludes that the anti-stereotyping principle endorsed in cases such as *Smith v. City of Salem, Ohio*, 378 F.3d 566, 572 (6th Cir. 2004), and *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), cannot be taken so far as to make actionable under Title VII the kind of sex-differentiated comments at issue here. In a context such as this one, where the alleged harasser makes sexually explicit comments to other men because of perceived fellowship or common interest as men, the audience for those comments—here, Pannek and Strotman—is not being *discriminated against* as men. Arguably they are being treated more favorably by being let it on jokes their female colleagues in the workplace are not.[8] The conduct complained of here falls in the broad category of objectionable and unwise workplace conduct that is outside Title VII's reach.

Additionally, and as a separate basis for granting summary judgment, Pannek and Strotman's assertion that Gemrich's comments about his sex life were "specifically geared toward them because they were both men," Doc. 50, PageID 2524, is not supported by the record. Instead, Pannek testified that he was not directly aware of Gemrich making sexual comments to other U.S. Bank employees but he "would be floored if he didn't make those comments to other people. . . . [Y]ou could just go down the laundry list and ask anybody who still works at U.S. Bank, and they'll tell you the same thing." Doc. 35, PageID 588. *See also* Doc. 40-1, PageID 1954 (notes from investigation of Gemrich stating that he "shares personal information about his dating and sexual encounters"). Pannek and Strotman have

---

[8] For this reason, an employee who complains of such conduct and is terminated in response may be able to pursue a Title VII retaliation theory—thus, why Plaintiffs were able to establish a prima facie case here. *See supra.* The Court concludes only that such comments are not themselves discrimination against Plaintiffs in violation of Title VII.

presented evidence that Gemrich shared information about his sex life with them, but have not offered evidence that he *only* shared this information with men. For this separate reason also, they have not raised a genuine issue of fact on their sex-based harassment claim.

### D. Age Discrimination

The Court turns next to Pannek's age discrimination claim.[9] Pannek, who was 50 years old at the time of the events giving rise to his claims, alleges he was terminated because of his age and replaced by a younger employee. Compl., ¶¶ 69–78. U.S. Bank argues that Pannek's age discrimination claim fails because he was not replaced, since his position was eliminated in the reorganization. Doc. 43, PageID 2029. It further argues that Pannek has failed to raise a genuine issue of fact as to whether U.S. Bank's stated reason for his termination—the corporate reorganization and reduction in force—was pretextual. *Id.* at PageID 2030–31. Pannek contends he *was* replaced by a younger employee—Alyson Roberts—and that U.S. Bank's stated reason for terminating him must be pretextual, because he was more qualified than Roberts. Doc. 50, PageID 2527–28.

The Court agrees with U.S. Bank. Pannek failed to establish a *prima facie* case of age discrimination. In a typical age discrimination case, to establish his prima facie case a plaintiff must show: "(1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was replaced by a person outside of the protected class." *Pio v. Benteler Auto. Corp.*, No. 21-1231, 2022 WL 351772, *3 (6th Cir. 2022) (citation and alterations omitted). In the case of a termination arising from a reduction in force, the Sixth Circuit "has modified the fourth element to require the plaintiff to provide additional direct, circumstantial, or statistical evidence tending to

---

[9] Strotman abandoned his age discrimination claim. Doc. 50, PageID 2489 n.1.

indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* (citation and internal quotation marks omitted).

This is such a case, where "business considerations cause[d] [U.S. Bank] to eliminate one or more positions within the company." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). The record reflects that Pannek's position prior to the reorganization was Vice President Third-Party Risk for Consumer Lending Services. Doc. 50-5, ¶ 9. In that role, Pannek was responsible for ensuring that "third-parties or vendors with whom the bank worked had appropriate controls in place for the bank's protection." *Id.* ¶ 10. Then, in fall 2017, U.S. Bank reorganized Consumer Lending to form the Lending Services group. *Id.* ¶¶ 13–14. In January 2018, the newly-formed Lending Services merged with U.S. Bank's Mortgage Services division to form the CBSS Servicing Group. *Id.* ¶ 17. Prior to the formation of CBSS Servicing, Alyson Roberts led third-party risk/vendor management for Mortgage Servicing, similar to the function Pannek had performed for Lending Services. *Id.* ¶ 21. Accordingly, Bolton set out to identify who would run third-party risk/vendor management for the new organization. He chose Roberts because vendor management was a larger responsibility in Mortgage Services than it had been in Lending Services, Doc. 39, PageID 1526–27, she had a strong track record, *id.* at PageID 1527, and Pannek was more focused on other responsibilities—process improvement work—rather than his vendor management responsibilities. *Id.* at PageID 1528.

To summarize, then, both Pannek's and Roberts's prior positions were eliminated. When U.S. Bank formed CBSS Servicing, Bolton chose between Pannek and Roberts for the combined vendor management position, and selected Roberts. And as earlier noted, several other employees were terminated as part of the merger and reduction in force, when it was

determined that their responsibilities were duplicative within the merged organization irrespective of their ages or whether they had complained about Gemrich's workplace conduct. Accordingly, Pannek was not "replaced" for purposes of the Court's age discrimination analysis—his position was eliminated and he was not selected for a new position.

This conclusion is buttressed by Bolton's testimony regarding Pannek's and Roberts's responsibilities. Bolton testified that his understanding was that Pannek spent only 20% of his time on vendor management responsibilities and 80% of his time on process improvement. Doc. 39, PageID 1527. Thus, the position that Roberts took over for CBSS Servicing was not an exact match for Pannek's position at Lending Services. Rather than Pannek being replaced, his responsibilities were "redistributed among other existing employees already performing related work." *Barnes*, 896 F.2d at 1465.

Having established that this is a reduction in force case, the Court moves to the fourth element of Pannek's prima facie case, where he must provide additional direct, circumstantial, or statistical evidence indicating he was singled out because of his age. He failed to provide such evidence. As to direct evidence, Pannek has adduced no direct evidence of age-based animus on the part of Bolton, the decisionmaker, which is unsurprising given that Bolton is older than Pannek. *See* Doc. 43, PageID 2030. He also has not adduced any statistical evidence. Pannek instead offers circumstantial evidence in the form of comparison to Roberts, and the fact that Bolton allegedly did not follow the Peer Group Analysis (PGA) process. Doc. 50, PageID 2527–28. This kind of comparator evidence does not establish a prima facie case in the reduction-in-force context. *See Pio*, 2022 WL 351772 at *4 ("[C]omparator evidence in the form of a replacement theory argument is inapposite to the fourth prong of

the *McDonnell Douglas* test in the context of a [reduction in force]"). The evidence Pannek offers regarding the PGA process is also not circumstantial evidence that can make Pannek's prima facie case, because it is not evidence Pannek was terminated because of his age. *See Geiger v. Tower Auto.*, 579 F.3d 614, 625 (6th Cir. 2009) (holding that email regarding hiring process that was "undeniably suspicious" was "ultimately irrelevant" because there was no evidence hiring or firing was influenced by age). *See also Metz v. Titanium Metals Corp.*, 475 F.App'x 33, 35–36 (6th Cir. 2012) (holding that purported irregularities in evaluation process were not sufficient to establish prima facie case of age discrimination in context of reduction in force).

Based on the record before us, the Court concludes that Pannek was not replaced by Roberts, but instead Roberts assumed Pannek's duties as part of a wholesale consolidation of two departments at the Bank followed by a reduction in force to avoid the duplication of services. In this context, Pannek must meet a higher burden to establish a prima facie case of discrimination. Offering only comparator evidence and criticism of Bolton's documentation of his employee evaluation process, Pannek has failed to meet that burden.

## IV.    CONCLUSION

For the foregoing reasons, U.S. Bank's Motions for Summary Judgment (Docs. 43, 44) are **GRANTED**. The Clerk is directed to enter judgment for U.S. Bank and terminate this matter from the docket.

**IT IS SO ORDERED.**

August 7, 2025

Jeffery P. Hopkins
United States District Judge